UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:10-cr-00182-RJC-DSC

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| **MICHAEL T. RAND** | ) | |

**THIS MATTER** is before the Court on the defendant's Motion for New Trial Due to Juror Misconduct, (Doc. No. 142), and related pleadings. For the reasons stated below, the motion will be granted.

I.  PROCEDURAL HISTORY

The defendant was charged with alleged manipulation of financial statements of Beazer Homes USA, Inc. and obstruction of federal investigations. (Doc. No. 3: Indictment). According to the Indictment, one scheme involved skirting accounting rules and company policy to inflate revenue figures. (Id. at 2-6). Another involved "cookie jar accounting" where various accounts were falsely inflated or decreased resulting in the dissemination of inaccurate financial information about the company to investors and Wachovia Bank. (Id. at 6-7). The defendant was also charged with destroying records and giving false statements after he was allegedly aware of investigations by a federal grand jury and the Federal Bureau of Investigation. (Id. at 7-13). Finally, the defendant was charged with witness tamping. (Id. at 27).

The defendant proceeded to jury trial on October 11, 2011, and the presentation of evidence concluded on October 24, 2011. The jury began its deliberations on October 25, 2011, and returned its verdict, (Doc. No. 134), on October 28, 2011. The jury found the defendant

guilty on Counts One (conspiracy to commit various securities fraud offenses), Two (mail and wire fraud conspiracy), and Three (securities fraud); not guilty on Counts Four and Five (making false statements to a bank); guilty on Counts Six (obstruction of justice) and Seven (destruction of records); not guilty on Count Eight (misleading to hinder investigation on or about June 15, 2007); guilty of Count Nine (misleading to hinder investigation on June 26, 2007); not guilty on Count Ten (witness tampering); and guilty on Count Eleven (obstruction of official proceeding).

On November 14, 2011, the defendant filed a Motion for Judgment of Acquittal and, in the Alternative, Motion for New Trial. (Doc. No. 138). On December 28, 2011, the defendant filed the instant Motion for New Trial Due to Juror Misconduct alleging that a juror had revealed to a member of the defense team that a printed definition of "reasonable doubt" not provided by the Court was present in the jury deliberation room. (Doc. No. 142 at 1). The Court held an evidentiary hearing on July 17, 2012, at which eleven jurors testified.[1] With the filing of post-hearing briefs, this matter is ripe for disposition.

II.   STATEMENT OF FACTS

   A.   Trial Proceedings

The trial consisted of testimony from approximately twenty-five witnesses and the introduction of over 500 exhibits from the government and the defendant over portions of nine days. The jury deliberated for portions of four days and asked 13 questions. However, it never asked for clarification of the term "reasonable doubt" or reported to the Court that it was deadlocked or otherwise was having difficulty reaching a verdict.

---

[1] Juror Six could not be located by the United States Marshal's Service, (Doc. No. 171: Hr'g Tr. at 99), but had provided declarations to defense counsel, (Doc. No. 142, Attachment 1), and to the government, (Doc. No. 149, Attachment 1).

B. Evidentiary Hearing

The Court held an evidentiary hearing on July 17, 2012, at which eleven jurors testified. (Doc. No. 171: Hr'g Tr.). Juror Six could not be located for the hearing, (Id. at 99), but had provided declarations to the defendant and government, (Doc. No. 142, Attachment 1; Doc. No. 149, Attachment 1). Rule 606(a) of the Federal Rules of Evidence prohibits a juror from testifying

> about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.

The rule contains an exception allowing a juror to testify about whether "extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). The United States Court of Appeals for the Fourth Circuit has described the interplay between the prohibition and the exception this way:

> Thus, although a juror can testify that she consulted an extraneous influence and related her findings to the panel, neither she nor any other juror can testify about any effect the extraneous influence may have had on the verdict or on the jury deliberations.

United States v. Lawson, 677 F.3d 629, 647 (4th Cir. 2012) (internal quotations and citations omitted). Some jurors testified beyond proper bounds of Rule 606;[2] however, the Court will confine its consideration to testimony falling within the "very limited exception," Lawson, 677 at 646.

---

[2] For example, Juror Twelve testified, "I felt more comfortable with making my decision at that point." (Doc. No. 171: Hr'g Tr. at 80).

1. Juror One

The foreperson of the jury, Juror One, testified that they "got through" Count One, or half of Count One, on the first day of deliberation.[3] (Doc. No. 171: Hr'g Tr. at 18). She "check[ed] off" on the "jury sheet" to record their conclusion. (Id. at 12-13). She felt that the jury "had gone through a couple" counts before they saw a definition, but later could not say with certainty that any of the counts were marked because she could not fully remember. (Id. at 13, 18). The jury did not revisit any counts after they came to a final conclusion. (Id. at 13). Juror One testified that two counts after Count One took a long time, and she described the jury as being "stuck," not making much progress, and requiring them to "seriously deliberate." (Id. at 12, 18). She remembered a juror bringing in a piece of paper with a "Googled" definition and reporting to the other jurors what it said on either Wednesday or Thursday, the second or third days of deliberation. (Id. at 12). Juror One could not remember which juror or which legal term was involved, (Id. at 9-10), but she described the paper as regular-sized with an "IP" address printed at the bottom, (Id. at 11-12). Some people, including Juror One, picked it up from the table and looked at it, and went "back and forth about it." (Id.).

2. Juror Two

Juror Two could not recall any juror bringing in outside information during deliberation. (Id. at 22).

3. Juror Three

Juror Three testified that the jury first went through the counts and "figured out what we knew as a collective." (Id. at 34). The "thicker stack that had all the statutes and all the information on it," presumably the indictment, was marked with their decisions and later

---

[3] Count One alleged a conspiracy with four objects. (Doc. No. 3: Indictment at 14). The jury found that each was an object of the conspiracy. (Doc. No. 134: Verdict at 1).

"transcribed," presumably on the verdict form. (Id. at 35). Although the jurors had a final time to agree or disagree on the decisions, none were modified after a definition was brought to their knowledge. (Id.). Juror Three described the deliberations as "difficult," with much data to review from the long trial, but that the paper with the definition did not surface until the jury reached the "rough edges" of the information. (Id. at 32-33). Sometime after the first day, during the middle to late period of deliberation, a juror brought in a definition of reasonable doubt that was circulated to the jury, which Juror Three personally read. (Id. at 29-30, 33). The day before, the jury had reached a "sticking point" on understanding what a reasonable doubt was in relation to the facts before them. (Id. at 29-30). The evening after the jury reached its sticking point, Juror Three also researched the term "reasonable doubt" using Google. (Id. at 29). However, Juror Three did not share what he read with the jury because the circulated definition matched what he had found on the U.S. Courts website.[4] (Id. at 30, 40).

        4.       Juror Four

Juror Four testified that she did not remember any juror bringing in outside material into the deliberation room. (Id. at 48). She reported that the jury discussed what reasonable or unreasonable doubt was and thought the jury sought clarification from the Court. (Id. at 49-50). Upon prompting by the Court, Juror Four responded that "maybe" somebody who did not understand something Googled a term or definition. (Id. at 50-51). She did not look at any instruction not provided by the Court, nor did she see any other juror look at one. (Id. at 50).

---

[4] Juror Three was shown two portions of the U.S. Courts website containing definitions of reasonable doubt. (Doc. No. 171: Hr'g Tr. at 42, 45). Although each appeared similar to what he had read, he could not state with certainty either was a match. (Id. at 43-46).

5. Juror Five

Juror Five testified that he was not aware of any information, other than what was received in the courtroom, being brought into the deliberation room and did not hear any jurors talking about independent research on the term "reasonable doubt." (Id. at 54-55).

6. Juror Six

Juror Six stated that the jury reached verdicts on Counts One through Five after the first two days of deliberation that never changed.[5] (Doc. No. 149: Supplemental Declaration at 1). The jury spent a considerable length of time discussing whether there was reasonable doubt. (Doc. No. 143: Declaration at 1). First thing on Thursday, October 27, 2011, one juror told the group that another juror brought in a piece of paper that contained a definition of reasonable doubt. (Doc. No. 149: Supplemental Declaration at 1). The paper was quickly passed around and placed in the middle of the table; however, Juror Six did not read its contents and did not observe any other juror seriously look at it. (Id. at 1-2). The definition on the piece of paper was never discussed during or outside of the jury's deliberations. (Id. at 2).

7. Juror Seven

Juror Seven testified that he could not recall any jurors bringing in independent research or circulating it to fellow jurors. (Doc. No. 171: Hr'g Tr. at 58).

8. Juror Eight

Juror Eight also testified that he could not recall any jurors bringing in independent research or circulating it to fellow jurors. (Doc. No. 171: Hr'g Tr. at 61).

---

[5] The jury found the defendant guilty of Counts One, Two, and Three, and not guilty of Counts Four and Five. (Doc. No. 134: Verdict at 1-2).

9. Juror Nine

Juror Nine testified that no one talked about any independent research they had done and that no paper or document was circulated or placed on the table. (Id. at 65-66).

10. Juror Ten

Juror Ten likewise testified that no jurors consulted or talked about any information that did not come from the Court and that no outside material was circulated. (Id. at 71-72).

11. Juror Eleven

Juror Eleven testified that no one brought anything in from the outside and that only the Court's information on the concept of "reasonable doubt" was considered by the jury. (Id. at 68-69).

12. Juror Twelve

Juror Twelve admitted that she Googled the definition of "beyond a reasonable doubt," printed it, and brought it into the jury room on a small piece of paper midway through the deliberations, either on Wednesday or Thursday.[6] (Id. at 74-76). The jury had previously decided a number of counts and marked the verdict form as it worked "down the line" to Count Ten, involving witness tampering. (Id. at 81, 83). Juror Twelve was not in agreement on Count Ten and was told she was not being reasonable. (Id. at 77, 80). She looked up the definition to be more comfortable with her decision. (Id. at 94). She may have read it aloud to the other jurors and then placed it on the table in front of her; however, other jurors ignored it, and she did not recall them passing the definition around or discussing it. (Id. at 77-79, 82). The jury decided

---

[6] Juror Twelve could not remember the source or the exact wording of the definition. (Id. at 74-75). She did her research at home and guessed it was on the second night of deliberations, that is Wednesday. (Id. at 80).

7

Count Ten after she brought the piece of paper in, but did not revisit any of the previously decided counts.[7] (Id. at 81-82).

Juror Twelve also admitted that she printed two newspaper articles from the internet after she was selected as a juror, but prior to the time deliberations began.[8] (Id. at 91-93). One article recited the charges the defendant faced and the other was about communities that were affected by foreclosures. (Id. at 92). She did not bring the articles into the jury room or discuss them with other jurors. (Id. at 93-94).

The Court recognizes discrepancies in the details of the jurors' testimony, such as the size of the piece of paper and whether it was read aloud or passed around. Based on the Court's observation of each juror during the hearing, the Court does not find that any intentionally lied about the events during their deliberations. The passage of almost nine months' time understandably eroded their memory of some particular details. Thus, it is not surprising that eight of the twelve jurors did not recall having seen outside material in the deliberation room and that only one juror remembered any discussion about the definition.

III. DISCUSSION

    A.    <u>Mayhue</u> Factors

In determining whether juror misconduct in consulting an internet source for a definition entitles a defendant to a new trial, the government bears the burden to rebut the presumption of prejudice in light of the factors in <u>Mayhue v. St. Francis Hospital of Wichita, Inc.</u>, 969 F.2d 919 (10th Cir. 1992). <u>United States v. Lawson</u>, 677 F.3d 629, 645-646 (4th Cir. 2012). Those factors include:

---

[7] The jury acquitted the defendant of witness tampering in Count Ten, the second to last count. (Doc. No. 134: Verdict at 3).
[8] Juror Twelve could not remember the source of the articles. (Id. at 92).

> (1) The importance of the word or phrase being defined to the resolution of the case.
> (2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.
> (3) The extent to which the jury discussed and emphasized the definition.
> (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.
> (5) Any other factors that relate to a determination of prejudice.

Id. at 646. Thus, the government has a "heavy obligation" to show that "there is no reasonable possibility that the verdict was affected by the external influence." Id. at 651 (internal quotations and citations omitted).

1. The importance of the term "reasonable doubt"

"The government must prove beyond a reasonable doubt every element of a charged offense." Victor v. Nebraska, 511 U.S. 1, 5 (1994). That standard is "an ancient and honored aspect of our criminal justice system" and a requirement of constitutional due process. Id. Thus, the importance of the term "reasonable doubt" is a factor weighing heavily in favor of the defendant.

2. Extent of difference between unauthorized definition and jury instructions

Defining that term is notoriously difficult, and attempts to explain it do not usually make it any clearer. Holland v. United States, 348 U.S. 121, 140 (1954). Therefore, the Court did not define reasonable doubt in its instructions to the jury, consistent with Fourth Circuit law. See United States v. Walton, 207 F.3d 694, 698 (4th Cir. 2000) ("efforts to define reasonable doubt are likely to confuse rather than clarify the concept"). At the evidentiary hearing, two jurors admitted consulting internet sources to find definitions of reasonable doubt. However, neither provided the Court with the specific language read on-line or printed and brought into the jury deliberation room. Thus, this factor weighs in favor of the defendant. Lawson, 677 F.3d at 648

9

(because government bears burden of proof, inability to confirm content of unauthorized definition weighs in favor of defendant).

        3.      Extent to which jury discussed and emphasized definition

Although Juror Six described the presence of the definition as a "non-event," (Doc. No. 149: Supplemental Declaration at 2), Juror One stated one of the jurors Googled a definition, brought it in on a piece of paper, and reported to other jurors what it said. (Doc. No. 171: Hr'g Tr. at 12). She further stated some people, including herself, picked up the paper from the table, looked at it, and went "back and forth" about it. (Id.). Juror Three was one of those who read the definition that was circulated to the jury. (Id. at 29-30, 33). He testified that it matched what he had found on the U.S. Courts website. (Id. at 30, 40). Juror Twelve thought she may have read the definition aloud to the other jurors, but did not remember them passing it around or discussing it. (Id. 77-79, 82). Although it does not appear that the jury extensively discussed the unauthorized definition, several of the jurors were aware of it by reading the printed copy or hearing it read to the group. Therefore, this factor slightly weighs in favor of the defendant.

        4.      Strength of the Evidence and Difficulty Reaching a Verdict

As detailed above, the trial was lengthy with a massive amount of information presented through dozens of witnesses and hundreds of exhibits. The chronology of deliberation described by Juror One shows that the jury "had gone through a couple counts" before the definition was brought in. (Id. at 13). From the testimony of other jurors, it is unclear which counts had been decided, if any. Juror Six remembered that they had decided Counts One through Five after the first two days. (Doc. No. 149: Supplemental Declaration at 1). Juror Three testified that the jury went through the counts and "figured out what they knew as a collective." (Doc. No. 171: Hr'g Tr. at 34). Juror Twelve stated the jury worked "down the line" until Count Ten, about which

she was not in agreement, and, therefore, Googled the term "beyond a reasonable doubt" midway through the deliberations. (Id. at 74-77). Even so, the jury had a final opportunity to agree or disagree with the decisions when the verdict form was marked after the definition was brought in. (Id. at 35).

The jurors also described the deliberations as difficult at certain points. Juror Six stated the jury spent a considerable length of time discussing whether there was reasonable doubt. (Doc. No. 143: Declaration at 1). Juror One described the jury as becoming "stuck" after considering Count One and as requiring serious deliberation. (Doc. No. 171: Hr'g Tr. at 12, 18). Juror Three testified that he did his own internet research and the unauthorized definition was brought in after the jury reached a "sticking point" on reasonable doubt in relation to the facts before them. (Id. at 29-30). Juror Twelve admitted conducting her research after being told she was not being reasonable. (Id. at 80).

Although the evidence on some counts was very strong and the jury never reported being deadlocked, the testimony shows that internet research was conducted and shared with the jury after it reached a particularly difficult time in the deliberations. There was no reported strain between the time the definition was introduced and the final verdict was delivered. Therefore, the Court finds that this factor weighs in favor of the defendant.

     5.     Any other factors that relate to a determination of prejudice

In addition to conducting internet research on reasonable doubt, Juror Twelve admitted she printed two newspaper articles relating to the case and Beazer Homes from the internet after she was selected as a juror, but prior to the time deliberations began.[9] (Id. at 91-93). This same juror stated during voir dire that she heard information about the case through media coverage,

---

[9] The particular articles she read and printed have not been presented by the parties.

11

but affirmed that she could render a verdict solely on the evidence presented in the courtroom.[10] (Doc. No. 172: Trial Tr. at 80-81). She further stated that her family owned a power washing business that had done business with Beazer for many years, but that she could fair and impartial. (Id. at 96-97). Neither party moved to strike the juror, (Id. at 117-118), and she and the other trial jurors were instructed not to conduct independent research about the case.

Jurors are ordinarily presumed to be impartial, Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987), and to have followed a court's instructions, United States v. Chong Lam, 677 F.3d 190, 204 (4th Cir. 2012). However, where a juror demonstrates a willingness to disregard such instructions, a court is "justifiably skeptical" of the juror's ability to follow instructions in the future. Here, Juror Twelve disregarded the Court's instructions at empanelment not to do independent research about the case. Thus, the Court lacks confidence in her ability to follow the instruction to set aside anything she learned outside the courtroom. This circumstance contributes to a finding of prejudice in this case.

## IV. CONCLUSION

As detailed above, the Court finds that each of the Mayhue factors favors the defendant and leads to a determination that the government has not rebutted the presumption of prejudice that arises from a juror's consultation of an internet definition in the circumstances of this case. Lawson, 677 F.3d at 651.

---

[10] Prospective Juror Eleven became Trial Juror Twelve. (Doc. No. 172: Trial Tr. at 77, 142).

**IT IS, THEREFORE, ORDERED** that:

1. the defendant's Motion for New Trial Due to Juror Misconduct, (Doc. No. 142), is **GRANTED**;

2. the defendant's Motion for Judgment of Acquittal and in the Alternative for New Trial, (Doc. No. 138), is **MOOT**; and

**3.** the defendant's Motion for New Trial Based on Newly Discovered Evidence, (Doc. No. 188), is **MOOT.**

**IT IS FURTHER ORDERED** that, pursuant to 18 U.S.C. § 3161(e) this matter is scheduled for the October 7, 2013, term of Court in the Charlotte Division.

Signed: September 6, 2013

Robert J. Conrad, Jr.
United States District Judge