UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:10-CR-182 |
| | ) | |
| vs. | ) | VOLUME IB – AFTERNOON |
| | ) | |
| MICHAEL T. RAND, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
OCTOBER 11, 2011

<u>APPEARANCES</u>:

On Behalf of the Government:

    KURT W. MEYERS, ESQ.
    MARIA KATHLEEN VENTO, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    EDWARD T.M. GARLAND, ESQ.
    DONALD FRANKLIN SAMUEL, ESQ.
    PATRICK SULLIVAN, ESQ.
    Garland, Samuel & Loeb, P.C.
    3151 Maple Drive, N.E.
    Atlanta, Georgia

    JOSHUA PAUL GUNNEMANN, ESQ.
    STEPHEN D. COUNCILL, ESQ.
    Rogers & Hardin, LLP
    229 Peachtree Street, N.E.
    Atlanta, Georgia

    DAVID S. RUDOLF, ESQ.
    Rudolf, Widenhouse & Fialko
    225 East Worthington
    Charlotte, North Carolina

                    CHERYL A. NUCCIO, RMR-CRR

1                            I N D E X

2     GOVERNMENT'S WITNESSES                        PAGE

3     MICHAEL McNEELY
          Direct Examination By Mr. Meyers          70
4
      DEBORAH DANZIG
5         Direct Examination By Ms. Vento           105

6

7                          E X H I B I T S

8     GOVERNMENT'S EXHIBITS

9     NUMBER                                     ADMITTED

10    Stipulated Exhibits ...............................9
      11 ................................................9
11    22 ...............................................10
      24B ..............................................10
12    121 ...............................................9
      125 ..............................................10
13    270 ...............................................9
      515 ..............................................10
14    517 ..............................................10
      623 ..............................................84
15

16

17

18

19

20

21

22

23

24

25

1    TUESDAY AFTERNOON, OCTOBER 11, 2011

2              (Jury not present.)

3              THE COURT:  Good afternoon, everyone.

4              All right.  Before jury selection, the government

5    handed three exhibits to me for my in camera review.

6              And, Mr. Meyers, let me ask you, Exhibits 11, 121,

7    and 270.  Starting with 11, what is the proffer of relevance

8    with respect to Exhibit 11?

9              MR. MEYERS:  Thank you, Your Honor.

10             Exhibit 11 is a document in which the defendant

11   notes to then chief financial officer of Beazer that the FBI

12   is investigating mortgage fraud -- or beginning to pay

13   attention to mortgage fraud.  This is extremely relevant

14   because two or so weeks after he sends that e-mail, he gets

15   word that Beazer is being investigated for, among other

16   things, mortgage fraud.  The defendant then destroys documents

17   related to his own crimes and related to his knowledge of

18   mortgage fraud at Beazer.  And so it's highly relevant to the

19   defendant's intent and his intent and motive to obstruct as

20   charged in the indictment.

21             THE COURT:  What says the defense?

22             MR. SAMUEL:  Your Honor, the reason we flagged this

23   exhibit, this is before the grand jury subpoena so it's not

24   relevant, we believe, to the actual obstructions.  It's a very

25   lengthy e-mail.  It's got a lot of information.  At least my

1   version that I have is 8 pages long, none of which has

2   anything to do with any of the charges in this case or any of

3   the events in this case.  And it is simply Mr. Rand telling

4   the person who is then the CFO, you know, about the FBI's

5   practices.  It has nothing to do with obstruction in this

6   case.  I don't think this e-mail is one that is deleted.  I

7   don't believe it's listed as one that's ever deleted.  So --

8   we just could not figure out exactly what the relevance of

9   this document was.

10          THE COURT:  Don't you have "week of" e-mails similar

11  to this that in kind and also -- as part of the documents that

12  were deleted?

13          MR. MEYERS:  We don't, Your Honor, not of this

14  particular variety.  We have documents the week of indicating

15  the defendant is aware of an FBI investigation.  We don't have

16  anything that indicates the defendant's concerned with the FBI

17  investigating mortgage fraud.  As to the rest of the document,

18  it's only the defendant's e-mail at the very top that the

19  government thinks is relevant.  The rest is necessary for

20  context if at all, but we'd be happy to redact the document

21  below the defendant's e-mail.

22          THE COURT:  I'll overrule defendant's objection to

23  this exhibit as redacted.  I'll let you put in Exhibit 11 with

24  respect to the March 9th statement.

25          MR. SAMUEL:  Actually, that's worse for us actually.

1        THE COURT:  Oh, okay.

2        MR. SAMUEL:  Well, really, because then it just --

3  you can't even tell if he's talking about this investigation

4  or not.  I mean, even though it's a little premature, it's a

5  little early in the year, but now it looks like -- you know,

6  this is just a very general comment by the defendant, you

7  know, in March that when there's a dialogue going back and

8  forth between other employees about certain practices and he's

9  saying, look, you know, don't forget the FBI investigates

10  these kinds of crimes.  What does it show about the

11  defendant's state of mind?  That he simply is aware that the

12  FBI investigates --

13        THE COURT:  I've heard enough argument on it.

14        MR. SAMUEL:  Okay.

15        THE COURT:  I believe that it's relevant to charges

16  in the indictment, including subparagraph 47A dealing with

17  practices that may circumvent the law.  I think it shows

18  knowledge of legal obligations.  And I will deny the

19  defendant's objection to it.  And if the defense would rather

20  have the full 8-page document come in as opposed to the single

21  page, that's fine.  I'm prepared to redact it.  But if -- but

22  if that's worse for the defendant, then it can come in as a

23  single 8-page exhibit.

24        With respect to the other documents, I think they're

25  relevant on their face.  With respect to Exhibit 121, talking

about not telling Deloitte & Touche.  The relevance to

avoiding internal accounting controls, state of mind of the

defendant is obvious to the court.  I'll let the government

admit that.

And then with respect to 270, referencing the number

for a three-year forecast aggressive or realistic, defendant

finishes with a comment about hating to see such e-mail on a

server if subpoenaed.  I think the probative force is readily

apparent there.  We'll overrule the defense objection to that

and permit the government to pursue that introduction of that

exhibit as well.

I've looked at the loss issue which has been briefed

by the parties.  And, Mr. Meyers, I'm not in a position to

rule on this -- that at this time.  I'm talking about the 5

million-dollar loss issue with respect to the loss statements

to a bank.  I know you've cited a case that I actually think

is in some ways distinguishable from the facts of this case

and I'm in the process of looking at some of the other cases

cited in that *Munoz* whatever case.  And so I would instruct

you at this time not to bring -- to mention loss amount, the

Wachovia loss amount in opening statement.

MR. MEYERS:  Yes, sir.

THE COURT:  And when do you anticipate it coming up

in terms of trial evidence?

MR. MEYERS:  We expect it will be a week or more

1 before such witnesses are called.

2         THE COURT: All right. Well, if you would stay away

3 from that subject, the actual loss suffered by the bank in

4 opening statement, and I'll hear you out on that at a later

5 time.

6         MR. MEYERS: Thank you, Your Honor.

7         With regard to the exhibits, I don't know if the

8 court has a preference in terms of how those exhibits are

9 admitted. I think the court has the power under Rule 611 or

10 104 to simply admit the exhibits the court has ruled on or

11 that are otherwise agreed to now outside the presence of the

12 jury. Given the number of them, I would ask that the court

13 consider doing that so as not take up the jury's time of us

14 reading all the exhibit numbers.

15         THE COURT: What says the defendant?

16         MR. SAMUEL: Well, we stipulated to, I don't know,

17 three hundred, four hundred something. I didn't count them

18 all. We have no objection to that. That certainly would save

19 time.

20         Could I bring up another topic? Is that okay?

21         THE COURT: Well, I don't know. We're in the middle

22 of this one.

23         MR. SAMUEL: You're right. We have no problem with

24 the ones we stipulated to, we have no problem. We have a

25 problem with the charts. We have a problem with, quote, the

deleted ones, and a problem with a number that they said they

will introduce through witnesses, but no problems with the

ones that we've stipulated.

THE COURT: So maybe what -- I'll admit all -- is

there a stipulation -- a written stipulation that's in the

record?

MR. MEYERS: There's not -- well, there is a written

stipulation, Your Honor, but it's as to a few elements.

THE COURT: All right.

MR. MEYERS: Wachovia being FDI insured and such.

THE COURT: All right. Any exhibits that are

stipulated to, you can signal that to me in questioning the

witnesses by saying pursuant to a stipulation, I'll show you

what's been admitted as Exhibit --

MR. MEYERS: Thank you, Your Honor.

THE COURT: -- so and so.

MR. SAMUEL: The color coded exhibit, everything

that's white is stipulated to. So you know which they are.

But that's fine.

MR. MEYERS: May we just move to admit the ones in

white now, Your Honor?

THE COURT: Sure. Any objection?

MR. SAMUEL: No.

THE COURT: All right. Yes. They'll be admitted

for purposes of this trial.

1          (Government's Stipulated Exhibits were received into

2    evidence.)

3          MR. MEYERS:  Thank you, Your Honor.

4          We would also move to admit Exhibits 11, 121, and

5    270.

6          THE COURT:  Those will be admitted based upon the

7    ruling of the court.

8          (Government's Exhibits Nos 11, 121, and 270 were

9    received into evidence.)

10         MR. MEYERS:  And, Your Honor, we would move as well

11   to admit Exhibits 22, 24B, 125, 515, and 517 with the

12   exception of the pages that follow those exhibits, namely the

13   meta data.

14         THE COURT:  Any objection to that?

15         MR. SAMUEL:  Other than assuming that it's meta

16   data, we agree.  The original document we agree.  The problem

17   is the duplicate.  Right, we agree to that.

18         THE COURT:  So you're just admitting the original

19   document.

20         MR. MEYERS:  We are, Your Honor.  What the court has

21   that we provided for its JERS system, what's in our system is

22   the original -- the document that looks like you would see

23   printed out normally for an e-mail followed by what -- what

24   the evidence will show to be a printout showing the meta data,

25   when it was deleted off that document.  We will -- we move to

1  admit the first two pages of those exhibits, not publish

2  anything further about those exhibits subject to putting on a

3  witness who will testify as to the nature of that data that

4  follows those exhibits.

5          THE COURT:  Any objection to that?

6          MR. SAMUEL:  That sounds reasonable.

7          THE COURT:  All right.  Those -- the exhibits as

8  described by counsel will be admitted and -- the first part of

9  it absent the disputed amount that would be the subject of a

10  separate ruling by the court at a later time.

11         (Government's Exhibits Nos. 22, 24B, 125, 515, and

12  517 were received into evidence.)

13         MR. MEYERS:  Thank you, Your Honor.

14         MR. SAMUEL:  The topic I wanted to ask you about

15  briefly was my understanding is that in North Carolina and the

16  federal court here, if we're cross examining a government

17  witness with -- and we want to show them a document, show him

18  or her a document, we can do that.  We can have the document

19  identified, but we cannot cross examine the witness and show

20  the document to the jury while we're doing the cross

21  examination, which -- Georgia practice is not like that.

22  Georgia practice, if we tendered the document, it's admitted

23  and the jury sees it.  And I'm wondering does that mean in

24  general you bring every witness back in order to do the cross

25  examination?

1          THE COURT:  Well, these are the kind of things I

2    thought counsel would have worked out prior to coming into

3    court.  You know, the general practice is to admit your

4    documents in your case in chief.  There's been plenty of

5    situations in which for convenience of witnesses and other

6    reasons, there's been a consent to do it in some different

7    fashion.  But I don't -- I don't hear you saying that that's

8    been either the subject of or any agreement to do it

9    differently than the normal practice.

10         MR. SAMUEL:  I'll work on it with Mr. Meyers.  I did

11   talk to him about it a little bit during lunch break and he

12   said that's not the way we do things in North Carolina.  I was

13   hoping there was some leeway and some modification of that.

14         THE COURT:  Yeah, the government's entitled to put

15   on its case in chief, as is the defendant if it wishes to put

16   on a case.  And so our general practice is if you're going to

17   admit exhibits in your case in chief, you do it during that

18   time and -- unless there's a good reason to do it otherwise,

19   which I'll be glad to hear from you at a later time on that.

20   Why don't you -- why don't you all discuss that.  If the court

21   has to step in and make a decision, it will.

22         MR. MEYERS:  Judge, I just want to make clear that

23   we didn't receive the exhibits until Saturday and so we're

24   just not in a position to do that.  Nor did I understand I was

25   being asked to do that.

1          THE COURT:  All right.  Have that conversation

2   outside the presence of the court and if we need to revisit

3   it, we will.

4          Are we ready for the jury at this time?

5          MR. MEYERS:  Yes, Your Honor.

6          MR. SAMUEL:  Yes.

7          THE COURT:  All right.  Call the jury.

8          (Jury entered the courtroom.)

9          THE COURT:  Good afternoon.  Madam Clerk, would you

10  impanel the jury.

11          (All 16 jurors were duly impaneled.)

12          THE COURT:  Members of the jury, now that you've

13  been both sworn and impaneled, I want to give you some

14  preliminary instructions to help your -- to guide your

15  participation in the trial.

16          It will be your duty to find from the evidence what

17  the facts are.  You and you alone will be the judges of the

18  facts.  You will then have to apply to those facts the law as

19  the court will give it to you.  Nothing the court will say or

20  do during the course of the trial is intended to indicate in

21  any way what your verdict should be.

22          The evidence from which you will find the facts will

23  consist of the testimony of witnesses, documents and other

24  things received into the record as exhibits and any facts that

25  the lawyers agree to or stipulate to or that the court may

1  instruct you to find.

2         Certain things are not evidence and shouldn't be

3  considered by you as evidence and they include things like

4  statements, arguments, and questions by the lawyers.

5         Objections to questions are not evidence.  The

6  lawyers have a duty to their clients to object to those things

7  that they believe are improper under the rules of evidence and

8  you should not be influenced by the objections.  If the court

9  sustains the objection, you just ignore the question.  And if

10  the court overrules the objection, then you would treat the

11  answer of the witness like any other answer.

12         And if you are instructed that some item of evidence

13  is received for a limited purpose only, then you must follow

14  that instruction.

15         If there comes a time where the court tells you to

16  exclude any evidence, then you should, of course, follow that

17  instruction.

18         And as I said earlier, anything that you may have

19  seen or heard outside the courtroom is not evidence and must

20  be disregarded.  You are to decide the case solely on the

21  evidence presented here in the courtroom.

22         Now, you as jurors must decide this case based

23  solely on the evidence presented in the courtroom.  And this

24  means that during the trial, you must not conduct any

25  independent research about the case, the matters in the case

1    or any individuals or groups involved in the case until you
2    retire to deliberate.  You also may not discuss the case with
3    anyone, even your fellow jurors.

4           During your deliberations, you must not communicate
5    with or provide any information to anyone outside the jury
6    room by any means about the case.  You may not use any
7    electronic device or media such as a telephone, cell phone,
8    Smart Phone, iPhone, BlackBerry or computer, the internet, any
9    internet service, or any text or instant messaging service or
10   any internet chat room, blog or website, such as Facebook, My
11   Space, Linkedin, You Tube or Twitter.  You can't use any of
12   those technologies to communicate to anyone any information
13   about the case or to conduct any research about the case while
14   you're serving as jurors.

15          Now, as you know, this is a criminal case and I did
16   want to remind you about the principles of criminal
17   prosecution that are essential to our justice system.

18          The first is that the defendant is presumed innocent
19   and that the indictment against the defendant brought by the
20   government is only an accusation.  It is nothing more.  It is
21   not proof of guilt or anything else.  It just notifies the
22   defendant of the charges against him and brings the matter
23   before you for determination.

24          Second, the burden of proof is on the government
25   until the very end of the case.  The defendant has no burden

to prove his innocence or to present evidence or to testify. And since the defendant has the right to remain silent, the law prohibits you from drawing any inference against him if he chooses that right.

And third, the government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later; but bear in mind that in this respect, a criminal case is different from a civil case.

Now, the indictment contains a number of charges that I will briefly summarize now, and at the end of the case I will give you more detailed instructions on the law and the indictment and these instructions will control your deliberation and decision.

But in summary fashion, the indictment charges in count one a conspiracy to commit one or more of the following offenses: Securities fraud; making false statements to auditors and accountants; circumventing internal accounting controls; and falsifying books, records, and accounts.

Count two charges a separate conspiracy to commit wire fraud.

Count three charges the offense of securities fraud.

Count four and five charge false statements to Wachovia Bank. Count four concerning a loan for the West Morehead project and count five regarding a line of credit.

Count six charges obstruction of a grand jury

1  investigation.

2          Count seven charges destruction of records.

3          Count eight charges misleading another person to

4  hinder an FBI investigation which is alleged to have occurred

5  on June 15th, 2007.

6          Count eight charges misleading another person to

7  hinder an FBI investigation which is alleged to have occurred

8  on June 26th, 2007.

9          Count nine charges witness tampering.

10         And count ten charges obstruction of grand jury

11  proceedings.

12         Now, you have heard from me several times that you

13  are the sole judges of the credibility of the witnesses and

14  the weight their testimony deserves.  And while there is no

15  absolute or arbitrary factor or measure by which you determine

16  the truthfulness or untruthfulness of a witness, there are

17  some factors which the court would like to point out at this

18  time that may assist you in your determination of the

19  credibility of the witnesses, and these factors include:

20         Whether the witness has any motive or reason for

21  being truthful or untruthful.

22         The witness's interest, if any, in the outcome of

23  the case.

24         Whether there has appeared from the witness's

25  attitude or conduct any bias, prejudice or feeling which may

1  cause that person's testimony to be influenced.

2        Whether the testimony bears the earmarks of

3  truthfulness.

4        To what extent, if any, it is corroborated or

5  confirmed by other testimony which is not questioned or by

6  known or admitted facts.

7        You may also consider the intelligence and mental

8  capacity of a witness and the witness's opportunity to have

9  accurate knowledge of the matters to which the person

10 testifies.

11       I instruct you again that you may believe all that a

12 witness says, none of it or believe part and disbelieve part.

13       Now, a few words briefly about your conduct as

14 jurors.

15       First, I instruct you that during the trial you're

16 not to discuss the case amongst yourselves or with anyone

17 else, nor should you permit anyone to discuss it with you.

18 Until you retire to the jury room at the end of the case to

19 deliberate on your verdict, you simply are not to talk about

20 the case.  If anyone should try to talk to you about the case,

21 you should bring it to -- this to the court's attention

22 promptly.

23       Second, do not read or listen to anything touching

24 on the case.  Do not do any research or make any investigation

25 about the case on your own.

1    And finally, do not form any opinion until all the
2 evidence is in.  Keep an open mind until you start your
3 deliberations at the end of the case.

4    Now, I notice that some of you are taking notes and
5 that's a proper thing to do; but remember that your notes
6 serve merely as an aid to your memory, not as a substitute for
7 it.

8    The trial is about to begin.  First the government
9 will make an opening statement which is simply a forecast of
10 the evidence.  Then the defendant's attorney may but does not
11 have to make an opening statement.  And as I said earlier,
12 opening statements are neither evidence nor argument.

13    After the opening statements, the government will
14 present its witnesses and counsel for the defendant may cross
15 examine them.  And following the government's case, the
16 defendant may, if he wishes, present witnesses whom the
17 government may cross examine.

18    And after all the evidence is in and I've given you
19 general instructions, the attorneys will present their closing
20 arguments.  And then the court will give you final
21 instructions on the law, and after that you will retire to
22 deliberate on your verdict.

23    So that's the procedure that we will follow from
24 this point forward.  We're now at that point in the trial
25 where the parties have an opportunity to make opening

1  statement.

2          Is the government prepared to go forward?

3          MR. MEYERS:  Yes, Your Honor.

4          THE COURT:  You may do so at this time.

5          MR. MEYERS:  May it please the court:

6          This is a case about greed, lying, and cheating on

7  Wall Street.

8          The defendant, Michael Rand, was the chief

9  accounting officer at Beazer Homes; a once Fortune 500 company

10 traded on the New York Stock Exchange.  As the chief

11 accounting officer for Beazer, the evidence will show that the

12 defendant's job was to tell the truth; to tell the truth about

13 Beazer, the truth that was important to the thousands of

14 investors who depended upon the defendant and others to tell

15 the truth about Beazer's numbers for how they invested their

16 hard earned money.

17         And the evidence will show that in this case,

18 instead of telling the truth, the job the defendant was paid

19 millions over time to do, the defendant chose to lie and to

20 cheat to further his own greed and to climb the corporate

21 ladder even higher than he already was.

22         The evidence will show the defendant was a certified

23 public accountant highly educated, highly trained in

24 accounting, and he knew what the right thing to do was.  Yet

25 the evidence will show the defendant chose to do the wrong

thing.  Time after time he lied when it suited his own
purposes.

Now, this is a case about accounting fraud in part,
and I think I saw a couple of you wince slightly when the
judge said that you might be listening to evidence for weeks
about accounting fraud.  But you'll see that all you're going
to need to do in this case is follow the lies and that's going
to be very easy for you to do.

Beazer was a company that published financial
statements and those financial statements included things like
revenue.  Revenue being the amount of money that Beazer
brought in from selling houses, the money from sales.  And
Beazer had expenses, expenses just like anybody has.  Things
that you pay in order to make money.  And those two items,
along with some other things, affected the earnings or the
profits that Beazer reported every quarter, four times a year.

Now, for those of you who, perhaps like me early on,
are not familiar with those concepts, revenue, expenses,
you'll see and the witnesses will testify that they're no
different from a lemonade stand.  The revenue from a lemonade
stand is simply the money you get in when you hand over the
glass of lemonade.  Twenty-five cents a cup, a dollar a cup,
whatever the going rate is these days.  And the expenses are
what you spend in order to sell that lemonade:  Sugar, lemons,
cups.  And you get your profits by taking the money you take

in minus the money you spend out and that's your profits and
your earnings.

And you'll learn that in this case, that was the
defendant's job:  To tell the truth about those numbers,
revenue and expenses, and he lied about both.  Why?  The
evidence will show that he did it to lie about the earnings,
about the profits for Beazer as its chief accounting officer,
despite his job to tell the truth.

In Beazer's case, the revenue, as I mentioned, is
the sales from homes.  And the expenses aren't lemons.  They
are home construction and land costs.  Home construction being
what you spend to build a house.  Land being what you spend to
buy the land, develop it, put the streets and the lights in.
Those are the numbers that you're going to be hearing about in
this case:  The home costs, the land costs, and the revenue,
and the earnings and profits.

You'll learn the other line item is selling.
General and administrative is the number that makes up the
overhead, if you will, generally speaking, for these houses:
What it costs to employ people, what it costs for printer
paper, what it costs for all the things that makes a company
run.

And you'll learn that in this case the defendant
lied about those numbers.  And you'll learn, witnesses will
testify about why it matters.  Because unlike most lemonade

stands, Beazer was a public company, and that means it was owned by the public. And the reason you'll hear that that matters and why that's relevant to this case and the defendant's duty as the chief financial officer is because the public is not inside Beazer. The public doesn't have access to the file cabinets. The public doesn't have access to the computers. The public who owns the company needs to get information out of Beazer. They can't get it themselves.

And so they are separated from what the revenues, the expenses, the profits by people like the defendant, by the defendant in particular in this case. They are dependent on the defendant to give them true information about what Beazer's profits are. Otherwise, they can't know what the true story is about what Beazer makes, what its profits are. And you'll hear it's not just one owner. There's no public. There are thousands and thousands of owners. And those owners include 401(k) plans, pension plans, mutual funds. All the hard earned money that folks use to invest.

And what you will see in this case is that it also affects in this case the financial statements. The reports about Beazer's profits affect all those who are trying to make decisions about how to invest money. People who don't even own Beazer yet but are considering it. Other owners, investors, pension plans, mutual funds, all making decisions.

And what you'll hear in this case is that that

information four times a year gets published by Beazer and it's certified to be true by the defendant and others. Every quarter he certifies that the revenue, that the expenses, that the profits are truthful. And yet, they weren't. Quarter after quarter, the evidence will show, the defendant lied. And that lie gets disseminated throughout the internet, throughout the SEC, and through folks that you'll meet called analysts. They are professionals on Wall Street who get these financial statements, who read them, who make recommendations about whether to buy the stock or not. What to do with Beazer. And they make recommendations based on this. And they will testify about how that process works.

And the reason that's important here is you'll see the defendant -- the scheme he's charged with is to deceive the public through those analysts, in part. You see, the public has expectations, you'll hear, about what's going to happen with Beazer every quarter. Are they going to do well? Are they going to meet expectations? Are they going to hit the number? The concept you'll hear about is consensus. Is Beazer going to get where everyone who owns it or is thinking about owning it expects it to get or is it going to fall short? You see, there's a report card, a scorecard for companies just like there are for all of us when we were students, just like there are for sports teams. There's a report card, and the defendant lied and cheated to make sure

1  everyone thought Beazer made the grade that it was expected to

2  make.  And you'll see that he did this every time that it's

3  necessary.

4          The scheme he's charged with is called -- or

5  referred to and folks will talk about it is one of securities

6  fraud.  Lying, cheating in order to affect the earnings or the

7  profits of the company.  Lying to auditors in order to make

8  that profit number different.  Lying about the books and

9  records of the company, falsifying them.  And you'll see that

10 by lying about the revenue, lying about the expenses, lying

11 about the earnings and profits, the defendant achieved that

12 goal, that scheme.

13         We're going to talk first and you'll hear about

14 during this trial how the defendant manipulated the home

15 construction and land costs.  How he lied about that number on

16 the financial statements in order to meet Wall Street

17 expectations and to lie to the folks who owned Beazer and who

18 would or consider owning, buying or selling Beazer.

19         The defendant did this by what's known as a cookie

20 jar scheme.  And what that means is that the quarters when

21 Beazer was making more money than defendant thought they

22 needed to in order to meet expectations, you take that money,

23 you lie about it.  You say you spent it on costs.  You say we

24 spent it on costs in order to change that number and you put

25 it away in a cookie jar.  And then when Beazer would otherwise

not make the number, that money is taken back out of the

cookie jar and used to inflate the profits.  Used to make it

look like Beazer is doing better than it really is.

You'll see the way this worked:  Lying about the

profits through lying about home construction and land costs.

Beazer was based in Atlanta but it had offices all over the

country.  That's where it built houses:  Southern California,

Northern California, and Denver, Las Vegas.  These are just a

few of the places, including right here in Charlotte.

And the way Beazer made its money was through

selling houses all throughout the country.  And the way it

should work is each one of those divisions, and you'll meet

many people from these divisions, would report up to defendant

at the end of every quarter their profits.  They would tell

the defendant what their profits were, what their numbers

were.  And the defendant could get in the system in some cases

and see what those numbers were.  They would report those

profits up to the defendant.  And what defendant should have

done is regardless of where the company was going to come out,

truthfully report those numbers regardless of what was needed.

And he would report those on the equivalent of the scoreboard

for this company.  Except here the scoreboard is revenue,

expenses, and earnings.

And what you'll hear from the witnesses is that

everyone's understanding is that being an accountant at a

public company is just like being an umpire.  You make

decisions about what accounting changes to make based upon

what you see in your own independent judgment, whether it's a

ball or a strike.  Even though it is -- it requires judgment

to decide whether a ball is a ball or it's a strike, even

though it requires judgment to determine what the strike zone

is.  What you'll learn is that accountants need to make that

decision independently.  What you don't want an accountant to

do is to look first at the scoreboard, look first at where

they want the score to come out and then make the accounting

decision.  Yet, you'll see that's just what defendant did.

Like the umpire who looks at the scoreboard first, decides

whether his team is going to win and then calls the balls or a

strike.  You'll see the defendant time after time looking at

where Beazer would come out on the scoreboard and then telling

the folks below him what changes they should make.

As I mentioned, when Beazer was doing too well, the

defendant would write down to the people who worked for him,

no, that's too much money.  The divisions will report

1 million dollars too much profit.  You'll see one of the

e-mails that the defendant wrote and exchanged.  You'll see

the defendant wrote, "If you deliver too much EBIT, too much

earnings, I'll spit it back up."

"We may have 5 million dollars to squirrel away.  If

you have any ideas, let me know.  Joavan's cookie jar is too

full."

And "a squirrel that stores up nothing for the winter starves."

This is the kind of dirty talk that you'll see in this case when the defendant knew that Beazer had more money than it needed to meet expectations. And so what would he do? He would tell the divisions it's too much money. We don't need it yet. Lie about it. Hide it. Squirrel it away. Put it in the cookie jar until we're going to need to lie about the number later.

And he would tell them to put it in two primary cookie jars, you're going to hear about: The house cost to complete and the land. Those two numbers that are about expenses. The defendant would tell the divisions, take your excess profits, the profits that we don't need to tell the truth about, we're going to put those away and put them in those cookie jars.

Now, I was always taught that saving is a good thing. And of course, it is. But with a public company, it's not saving when you lie about it. It's not saving when you report it as more expenses than is truthful. That's lying. That's cheating. That's hiding the money.

And so this money was in these accounts waiting, not being evaluated, not being used for the purpose for which it was supposed to be. Instead, it was there in the cookie jar.

1   And then just like the squirrel puts away nuts for the winter,

2   the defendant lied.  When that money was necessary to be taken

3   back in, he'd go to those divisions and say send me the

4   excess.  Send me the money that was away.  And he could use

5   that to increase the expenses and decrease the earnings.  And

6   when the number needed to come in -- excuse me, you have the

7   excess come in and he would decrease the expenses and increase

8   the amount of earnings.  So money that he had put away, that

9   he had hid before, he could then use that money to jack up, to

10  increase, to inflate the earnings and show Beazer to be a

11  healthier, stronger company than it was.  Which would make him

12  look good.  Which would increase his bonus, increase his

13  salary, and give him the opportunity to go up the corporate

14  ladder.

15          So you'll hear about the lies related to the cookie

16  jar scheme.  And you'll also hear the defendant lied about

17  revenue.  Lied about the amount of money that Beazer was

18  bringing in from home sales.  And he did this with regard to

19  Beazer's model home sales.

20          Now, a model home, many of you may be familiar with,

21  is the house in the beginning of the neighborhood, the house

22  that you go into, that you can look at, that advertises the

23  rest of the neighborhood.  You get a sense for what that house

24  is going to be like.

25          But the problem with a model home for a company like

1 Beazer is that the model home doesn't bring in cash or revenue

2 and just sits there on the company's balance sheet because

3 it's not sold for a while.  You need to use it for marketing.

4       And so there was a way to get money from these model

5 homes through what's known as a model home sale leaseback.

6 What you're going to learn is that it worked this way.

7 Namely, Beazer would sell its model homes to investors.  The

8 investor would then provide Beazer with the cash and allow

9 Beazer to recognize revenue and increase the amount of profits

10 it reports for the quarter.  And then Beazer would lease that

11 home back and be able to continue to use it for its marketing

12 and for other purposes like that.  It allows Beazer, in

13 effect, to get cash, recognize revenue and still maintain the

14 house for its ongoing marketing purposes.  So if that works,

15 the investor owns the house and Beazer leases it back.

16       But you'll learn and the evidence will show there

17 was a problem in this case with this.  Beazer wanted to do

18 this and the defendant wanted to do this during that period in

19 time when Beazer wasn't going to meet expectations, when

20 Beazer was going to fall short.  It's during the very same

21 time in or about 2006 when Beazer was dipping into the cookie

22 jar.  And the defendant wanted to recognize this revenue,

23 again, to meet Wall Street expectations and make himself look

24 good.

25       But the problem was is that the investors only

wanted to buy these houses at a discount.  Investors aren't
going to buy these houses and then lease them back at full
price.  They only wanted to pay 92 percent of appraised
values.  And there were folks out in the divisions, out in the
various places that Beazer sold homes that didn't like that
deal.  So the defendant explored an alternative.

Sell these houses for a discount, but then when the
investors sold it to another buyer, could Beazer participate
in the profits?  Could Beazer get some of that money if the
house increased in value and it got sold to another buyer?
The defendant tried this out and he asked Beazer's auditors
about this.  You'll hear the auditors are the folks who work
for Deloitte that you heard about during jury selection and
who have an obligation to make sure Beazer's numbers are being
reported as reasonable.

He asked them can we do this?  Can we sell the
house, get the revenue and yet still participate in some of
the profits when it gets sold again?  And what you'll learn is
that there is some common sense in accounting.  And just like
if you sold a house three years ago, you don't get to drive by
it, see it for sale again and say, oh, great, I'm going to get
some more profits for when the person I sold it to sells to
someone else.  You can't do that in accounting either.

And so what the accountants told the defendant in no
uncertain terms is if you recognize the revenue, if it's a

true sale, you don't get to participate in the profits. You can't do it. You can't have your cake and eat it too. You can't have it both ways. And the defendant, the evidence will show, understood that.

In fact, what you'll see is that Beazer's own accounting manual said when you sell a house, even if it's part of a model sale leaseback, you need to transfer all the risks and rewards of ownership. A sale is a sale is a sale. When you sell a house, you transfer the risk and rewards of ownership. You don't get, when it's sold again, get some of the profits.

The evidence will show the defendant knew this, but he did it anyway. He had his cake and he ate it too. He agreed on the side to share in the profits despite knowing that he could not and he caused Beazer to recognize the revenue. He had the agreement that he showed the auditors and he had the side agreement that he lied about about sharing in the profits. And what that did was it inflated Beazer's revenue and it inflated their profits just at the time when he needed it to make the market think Beazer was meeting expectations.

His question to Deloitte again was may Beazer share in the appreciation? And the answer from the auditors was clear: No, you don't get to recognize the revenue if you don't really sell it. And you're not really selling it if you

maintain a share in the appreciation. No revenue recognition.

And the evidence will show that the defendant understood. He sent e-mails that you will see making it very clear that he's passing on what Deloitte said about this and that they cannot participate in the appreciation. There was no misunderstanding. The defendant knew despite being a highly trained accountant, he had asked about it and it was perfectly clear.

And yet, you will see -- and in conjunction with that you'll see in the master sale and rental agreement, the agreement Deloitte saw, there's nothing in there about sharing in the appreciation. Not a word. Because that was the one that would be inspected. You'll see, however, there was a side agreement. The side agreement was with a company called GMAC Model Home Finance. And they agreed on the side to provide defendant with a share of the profits despite that share not being anywhere in this agreement. And despite defendant telling the auditors, nope, we're not sharing the profits or the appreciation.

You see, GMAC Model Home Finance had an agreement with the investor, the property management agreement. And that agreement that they had with the investors, because it was with the investors, it wasn't going to be subject to inspection by Deloitte, had the provision. It said in paragraph M that you'll see, something called the waterfall

provision. That the investor agreed to share 50 percent of the profits that remained with Beazer. The two agreements just aren't the same and they don't line up. He had a side agreement that he hid and he lied to the auditors and he had the agreement that he put in front of the auditors.

What this did, what this side agreement would have done if known, prevent defendant from recognizing the revenue. And most importantly, prevent the earnings, the profits from being inflated, prevent him from lying about the earnings and the profits.

And you'll see the defendant made very clear that he was all part of the side agreement. He wrote time after time to the folks in the divisions that they would share in the upside; the upside being the appreciation, the amount that the house goes up in value. December 21st, 2005.

December 28, 2005, "We will receive all the ultimate upside."

January 26, 2006, "We receive the upside."

And even later, August 28, 2006, "We significantly share in the appreciation."

Defendant made these assurances to the people who were unhappy about this deal because he knew about the side agreement. He entered into the side agreement and he lied to the auditors, committing fraud. Making Beazer look better than it was just at the time when Beazer needed it.

1    The charges are conspiracy.  As the judge told you,

2    count one, securities fraud:  Lying about stock, Beazer stock.

3    False and misleading statements to auditors and

4    accountants, including the false statement about whether there

5    was a side agreement and whether Beazer would share in the

6    appreciation.

7    Circumventing accounting controls.

8    And falsifying books and records.  Every time the

9    defendant told someone put down a number that's not right, put

10   down a number that you get to after I look at the scoreboard,

11   he created false books and records.  And in a public company

12   that the public depends on, that the 401(k) plans depend on,

13   it matters whether your books and records are truthful.  And

14   defendant lied.  He controlled those books and records and

15   made them false.

16   Count two, wire fraud.  What that means is the

17   defendant agreed to commit fraud with other people and he did

18   so using e-mails, using faxes, using phone calls.

19   Now, you're going to hear from some of these people

20   that did what defendant asked them to do about the accounting.

21   They're going to get up on that witness stand and they're

22   going to testify about it.  And some of them are accountants.

23   The government will make no excuses for those people.  They

24   worked for the defendant.  They did what he told them to do

25   and they shouldn't have.  No excuses.  But in order to

understand the crime, you're going to have to hear from the
people who did what the defendant asked and who participated
in the conspiracy.

You'll also hear the defendant is charged with
making a false statement to a bank, a 35 million dollar
revolving credit facility in order to buy a property and
finance the purchase of property in Charlotte, North Carolina,
right behind Bank of America Stadium on the West Morehead lot.
You'll learn the defendant caused Beazer's false financial
statements to be submitted to Wachovia in order to get that
loan and that he knew those statements were false.

You'll also learn the defendant lied to get a line
of credit involving Wachovia and other banks.  Went back for
years.  What you're seeing on your screen is one of the
documents dated August of 2005, again, submitting false
financial statements from Beazer.  This time to get a 750
million dollar line of credit.

And, ladies and gentlemen, you're going to hear
about the cover up in addition to the crime.  You'll hear that
in March of 2007, the *Charlotte Observer* started running a
series of articles about mortgage fraud at Beazer.  And that
caused the FBI and the grand jury and other agencies to start
an investigation.  And that investigation led as of
March 23rd, 2007, to the issuance of a grand jury subpoena to
Beazer Homes.  And the defendant learned about that shortly

after that subpoena was received.

And what the defendant did after he learned about that investigation, after he learned about that subpoena is he started destroying evidence. He started destroying e-mails, 9,000 of them in one week. The evidence will show the defendant knew well about the investigation. It became highly publicized by that Tuesday, March 27th. The evidence will show the defendant was aware of an article in *BusinessWeek*, that the FBI gave a comment to *BusinessWeek*, which is normally not done, and said they're "looking at all types of potential fraud associated with Beazer - corporate, mortgage, investments." The defendant knew well about the investigation and he knew at the time that that publicity came out that he was sitting in his inbox on evidence of his crimes and of other crimes at Beazer.

So defendant, learning that Beazer would cooperate with the investigation, that that evidence would be turned over, began destroying it.

You'll see that there can be no doubt the defendant knew about the investigation. March 28, 2007, he forwards an e-mail from his boss about the broad criminal probe, about the FBI quote. We'll go over these e-mails in detail.

You'll see the defendant was focused on the FBI. He was joking with a friend of his about the FBI calling his house March 28, 2007. You'll see the defendant reached out

for information from consultants, people who used to work for
the FBI who could tell what the kind of things the FBI does in
investigations of corporations like Beazer, thinking about it,
writing about it. And all the while, destroying documents.
From Friday March 23rd to Friday March 30th, the defendant
deleted over 9,000 e-mails. The evidence will show that the
defendant did it knowing about his crimes.

Now, the company, knowing about the investigation,
hired lawyers to investigate, and hired these lawyers to
determine whether anybody needed to be fired and to provide
information to the government that was requested. And these
lawyers came across evidence of defendant's fraud and started
asking him about it. And during one of the breaks in June,
months after the defendant destroyed documents, they asked the
defendant the million dollar question. And they told him
before they asked him this question at the beginning of the
interview that any information he provided would be turned
over to the FBI, to the U.S. Attorney's Office. And so they
asked him: Did you delete any e-mails? Knowing that he had,
knowing he had destroyed over 9,000, knowing that the
information could be provided to the Department of Justice,
the defendant answered, No, I didn't.

And you'll hear about a second interview. After
these investigators learned that he had deleted e-mails, they
confronted him again and asked him, Mr. Rand, did you delete

any documents?  He at first denied it.  And then he admitted
only a couple.  And he changed his story over and over and
over again.  Finally, after being confronted, admitting that
he had deleted some but never telling the whole truth.  And
then he told some big whoppers.

The defendant said that he may have deleted some
e-mails, but only learned about the investigation late Friday
evening.  He said this when he was confronted and told,
listen, whatever you tell us, we're under investigation here,
we're going to give that information to the U.S. Attorney's
Office, to the FBI, and defendant said, I didn't even know
about that investigation until Friday evening.  And the
evidence that you will see is that he was e-mailing about the
FBI investigation, talking about it, focused on it well before
Friday.  He lied because he had a guilty conscience.  He lied
because he knew that if he told the truth, he was in big
trouble.

You'll even hear that the defendant went down the
hall Friday afternoon between 4:09 p.m. and 4:19 p.m. to a
lawyer in Beazer's office and asked her words to the effect
of, I know you're telling folks to keep documents and not
destroy them, does that apply to me?  Of course, he had been
deleting documents all along knowing the FBI was
investigating.  She said, Yeah, it applies to you.  And she
made clear to him that he was to destroy nothing.  Yet, the

1  defendant, after having that conversation, went back to his
2  office and after 4:19 p.m. destroyed thousands more documents
3  because of his guilty mind.  Because he knew what he did and
4  because he knew how much trouble he would be in if the
5  investigation focused on him.
6      Ladies and gentlemen, we ask that you listen
7  carefully to all the evidence.  We ask you to return a verdict
8  of guilty on all counts at the end of the case.
9      THE COURT:  Mr. Garland, you can go when you're
10  ready.  But does the government want to remove the tripod
11  unless Mr. Garland is going to use it.
12      MR. GARLAND:  We're going to share that, Your Honor.
13      THE COURT:  Oh, okay.
14      MR. GARLAND:  Thank you.
15      Jurors, good afternoon.
16      You were just told that Mr. Rand when confronted
17  with a question said he had allegedly said he had just learned
18  of the investigation.  You're going to find out that that
19  claim by the government is not true.
20      And you're going to find out that the claim about
21  deleting e-mails that have been made here are incorrect and
22  not true.
23      The government has operated on a number of false
24  ideas that created the thought process that Mike Rand was
25  deleting documents and hiding something.  So I want to start

by talking to you about the deletions.

He is not guilty of those charges because the deletion of the e-mails he made was totally legal and not against the law and with no intent to hinder a grand jury investigation.

Now, you're going to learn something very interesting and that is that you had this mortgage fraud investigation that started up in Charlotte. And let me be clear. Mr. Rand was not involved in the mortgage business. Beazer had a subsidiary company and Beazer had a division that dealt with mortgages not only here, but around the country.

So the investigation starts with a mortgage investigation. And at Beazer there was an assistant counsel named Danzig who had -- part of her job was being responsible for the issues related to mortgages that had been popping up around the country. And when this investigation came up, she obviously was concerned about her role in what had gone on.

Now, she had a husband that worked at the U.S. Attorney's Office in Atlanta. And Mr. Brown, we'll hear about in a minute, had worked at the U.S. Attorney's Office and they were friends on a social basis. So when this problem came up and Beazer was facing problems about its mortgages, Mike Brown, who had been a drug prosecutor in Miami and then Atlanta with her husband, was her social friend. Had moved into a huge law firm that's nationwide and international

1  called Alston & Bird in Atlanta and he was there.  And she

2  called him and he came over and was hired to represent the

3  company and started being paid money.  And the objective was

4  to prevent Beazer from being charged with mortgage fraud.  And

5  of course, if that happened, it would look bad for her and her

6  area.  And they started a series of press releases responding

7  to the articles in the Charlotte paper.

8       Well, what happens there is that Mr. Brown, who's a

9  very assertive, aggressive prosecutor, starts communicating

10  with the government.  Oh, don't come take our records.  They

11  were about to serve a search warrant.  I'll handle everything.

12  I'll investigate it for the government.  And he gets himself

13  hired by what's called the audit committee.  And this

14  investigation produces for the investigator millions and

15  millions of dollars.

16       Now, that same investigator, guess what?  Becomes

17  one of the witnesses you'll hear in a few days.  Now, he was

18  the lawyer being paid money, and he then becomes the

19  investigator and is paid millions and millions of dollars

20  doing the investigation for the government.

21       The result at the end of it is, and you're going to

22  hear details about it, is that an investigation develops about

23  e-mails and deleting e-mails.  The deletion of e-mails had

24  been a nonevent back when the subpoena came out.

25       You'll learn that Beazer had operations all around

the country. And this whole business operated a great deal on e-mails. So this mortgage investigation starts up here in Charlotte and Brown comes in. And the first thing the company does, Danzig and Brown and the officers of the company, the president who serves on the board of directors -- my client is an employee. Not one of the people that ran the company, not the person that made the decisions. Well, what happens is they send out a group of press releases saying, in essence, this is no big deal.

So to understand this case, you have to understand a little bit about Mike Rand. Mike Rand has an unblemished record. Never been accused of anything wrong. A person of good character and hard working. Gone to the University of Virginia School of Commerce. Worked 12 years at Peat Marwick, a fine accounting firm, doing auditing. And then went to work for Beazer down in their accounting department. He was a workaholic. Kind of a sports addict. His interest in life was working on making this very complex accounting that involved the whole United States better, more correct, putting in computer systems. And literally, starting in 1998 and forward, created the policies, wrote up the manuals, put in all kind of systems to make the reporting better and better and better and better.

So now this mortgage investigation is going on and Brown and Danzig -- it's unusual that the man who is the --

being paid to defend also becomes paid to investigate and now
we're being accused of a crime because he is saying that we
didn't tell him the truth.  And the claim in the indictment is
that my client said he never deleted an e-mail.  This
stretches credulity, and you'll find out why.

So here's Mike Rand, a man who's gotten married.
Had twins.  Working 18 hour days.  And he has an office in
what's known as the corporate headquarters.  Corporate
headquarters has around a hundred or so people that work
there.  That's where the president of the company is.  That's
where the legal staff is.  There's seven lawyers or so on the
legal staff.  I forget exactly how many on the legal staff.
They're right down the hall from him.

So they start putting out information and
essentially the information says this -- well, there are two
things they do.  They first start saying, okay, we'll send out
what's known as a hold notice.  Hold your documents.  Hold
your e-mails.  Don't delete any e-mails.  This is drawn up by
Mr. Brown and Danzig.  They do not -- they send it just to
mortgage people in Charlotte.

Then they say -- this is starting on the 23rd of
March 2007.  They put out at the same time they're doing that,
they -- in a day or two send it to a few more people saying --
that are all in the mortgage company, three or four more.
Then they send this notice that says don't delete e-mails to

vice presidents around these divisions.

Never -- they don't send it to Mike Rand.  He's in the corporate office.  For one week the information they are putting out is we dispute these allegations and based on an internal review to date have found no evidence to support them.  The *Charlotte Observer* claimed above average foreclosure rates in certain communities due to Beazer's qualification of home buyers.  Then they issued this press release and this is what is being sent around back to our client who's sitting in there working on the numbers.

"We have been in contact with the U.S. Attorney's Office which directs federal investigations and at this time there have been no allegations of any wrongdoing.  We have received from the United States Attorney's Office a request for documents generally related to our mortgage business."

And there had been a subpoena and the subpoena was in the news and it was all about the mortgage business.  And they send out repeated press releases up to and including March 28th and 29th repeating the same thing.  They were putting out the message:  This is no big deal.  Don't be worried about it.

But they continued to send out this hold notice to people.  They sent ten different ones out.  And finally, on March the 30th, 2007, at 4:19 p.m., it gets sent to the corporate group.  So the people guiding the hold notices

1  finally send one to Mike Rand.

2          Now, that was referred to by the prosecution, but

3  what wasn't told you is that he didn't open it until 4:25.

4  Six minutes.  And there's a complaint that after he was sent

5  the hold notice, that there were deletions during that time,

6  the six minutes.  There's also a complaint about deletions

7  that had occurred from the 23rd to now.  But you need a little

8  more background to understand how this case got pointed at

9  making e-mail deletions into an alleged crime and not into a

10  mortgage case.  So here's some things that you need to know.

11          Beazer had a record retention policy all across the

12  company.  There was a policy you keep records until they're

13  not needed.

14          Secondly, they had a backup system that every week

15  all the e-mails on the computer would be backed up.  And if an

16  e-mail had any age on it at all, it would never be destroyed.

17  It would never be deleted.  It would be on the backup system.

18  And if after it's backed up you deleted it, it would still be

19  there.

20          Mike Rand was the man in charge of seeing that that

21  was done under the regulations, Homeland Security and other

22  things where you don't lose all this data.  And he knew that.

23          But there's something else you need to know about

24  this deletion case.  Mike Rand had the habit of accumulating

25  thousands of e-mails on his computer.  He had received over

500,000 on to his computer from all over the country. There
were 120 different accounting people at different times more
or less sending information up to a central accounting office
where he had become the head guy to put the financial
statement together.

The company in 2005, the company came along and
said, Mr. Rand, you are overloading our server. We want you
to clean out e-mails. E-mails to him would often have massive
attachments of accounting data. Loads of it. So the process
of him deleting, when he would start deleting, it would take a
long time. But he set out at the direction of the company to
reduce his number of e-mails. And he started reducing them.
He had a method of reducing them, and that was to put the name
of the person in and then call up all of the e-mails and hit
the delete button and it would sit there and grind out this
deletion. And he managed to get his e-mails down from maybe
200,000 down to 130,000.

The problem was the company was still growing. The
e-mail traffic was still coming in so the lake of e-mails
would fill up as fast as he could bring it down. And that was
his pattern and that's what he was doing just like the company
had directed him to do and he'd been told to do. And he'd
been kidded about it and chided about it.

So from time to time he would try to do some
deletion, and he would start with people who had left the

1   company or were no longer there and just put their name in.

2   So that's what he was doing.  And that's what he was doing

3   when the company was saying this is no big deal and putting

4   out these releases.

5        Now, obviously, he had heard about it, but he wasn't

6   given the subpoena.  He wasn't served the subpoena.  And he

7   wasn't given one of these hold notices.  So obviously, the

8   thinking in the legal department and among Brown and Danzig

9   and Ian McCarthy, the CEO, served on the board, and the senior

10   legal counsel was, well, here are the people we need to tell

11   not to delete e-mails, and it didn't include Mike Rand.

12        Now, you're going to hear testimony that, well,

13   people got excited when the subpoena came out.  And it's true.

14   Mike Brown -- I mean, Mike Rand knew the subpoena had come

15   out.  And Mr. Brown was running up and down the hall drawing

16   up these press releases, working on these don't delete things.

17   No one, not a person in the legal department, not Mr. Brown,

18   not the -- any other person walked in and said right down the

19   hall, don't delete any e-mails.  So they obviously concluded

20   that there was no reason to have corporate not continue to

21   delete e-mails.

22        But that's when things kind of get funny here.  Rand

23   has deleted e-mails before the subpoena comes out and after

24   the subpoena comes out.  Now, it's not the number of e-mails

25   that the government just said.  They're wrong about that.

They've got a lot of their facts wrong. But let me tell you what started it. 4:19 Ms. Danzig is sending out the e-mail to corporate. She sends that e-mail out.

Mr. Rand is in his office and he is deleting e-mails. Those e-mails have nothing to do with mortgage investigation. Nothing to do with these accounting claims that he is deleting during a six-minute period. Those e-mails deal with his kids' sports team, ads by Fidelity Mortgage and a woman's e-mail who was a treasurer that none of her information was in any way conceivably anything wrong with it named Cory Boydston. And her e-mails say reply that you've received this e-mail. Well, Mike, didn't read her e-mails, a lot of them. So he sent them back unread showing that he had deleted them.

Well, Ms. Boydston had received the 4:19 e-mail which said don't delete e-mails. She got included on that. And immediately she's receiving these notices from Mike who hasn't opened his e-mail. The record will show it was opened at 4:25. She runs into his office, says, What are you doing? There's a hold notice. Mike stops, opens the hold notice, and doesn't delete after that except a couple of Viagra, just totally junk mail and that was the end of it.

Now, at that time there's a report of this by Ms. Boydston to Ms. Danzig and it's a nonissue. It was a nonissue.

1    Now, things progress forward and it gets over to

2 June 21st, some three months later.  And Ms. Danzig, according

3 to Mr. Brown, Ms. Danzig tells Mr. Brown, Oh, Mr. Rand has

4 said that he had deleted some things.  And they go look at the

5 records.  They have these computer experts they paid millions

6 of dollars too.  And they go look at the records and they pull

7 up the records and they conclude that Mike Rand has been

8 deleting e-mails till 8:00 that night.  Here they've got

9 evidence.  Sent him the e-mail at 4:19 and he's deleting at

10 9:00 at night.  They take that to the board of directors and

11 he's fired.  Well, guess what?  These multi-million dollar

12 experts forgot to correct for Greenwich Mean Time, because

13 computer dates are tied to Greenwich Mean Time.  And that

14 means that he stopped his deletions just like I've told you:

15 At 4:25.

16    Now, they had fired him based on false information

17 with no hearing or anything.  Based on their wrong

18 information.

19    And they got other wrong information.  The other

20 wrong information was Ms. Danzig saying, Look, he popped into

21 my office and said does that apply to me.  I said yes.  Of

22 course, they think.  They haven't checked things.  They think

23 he goes and deletes after he -- she's remembering this now two

24 and a half months later, June 21st and 22nd, this nonissue.

25 She's then interviewed by Brown and says, Oh, yeah, I remember

it was before I sent him the notice that he popped in there, right before, because I said I had my hand on the button.

Well, when they are interviewing her, she is just looking at the hold notice she sends at 4:19. Two and a half months later she's reconstructing what she had been doing in this period back when they were churning out all these hold notices. And she doesn't have before her the hold notice she sent out at 5:58 and the hold notice she sent out at 7:27. So she's thinking back and knows she has some conversation with Mike Rand and places it before the 4:19.

But had her memory been refreshed and had she been presented with her other hold notices, and had they not been operating on false information which they were now turning this thing against Mike Rand, making him a scapegoat and taking the barrel of the gun away from the mortgage business, now they had something to make a claim about.

They go back and they check the e-mails he deleted during that week when he wasn't told not to delete e-mails and they find, yes, there's some deletions. But it's not the deletions, it's not all what they think it is.

So that's how this ball gets rolling to make a deletion case, and to make a deletion case where the claim is that a man whose life is all about e-mails, who has been told by his company start deleting e-mails -- oh, and I left out something really important.

1    About a week or two after this event when he gets

2  put under the hold notice, he goes down to the corporate

3  lawyers and said, Oh, by the way, I deleted some e-mails.

4  This is back in March, the first of April.  It was March 30th

5  when he's told not to delete.  Before Mr. Brown ever hears

6  that there's been some deletions, he's gone down to the

7  lawyers and said, by the way, I was deleting before I got the

8  hold notice.  When I got the hold notice, I stopped.

9    And this charge here says, according to Mr. Brown,

10 that when he was interviewed over in June, he looked at an

11 investigator and said, I never deleted e-mails.  That gets

12 reported to the government.  They buy into it and you've got

13 this charge here.

14    It's -- and so what's happened is an e-mail, which

15 is perfectly legal to delete, has now been converted into a

16 federal crime on the theory that when Mr. Brown supposedly got

17 this information, he was working as the agent for the

18 government and he then says to the government up here, well,

19 Rand said so and so.  He said he never deleted any e-mails.

20 The evidence will show you that no one who lived on e-mails,

21 who had reported deleting e-mails, who had been counseled to

22 get rid of e-mails would make such a statement as that.  But

23 that is the story -- what's in the indictment says he said he

24 never deleted e-mails.

25    So now, that -- that's what happened there.  So

these hold notices were evolving out into the Beazer organization. Mike Rand wasn't subject to it. Didn't do anything to be turned into a crime. But now, the interesting thing is the noncrime of deleting e-mails has been turned into a second crime. So he's indicted for having deleted and now he's delighted -- indicted for what he said to Brown. So your main witnesses here are Brown and Danzig on this supposed obstruction of justice and the theory that somehow what Rand says to Brown, the hired investigator, somehow obstructed justice or was an attempt to obstruct justice up here where they have a mortgage investigation. And the evidence simply will not support such an idea as that. And when you look at the e-mails and when you find out that he opened that e-mail at 4:25, you will realize that what her claim is, that I told him and then he went in his office and deleted e-mails, is not true.

Now, when Brown is interviewing Rand, he's operating on all this false information. He thinks that there's been deletions that haven't been. At times there haven't been. And it's a tough, hostile interrogation that he goes through and it gets to be heated. And they start going into how the accounting systems work. And those meetings starting on the 15th of June, Rand sits down 11 different times and talks to them about what he did, what his accounting processes were, how he handled the accounting, the reserves, the things that

1   we'll talk about in a minute.  And during those conversations

2   supposedly he lies about earnings management.  He described

3   his view of what the proper accounting was.  Basically, his

4   view of proper accounting is that the financial statement

5   states the true financial condition of the company.  That's

6   his duty.  And I'm going to explain to you how difficult that

7   is in this kind of case.

8           It's not a lemonade stand.  It's a construction

9   business scattered all over America.  And if you'll notice

10  here, during the time period that he's being accused of not

11  getting the right number, this company was booming.  Y'all

12  know the economy boomed from 2000 to 2006 or 7 in

13  construction.  We'd have to hide from the newspapers if we

14  didn't know the collapse that occurred in the real estate

15  market.  But they built almost a hundred thousand homes in

16  1,492 subdivisions.  And they had increasing real profits.

17  And those real profits, every 90 days Mr. Rand had to get the

18  information from everywhere on all of the uncertainties that

19  make up this accounting.

20          Now, what he did do was he developed sophisticated

21  monitoring systems.  He put in software and computers that

22  would allow him to monitor, look at history, look at

23  performance because when all this stuff came in to him, he had

24  to make a judgment about what kind of reserves this whole

25  company needed.

But before I leave and get into the accounting attack on Mr. Rand's methodology, I want to say that in connection with his conversations with Mr. Brown, he didn't lie to Mr. Brown. He did say to Mr. Brown he had not destroyed e-mails because he knew they weren't destroyed.

Now, those interviews that he's being prosecuted on, this multi-million dollar law firm, multi-million dollar fees, they didn't tape record any of it. They had somebody there taking some notes who wrote up a memo about it, that person's impressions of what was said. Half of it three days later. And the part about the deletions, well, the note taker wasn't present during that alleged conversation. She had left. And that was just where Mr. Brown passed on this information, and so now we're indicted for deleting e-mails and supposedly lying to Mr. Brown.

What Mr. Brown did was turn this investigation into millions and millions of dollars where he carried it out and they got after Mr. Rand about his methodology of keeping up with his accounting.

So as to all of these obstructions and misleading, he is not guilty of those charges, but those charges are convenient because it allows a claim to be made that inflames a jury about a case on the accounting that doesn't hold water.

One other piece of that case is supposedly Mr. Rand has a conversation with somebody and asked him a question or

two and asked him about some history.  They said, well, he was
trying to get that man to perhaps not say the truth.  But
there's nothing to that.  That's the same part of it.

        So let me turn now to a focus on this accounting.
You'll have a couple of questions to be answered.  One is were
these financial statements a correct statement at the time
they were filed of the true economic condition of the company?
And the true economic condition of the complex enterprise like
this is quite an undertaking.  If you were the accounting
officer and you gain information and you believe that reserves
are needed -- now, I want you to understand what they're
saying here.  They're saying Mr. Rand for six years where this
company is booming and growing is being too conservative for
those years.  This is not a case where they're saying he was
going up as companies have done and inflating their earnings.
Saying he was not doing that.  He was taking reserves on a
theory that from 2000 to 2006, that somehow he looked out into
the future and knew there would be a catastrophe.

        Let me show you a few more things.  When you're
talking about keeping up with the accounting on the
development of a subdivision and the building of houses, you
have uncertain areas.

        And I want to back up just a second.  I said there
were two questions.  One, were the financial statements a true
statement?  And the second question was did Mike Rand intend

1　them to be true statements of the economic condition?  And the

2　answer to those is yes.  They were correct financial

3　statements and they did state the true economic condition of

4　beaver -- Beazer.

5　　　　　And the government will not show you that they

6　didn't state it correctly and they won't show you what the

7　alleged correct figure is.  What they're saying is, well, you

8　got there by the wrong method.  We don't like the way you went

9　about it.  But they're not going to prove to you that those

10　financial statements weren't true and correct.  They have a

11　theory about his methodology.

12　　　　　Now, this is up here because these are the type of

13　things that when you are building a subdivision, you're going

14　to have as costs.

15　　　　　Let's say you've started the first few houses in the

16　subdivision, but you've got the bulldozers out there.  You've

17　got streets being put in.  You've got more and more houses

18　being built and you have some selling.  And then you have

19　warranty reserves and you have -- and you're estimating costs

20　and you're estimating costs in an inflationary economy and in

21　a litigious society.  You have all of these things when you're

22　developing a subdivision and a house that can be future costs.

23　　　　　So what do you do?  You have reserves.  And those

24　reserves wind up on a financial statement.  And we are saying

25　that the evidence will show that those financial statements

1   filed every 90 days -- that's, I think, 30 of them -- were

2   correct. And that what was put in there for reserves was what

3   you had to put in. You had to put a range for a number. And

4   I'm going to talk about range in just -- just a minute.

5           So estimates or reserves are speculation. Done in

6   all of these different divisions as to what the particular

7   situation is. They are guess work about what's going to

8   happen. So where you have so many uncertain numbers, you try

9   to develop formulas and approaches as to how you will do it.

10   And that's what Mike did. And he did it at a very high level.

11   And he was in a position to know which people were being too

12   aggressive, which people were being too conservative, which

13   people were incompetent, which people you couldn't rely on

14   their numbers. You could look back at the trends and see what

15   had happened. And he would make a judgment and say here's the

16   number. And his judgment is being Saturday -- Monday morning

17   quarterbacked, looking back and picking over seven years of

18   his work.

19           Now, this chart shows you from 2000 when this case

20   is about to 2006 how the profit just went up. Start off

21   making 43 million in a year and wind up making $388 million.

22   Remember what I said. They're saying he -- he had some

23   reserves and he shouldn't have taken those reserves. They

24   were too much to reserve. But this is a booming company.

25           Not only is it booming and is the income going up,

1  it gets up into the billion dollars, 1,300,000,000, and has a

2  791 percent increase.  What happens when you grow too big too

3  fast?  And think about the accounting for construction is a

4  world unto itself.  Thirty-four divisions.  They're building

5  all these homes.  Every -- all you have to do is take human

6  experience when you try to get what's it going to cost to

7  build this and then you find out what your bill is.  It's an

8  estimate.  It doesn't turn out that way.

9           So that's the kind of growth that is going on.  And

10 he's trying to keep up with it and put systems in place to

11 keep up with all the fallout from that kind of dramatic

12 growth.

13          Here's how the employees grew.  Every employee is an

14 accounting entry, but they start out here with 1600 during

15 this time, and this company is creating jobs and it's being

16 managed conservatively in terms of how much money are we going

17 to put aside.  It's not true that it was a cookie jar.  Cookie

18 jar, you just take them over there and leave it, right?  But

19 as these subdivisions grew -- I mean closed, the reserves

20 would be brought back in.  But then the business was growing.

21 There would be new subdivisions, new reserves and it would

22 just float in and out.

23          So this is what happened to the growth of employees.

24 It was phenomenal.  But a great deal of stress on how you keep

25 up with -- well, if you just -- we went back to this one where

1  I -- these are all these things that you have to keep up with.

2  Multiplying that times almost a hundred thousand homes and

3  developments.  And you'd better be conservative and you better

4  be careful because all kind of problems can go to pieces on

5  you and then you bust your budget if you hadn't had enough

6  reserves.  So he was looking at it from a hundred thousand

7  feet trying to make it right.

8  So in talking about reserves, you have to do an

9  estimate.  And he had to be kind of like the weather man.  He

10  says, well, I think the range of what the expense may be is

11  like the weather man says, it's 25 to 40 percent chance it may

12  rain.  He might say on the news 30 percent chance of rain or

13  35 percent chance of rain.  Whatever between those two numbers

14  he says is a right number.  So establishing a range is the way

15  the construction worked.

16  If you took your car into a friend who worked on

17  your car and said will you do the repair and your friend says

18  to you, well, I won't really know what it's going to cost

19  until I get in there.  He says, but it will probably be

20  somewhere between two hundred and three hundred dollars.  You

21  go back home tonight and you are required to come up with a

22  number as to what it's going to cost you.  You have to pick a

23  number.  You can pick a number anywhere between two hundred

24  and three hundred and it will be a right number because you

25  figured out what the range is.

1          That's what he was having to do.  He was having to

2   figure out for this company all over the country what the

3   range was and where the number should land to be conservative

4   and not be outside of a reasonable range.  And so the rule is

5   you got to place the number within a reasonable range.  So if

6   you had -- just imagine a target and here is the bulls eye.

7   You fire into this range.  If you hit here or here or here or

8   here or here, you've hit the bulls eye.  You get the ten

9   points.  And if you are in a reasonable range, your numbers

10  are correct.

11         Mike's financial statements always hit the bulls eye

12  and were in a reasonable range.  Sometimes he might move it

13  from here to here for a whole variety of reasons.  Sometimes

14  because he was asked by his boss can you make it a little

15  closer to this or that.  And he'd go back and look at the

16  numbers, look at everything and say is there a reasonable

17  range?  Am I in the reasonable range?  And every time he was

18  and there will be no proof that he wasn't.  But his work for

19  six years has been picked over to the point that what the real

20  true economic condition of the company was has been lost.

21         Now, this shows you how when the company was

22  growing, the reserves were growing.  And shows the total

23  assets.  Well, the assets were going way up and these reserves

24  were much less as a percentage of anything.  So it gets down

25  to where it's not -- these reserves we're talking about are

1  not that significant.

2        I'll just -- this shows you -- this is the first

3  year.  The reserves that are being contested here, here's the

4  revenue, and the chart has to have a cut through it because

5  this would be way up to the ceiling of the courthouse to make

6  it convey its -- but here's your revenue up into the billion

7  dollars that year.  Here's your net income, 43 million.

8        As best we can tell from what their claims are,

9  there's a minor amount of reserves that they're saying, well,

10  he shouldn't have had those reserves.

11        I'd like to go on to the next year.  Here's your

12  income number, 1,800,000,000, reading it right.  Here's your

13  income, 75 million.  And here is the percentage that the

14  reserve is of the revenues, 0.12.  Or percentage of the

15  income, 3 percent.  And that is the amount is being contended

16  he was doing something wrong about.  What was the reasonable

17  range given the enormity of this operation?

18        Next year, it keeps on just like that.  You're now

19  up to 2 billion in revenue and we're dealing with a claim

20  that -- down here, there was 2 million too much reserves.  At

21  least as best we can see from the evidence that's been

22  presented to us what they're saying it is.

23        So the point is these reserves were insignificant.

24  They had no significance and a mountain has been made out of

25  the mole hill over the judgment decisions that Mike Rand made.

1    And here's the next year, 2003.  This is the little

2   line, 700,000.  You didn't do it exactly right.  You put it

3   there.  Out of 3 billion against 172 million.  Mike's judgment

4   was this was the reasonable range.  He had diagnostic tools.

5   He knew more than the people in the field about where the

6   problems were, where the failures were, where the issues were

7   to worry for.  He had the job.  He was the guy that was on the

8   hot seat.  He was the employee.

9    Now, they're making something out of the fact that

10  he wound up the accountant in one of the 500 biggest companies

11  in America.  If you get that job, if you work up into that job

12  with the kind of labor you have to do, they pay good salaries.

13  He started out at 170,000.  They gave him bonuses.  Well, when

14  this company grew and had so many profits, his stock went up

15  and then he sold it.  And he got the benefit of bonuses, but

16  he didn't write the bonus plans.  He didn't set the policies

17  of this company.  He was just an employee with a title.  He

18  really was back there 18 hours a day working on a computer,

19  trying to get this right with all kind of issues all over

20  America.

21   So this continued year after year, the same issue.

22  And y'all have listened a long time, but it's a tiny little

23  bit against the nearly 4 billion in 2004.

24   And it continues like that to 2005 and 2006.  But in

25  2006 you have a little bit different situation I'll tell you

1  about.  But still, this tiny little bit is what's being

2  complained about.  Those reserves were like a pebble thrown in

3  an ocean of money.  This is a company that was accumulating

4  assets, generating profits.  People who bought the stock,

5  their stock was going up.  And because there was conservative

6  accounting underway, things could be solid.  And yes, every

7  company manages its earnings.  There's proper earnings

8  management and there's improper earnings management.  Improper

9  earnings management is when you cook the books and they really

10  don't have the money they say.

11      Now, he's saying there's a cookie jar.  But the

12  money was made.  They got the real money.  The company had the

13  real money.  So it's not anything other than saying we're

14  being conservative.  So when the bomb goes off, you can handle

15  the problem and you don't wind up -- now, what's the other

16  problem?  If he overstated it, he would be accused of trying

17  to pump up the stock.  And understating it, since he was a

18  stockholder, would certainly be conservative from his

19  standpoint, wouldn't run his stock up.

20      So in 2006 you have several things that happen and

21  the number for this year becomes larger, and we'll explain

22  exactly why it was a little bit larger in 2006.

23      Now, this chart shows you how it all fit together.

24  You had 23 billion in revenues.  You had 1,000,300,000 in net

25  income during this time.  And you had this amount during the

whole time with that giant amount of money that's being argued about here on the theory that the investors were lied to. They were not lies.

Turned out the prosecution and defense had the same chart. GMAC pays the money to Beazer. The indictment refers to it as 34.1 billion -- I mean million, but it really was 117 million. They sold that many homes. There was nothing wrong with them selling those homes. They got the money. It went into their bank. And Mike filed a financial statement that said we've got the money.

Now, what they're saying is, well, you should have accounted for it differently and you shouldn't have said you got the money. And this is the GMAC transaction. But if you're stating the true financial condition of what really happened, what the real truth is is they got the $117 million. They owned the homes. They sold the homes. GMAC paid the money. So now there's this theory that, well, you can't do that. Even though you got the money, we're going to say you were committing fraud and trying to deceive investors who found out you got the money from your financial statement because you might have gotten a little more profit. And therefore, we're going to say you can't get -- you shouldn't show any of this.

This is a really interesting thing that happened. What happened is Mike Rand sends out -- gets the accountants

involved, gets the auditors involved, gets the legal folks
involved and says here's the proposal that GMAC wants us to
agree to:  We'll give you some of the profit when it sells.
Now, why would GMAC want to do that?  GMAC was buying these
houses.  They owned them at 92 percent.  And they wanted to
make sure they got sold so they wanted to incentivize the
salesmen out across the country.  But Mike finds out that the
rule is you cannot take this into income if you have a binding
agreement to take additional money.  And GMAC, Mr. Kranz,
wants to give the money because he wants the salesman to sell
that house as high as he can.

It's negotiated.  Mike says we can't take it.  Our
accountants say we can't take it.  He puts it all out.
There's a written document.  That written document says this.
There is no other agreement except what's in writing.  You
can't enforce any other agreement unless it's in writing,
signed by the parties.  That's the binding agreement.

But Mr. Kranz says I want your people to know we
want to pay the extra money even though you can't take it.  So
Mike sends out some e-mails saying we'll get the upside.  But
he didn't have a binding agreement.  He couldn't have enforced
it.  There was no way it was binding.  It was a voluntary
offer and Mike's position was if you give it, I'm sure the
salesmen at Beazer will take it.  But you're not bound to give
it and we don't have a binding agreement and therefore my

1    accounting is correct.

2         That's what is being turned into a claim of criminal

3    activity, reporting the receipt of all of that money.

4         But let me tell you one other fascinating thing.

5    These auditors who are checking everything checked all the

6    documents.  They're going to look over everything.  They look

7    at the written transaction.  They say this written document

8    works.  You can report the income.  Guess what?  Mike was

9    right about the accounting treatment.  Our expert will come

10   here and tell you he treated it correctly.  Since there wasn't

11   another agreement that was binding, it's referred to as a

12   courtesy handshake agreement or -- but it was not binding.

13   The expert says Mike Rand's treatment was correct.  This is

14   disputed.  Disputed about what's the right way.

15        But guess what?  The accountants overlooked another

16   provision in this contract the lawyers had drawn and that

17   provision in fact would require not reporting it.  Now, those

18   auditors got it wrong.  Mike got it right.  Mike's indicted

19   and they're coming as witnesses.  There's really something

20   wrong with that picture.

21        The idea that there's a cookie jar out there is a

22   fictional, made up idea.  It's inconceivable that anybody

23   looking at that growth curve would look out into the future

24   and imagine the real estate collapse.  Imagine some

25   catastrophe coming in this booming building economy that's

proven out by the facts. But the theory of this case is that people got together back in 2000, 2001 and said we're going to have some cookies. Of course, the cookies wouldn't affect anything that's so insignificant, but we're going to have some cookies because some event may occur.

Now, an event did occur. Our real estate market did collapse. But the government didn't know it was going to collapse. Wall Street didn't know it was going to collapse. The banks here in Charlotte and all over the country didn't. And down in Georgia we've got more failed banks than anybody but California. Nobody knew and the theory is that when things started to decline because there had been this conservative accounting and aggressively conservative accounting, now it -- the money that you actually made does come into your earnings. It's supposed to come in when the need for the reserves disappear. Wasn't put in a cookie jar; it was put into reserves for the various developments.

This case wouldn't be here if the investigation hadn't gotten directed away from mortgages. And lo and behold, there's no indictment of Beazer on mortgages. The scapegoat, Mr. Rand, is here alone. The man they fired based on false information.

So we say straight out, straight out the government is second guessing accounting. They weren't there doing it and making the judgments and they're coming along and saying,

well, you shouldn't have gone about it in a certain way. But
we stand by the fact that every one of those financial
statements were correct. That to the degree there was any
kind of managing earnings, it was legal and lawful.
Understand every company in America, that's what the
executives do is plan how the earnings will come, when they
will sell things, when they will lay people off, when they
will increase expenses, when they will buy equipment to gain
depreciation, whether they will delay taking -- making sales
at the end of the year and put them into next year. There's
all kinds of organizational management that goes on in every
company in America. And there's accounting management so that
you can get the real guts of what the accounting is so that
the statement says this is the true economic reality of this
company. That's what Mike did. And when he's talking to
Brown, he's trying to explain what he did.

There was absolutely no crime in the GMAC or the
home leasing agreements. There was nothing wrong with
reporting that money.

You're going to learn a lot of history and a lot of
information, a lot of events here in the next, as the judge
said, few weeks. When we get to the end of this process, the
evidence will show that Mike Rand wanted to get the number
right, that he wanted to get it within a reasonable range, and
he got it right.

1        I'm going to come back to you whenever that date is

2   when this case is over and I'm going to be proud to ask you at

3   that time to find Mike Rand not guilty.

4        I want to thank you for your patience in listening

5   so carefully to me.  I hope my remarks will help you sort this

6   evidence out.  The judge has told you several times that the

7   defendant is presumed to be innocent and has said will you do

8   that.  You said you would and we believed you.  And that means

9   as we start this case and until you reach a verdict, Mike Rand

10  is presumed to have intended his financial statements to be

11  correct and those statements are presumed to be correct until

12  they show that they were wrong beyond a reasonable doubt.

13  They won't do that.

14        I thank you for your attention.

15        THE COURT:  Members of the jury, the next phase is

16  to begin the evidence but we're going to take our afternoon

17  break at this time.  And while we take the break, remember not

18  to talk about the case.  Keep an open mind until the end of

19  the case.  And we'll see you at 4:45.

20        (Brief recess from 4:29 p.m. until 4:46 p.m.)

21        THE COURT:  Anything we need to take up before we

22  call the jury?

23        MR. MEYERS:  Your Honor, there's just -- there's one

24  issue, but I think the parties have worked it out.

25        MR. SAMUEL:  I think we have.

1          MR. MEYERS:  So, no, Your Honor.

2          THE COURT:  All right.  Let's call the jury.

3          (Jury entered the courtroom.)

4          THE COURT:  Thank you, ladies and gentlemen.

5          I wanted to mention to you that we will be going

6    until 6:00 each night.  Part of the reason for doing that is

7    there's really no sense in letting you out in Charlotte

8    traffic at 5:00, and we can get a little bit more work done

9    between 5:00 and 6:00.  And so the normal schedule is going to

10   be we will begin trial at 9:00 in the morning, have a lunch

11   break at 1:00 and finish up at 6:00.  And we'll take a morning

12   and afternoon break each day as we have done today.  And so

13   just for your planning purposes, that will be the schedule

14   that we follow.

15          Is the government ready to call its first witness?

16          MR. MEYERS:  Yes, Your Honor.

17          THE COURT:  You may do so.

18          MR. MEYERS:  Government calls Mr. Michael McNeely.

19                    MICHAEL McNEELY,

20   being first duly sworn, was examined and testified as follows:

21                    DIRECT EXAMINATION

22   BY MR. MEYERS:

23   Q.   Good afternoon, sir.

24   A.   Good afternoon.

25   Q.   Please state your name.

MICHAEL McNEELY - DIRECT

1   A.   My name is Michael McNeely.

2   Q.   Where do you live, please?

3   A.   I live in Charlotte, North Carolina.

4   Q.   Are you currently employed?

5   A.   I am.

6   Q.   How are you employed, please?

7   A.   I am employed as a special agent with the Federal Bureau

8   of Investigation here in Charlotte, North Carolina.

9   Q.   Please describe for the jury your education and your

10  training.

11  A.   Sure.  I graduated with a four year degree in mechanical

12  engineering.  Worked for NASA as an engineer at the Johnson

13  Space Center for about five years.  And then I joined the FBI.

14  The FBI sent me immediately to Quantico, Virginia, for a

15  16-week training course, and then sent me here to Charlotte

16  where I began working as an agent.

17  Q.   So you actually started your career in the Charlotte

18  office where you are now.

19  A.   I did.

20  Q.   When you started with the Charlotte office, what were

21  your responsibilities, please?

22  A.   I was immediately assigned to a white collar crime squad

23  as an agent, an investigator investigating a variety of white

24  collar crimes.

25  Q.   What is your position or your responsibilities with the

MICHAEL McNEELY - DIRECT

1    FBI right now?

2    A.    Right now I'm the applicant coordinator for the Charlotte

3    division of the FBI.

4    Q.    What does that mean to be an applicant coordinator?

5    A.    It's kind of just a fancy title for someone who goes out

6    and finds good candidates to become special agents.  Recruit

7    them, bring them into the process and help them along their

8    way to becoming a special agent for the FBI.

9    Q.    And how long have you been in that recruitment capacity?

10   A.    For three years.

11   Q.    What was your position in March of 2007, please?

12   A.    I was an agent in the white collar crime squad here in

13   Charlotte.

14   Q.    Please describe for the jury your responsibilities as

15   they existed at the time in March 2007 on the white collar

16   crime squad.

17   A.    Sure.  I was a case agent on several -- a variety of

18   matters, some mortgage fraud cases, a public corruption case.

19   I was also a member of the FBI SWAT team here in Charlotte.

20   Q.    In the course of your duties, did you become aware of

21   potential criminal issues with Beazer Homes?

22   A.    I did.

23   Q.    Please explain.

24   A.    Sure.  It was March 18 of 2007.  There was a *Charlotte*

25   *Observer* news article that described several Beazer Homes

1    neighborhoods in Charlotte, in and around Charlotte that had a

2    very high foreclosure rate amongst houses, amongst loans that

3    had been loaned -- mortgages that had been loaned on the

4    houses.  And there was a lot of information in these newspaper

5    articles about low income buyers being qualified for loans

6    that they couldn't have qualified for; a down payment

7    assistance program that Beazer Homes had been utilizing with

8    these buyers; and that a good portion of these loans had been

9    funded through a wholly owned subsidiary called Beazer

10   Mortgage that had been a subsidiary of Beazer Homes.  The last

11   thing I remember that was in there was that a lot of the loans

12   had been funded by FHA insured lenders.

13   Q.    Special Agent McNeely, were you the case agent initially

14   on the Beazer Homes case?

15   A.    I was not.

16   Q.    Did you become a case agent for any portion of time on

17   any part of the case?

18   A.    I did.  In -- later in 2008 I became the case agent for a

19   short period of time.

20   Q.    And on which part of the Beazer case did you become the

21   case agent?

22   A.    I became the case agent on the mortgage fraud side of the

23   investigation.

24   Q.    Well, we heard during the opening statement from the

25   defendant that there was no investigation of mortgage issues

1  for Beazer.  Is that correct?

2  A.    No, that's not correct.

3  Q.    Well, explain.

4  A.    The case that was opened and assigned in 2007, I believe

5  it was March 20th, 2007, the case was actually opened.  It was

6  a mortgage fraud investigation into the activities that were

7  alleged in the newspaper article, which was a mortgage fraud.

8  Q.    And did the mortgage fraud case continue even though

9  another case involving accounting started?

10  A.    Yes.  Yes.  I know that it did.  I know that it did

11  because I was the case agent for several months.  And then I

12  know that it did because I had kept track of some of the

13  events that had transpired as the case moved forward.

14  Q.    So how long were you the case agent on the Beazer

15  mortgage part of the case?

16  A.    Approximately two months.

17  Q.    Were you aware of the investigation when it started right

18  away?

19  A.    I was.

20  Q.    And when did the FBI investigation start, please?

21  A.    It was March 20th.  It was two days after the first

22  newspaper article came out.

23  Q.    March 20th of what year, please?

24  A.    2007.

25  Q.    What does it mean for the FBI to start an investigation

1  or open a matter?

2  A.    Sure.  If we have information that we receive from a

3  public source or from somebody that calls that allegations of

4  wrongdoing, violations of federal law, in order to get that

5  case open, we have to draft a communication, an internal

6  communication requesting that a case be opened and assigned.

7  If that case is opened and assigned, that then becomes a

8  repository for information that we gather in the course of the

9  subsequent investigation.  If we do interviews, that's where

10 we would document the interviews.  If we collect evidence,

11 that's where the evidence would be held.

12     So it's the means and the mechanism for us to run the

13 investigation from that point forward.

14 Q.    So that just means the investigation started.  Are there

15 any conclusions that are drawn necessarily in the beginning of

16 a case?

17 A.    No.

18 Q.    What happens in a general manner after a case is opened

19 and started?

20 A.    Well, we begin to gather evidence.  So we might conduct

21 interviews.  We may execute search warrants.

22     If you're talking in general, a lot of times we will

23 issue subpoenas or we'll request subpoenas from a federal

24 grand jury so we can obtain records or have folks testify

25 before the grand jury.  So we do a variety of steps.  Whatever

1    would be the most logical in a particular matter to get the

2    evidence that we're looking for in that particular matter.

3    Q.   Was the FBI the only agency that was investigating Beazer

4    Homes?

5    A.   No.

6    Q.   Were there other agencies?

7    A.   Yes.

8    Q.   What were they, please, to the best of your memory?

9    A.   I know that HUD was involved and at some point the IRS

10   was involved.

11   Q.   Please tell the jury what some of the first steps of the

12   Beazer Homes investigation were.

13   A.   Sure.  In that particular case, we had requested a grand

14   jury subpoena for records from Beazer Homes, and that was very

15   quickly.  It was within three days of the case being opened.

16   I believe it was March 23rd of 2007 is when that subpoena

17   request went in and when it was issued.

18   Q.   Now, when an FBI investigation, grand jury investigation

19   starts, does the FBI have any expectation of whether folks

20   will maintain documents that are relevant to the

21   investigation?

22   A.   Absolutely we do.

23   Q.   What is the expectation?

24   A.   The expectation is that they would retain the records and

25   then provide them if they're commanded to do so under

1  subpoena.

2  A.   Why?

3  Q.   If they don't, that's an obstruction if they don't

4  provide those records.  That's a -- it's a court -- it's a

5  court order.  It says on there you're commanded to bring these

6  records.  You're commanded to appear.

7  Q.   Well, don't folks only need to maintain documents if

8  someone specifically tells them to maintain those documents?

9  A.   Well, there's an expectation.  If someone is aware of an

10  investigation, we know they're aware of an investigation and

11  deliberatelily do not provide records that would be relevant,

12  then they're obstructing our investigation.

13  Q.   Does the FBI view it as important that people not attempt

14  to delete or destroy evidence?

15  A.   Yes.

16  Q.   Why?

17  A.   Well, deletion of -- if they deleted or destroyed

18  evidence, again, that would be destruction or obstruction.  It

19  would -- it would impact our ability to ascertain the truth of

20  the matter and they would have taken deliberate steps to stop

21  us from doing our job.

22  Q.   Well, what about e-mails?

23  A.   Including e-mails, yes.

24  Q.   You mentioned that the FBI requested a grand jury

25  subpoena in this case.  Does the FBI work with grand juries?

1  A.   We do.

2  Q.   Are you familiar with the grand jury that was involved in

3  the Beazer matter when it was started?

4  A.   Yes.

5  Q.   What is a grand jury, please?

6  A.   A grand jury is a group of jurors that are an

7  investigative arm of the courts that can hear testimonial

8  evidence and receive records.

9  Q.   Where does the grand jury -- where did the grand jury for

10  the Western District of North Carolina sit?

11  A.   They sit in this courthouse right down the hall,

12  actually.

13  Q.   On this very floor?

14  A.   Yes.

15  Q.   What does a grand jury do?

16  A.   A grand jury receives information through records and

17  testimony to ascertain whether or not there's been a violation

18  of a federal law and then they have the ability to issue an

19  indictment.

20  Q.   And was there, in fact, a Western District of North

21  Carolina grand jury proceeding involving Beazer beginning

22  March 23rd, 2007?

23  A.   There was.

24  Q.   What does it mean for the grand jury to gather evidence

25  or to investigate?

1   A.    The subpoena -- a subpoena that's issued by a grand jury

2   commands that a person appears or that they bring records or

3   that -- or both.  And so for them to gather that evidence, if

4   they have a subpoena for a record such as e-mails you

5   mentioned earlier, then there's an expectation that there

6   would be return of those e-mails as described in that subpoena

7   and the return would be made to the grand jury.  Those records

8   are maintained by the grand jury.

9   Q.    And you mentioned that the Beazer investigation started

10  on the basis of newspaper articles.

11  A.    That's correct.

12  Q.    Is that unusual?

13  A.    No.

14  Q.    Explain, please.

15  A.    When the FBI opens up a case, we can't self predicate a

16  case.  That means we may think something is going on or we may

17  be suspicious something is going on; we can't just go out and

18  start an investigation.  We have to predicate it somewhere.

19  We have to receive information that would be indicative from

20  an outside source that there is some issue or problem,

21  violation of federal law.  And one of the common forms that

22  that comes in is through complaints; folks who call our office

23  and complain about something that has taken place that could

24  constitute a violation of federal law.

25        But oftentimes you'll find there will be good

1   journalists -- journalists who do investigations for
2   newspapers and they'll gather facts and we can use that
3   information.  That happens fairly regularly.
4   Q.    So the Beazer investigation started looking into
5   generally allegations of mortgage fraud; is that correct?
6   A.    That's correct.
7   Q.    What direction did the investigation take, please?
8   A.    I know that at some point there was an accounting fraud
9   case opened and that -- so there was kind of two
10  investigations that begin to work kind of parallel.  And the
11  mortgage fraud case continued to march forward and -- that's
12  what your question is.
13  Q.    Well, how was it determined -- or how is it determined
14  that an investigation may start looking at one thing and then
15  look at something else?  How is that possible?
16  A.    Well, if, in the course of your investigation, you
17  discover or uncover other fraud or other activity that might
18  be linked to but not directly related to the course of actions
19  that you've taken to address maybe a mortgage fraud case, or
20  in this instance if it's an accounting fraud case, if evidence
21  of an accounting fraud case is discovered, then we have an
22  obligation to pursue that as well.  And one of the ways that
23  we can do that is to open up another matter that can be worked
24  in parallel.
25  Q.    And what kinds of evidence does the FBI and the grand

1  jury look for particularly in white collar crime cases?

2  A.   We look for a variety -- we look for records.  You

3  mentioned e-mails.  We look for invoices.  We look for

4  anything that would indicate criminal intent, and a lot of

5  times that would be found in communications.  So we put a

6  heavy emphasis on communications being provided to us.  And

7  right now that's -- e-mail tends to be a way for that text,

8  even written notes --

9  Q.   Why?  Why are communications important to the FBI's

10  investigation?

11  A.   Sure.  It's the communications that are going to show you

12  the inner workings of an organization.  Who the players are.

13  What -- who's in charge of who.  Who's directing who.  And I

14  think most importantly it will show you what their intentions

15  are.

16      So if a crime is taking place, many times you would look

17  at e-mails or communications to determine the criminal intent

18  that is present.

19  Q.   Were e-mails material to the Beazer investigation?

20  A.   Absolutely.

21  Q.   Explain, please.

22  A.   There was -- in the course of the mortgage fraud

23  investigation, the e-mails became important.  There was mass

24  amounts of communications from -- that Beazer had that were in

25  the course of e-mails.  So it was just a common method for

1  them to communicate. So it became a great way for the case

2  agents to be able to evaluate who the players were, what they

3  did, what their intentions were.

4  Q.    Are you familiar with whether e-mails became important to

5  the accounting fraud side of the case as well?

6  A.    I did later.

7  Q.    How did you become familiar with that?

8  A.    I became familiar with a series of e-mails that had been

9  gained -- or that had been gathered during the course of the

10  accounting fraud investigation that were related to the

11  defendant, Mr. Rand.

12  Q.    Special Agent McNeely, does the FBI have jurisdiction

13  over crimes involving mortgage fraud?

14  A.    Absolutely.

15        MR. COUNCILL:  Objection, Your Honor.  Calls for an

16  opinion about a legal issue.

17        THE COURT:  Overruled.

18  Q.    Does the FBI have jurisdiction over crimes involving

19  false statements to financial institutions?

20  A.    Absolutely.

21  Q.    Does the FBI have jurisdiction over crimes involving

22  falsifying books and records?

23  A.    Absolutely.

24  Q.    How about circumventing accounting controls?

25  A.    Yes.

1  Q.   How about securities fraud?

2  A.   Yes.

3  Q.   Does the FBI have jurisdiction over crimes involving

4  lying to auditors?

5  A.   Yes.

6  Q.   Special Agent McNeely, we heard during the opening

7  statement from the defendant that there was no indictment of

8  Beazer on mortgage issues.  Were there charges filed against

9  Beazer on mortgage issues?

10 A.   If I recall right, I don't believe there was an

11 indictment; but I believe there was a bill of information that

12 was filed.

13 Q.   Let me show you Government's Exhibit 263 which is not yet

14 in evidence.  Excuse me, Government 623 which is not yet in

15 evidence.

16      And I'll ask you, sir, if you're familiar with that?

17 A.   I don't have anything on my screen.

18 Q.   Let me put it on your screen.

19      Do you see it now?

20 A.   I do.

21 Q.   Are you familiar with Government's Exhibit 623?

22 A.   Yes.  That is the bill of information regarding Beazer

23 Homes in 2009.

24          MR. MEYERS:  The government moves to admit

25 Government's Exhibit 623.

1    THE COURT:  Any objection?

2    MR. COUNCILL:  No, Your Honor.

3    THE COURT:  Let it be admitted.

4    (Government's Exhibit No. 623 was received into

5  evidence.)

6    MR. MEYERS:  Publish it to the jury.

7    THE COURT:  You may.

8  Q.   Special Agent McNeely, please explain what a bill of

9  information is.

10  A.   A bill of information is something very similar to an

11  indictment but it's not issued by a grand jury.  It's a set of

12  facts regarding allegations of wrongdoing, violations of

13  federal law by an entity that's put together by the U.S.

14  Attorney's Office and is filed at the federal courthouse.

15  Q.   What is the date that is indicated in the upper

16  right-hand corner of Government's Exhibit 623, please?

17  A.   July 1st, 2009.

18  Q.   Special Agent McNeely, I want to direct your attention to

19  paragraph 3 of Government's Exhibit 623.  I'm going to ask you

20  to read that for the jury, please.

21  A.   Yes.  It's titled "The Mortgage Fraud Scheme.  From at

22  least as early as in or about 2000, through in or about 2007,

23  Beazer, Beazer Mortgage, and certain co-conspirators engaged

24  in a fraudulent scheme designed to increase Beazer Mortgage's

25  profit margin and to sell Beazer homes.  Several aspects of

1  this scheme are set forth below."

2  Q.  Special Agent McNeely, are you familiar with the charges

3  contained generally in this bill of information in regards to

4  the fraudulent mortgage practices?

5  A.  Generally, yes.

6  Q.  Please explain generally what those charges are without

7  us going into detail in every paragraph.

8  A.  Well, my understanding -- this is going from memory from

9  the time that it was filed.  It's been a while since I've seen

10  the bill of information.  That it accounted for both mortgage

11  fraud activity as well as accounting fraud activity.

12  Q.  Let me ask you to concentrate on the mortgage fraud

13  charges, please, Special Agent McNeely.

14  A.  Yes.

15  Q.  And I'll just take you to the second page of this

16  document.

17  And I'll ask you first to look at paragraph 3 -- or

18  paragraph A, subparagraph 4, and ask you to read the heading

19  and paragraph 4.

20  A.  The heading is "Discount Point Fraud."

21  Q.  And please read paragraph 4.

22  A.  "In general, a home buyer may pay discount points to a

23  lender or broker to receive a better interest rate in

24  connection with a home mortgage loan.  North Carolina law

25  requires that discount points result in a bona fide reduction

1  of the interest rate or time-price differential."

2  Q.   I'll ask you to read paragraph 5, please.

3  A.   "From at least as early as in or about 2000, through as

4  late as in or about 2006, Beazer Mortgage, through certain

5  Beazer Mortgage employees, and certain co-conspirators entered

6  into a scheme to charge discount points in connection with

7  home mortgage loans without providing the borrower with a bona

8  fide reduction of the interest rate or time-price differential

9  in certain instances."

10 Q.   I want to take you now to paragraph 10 and I'll ask you,

11 Special Agent McNeely, to please read the allegations in

12 paragraph 10.

13 A.   The heading says "Down-payment Assistance Fraud.   In

14 North Carolina and certain other markets, Beazer built homes

15 primarily for first-time and low-income home buyers who were

16 expected to purchase Beazer homes with the assistance of home

17 mortgage loans insured by the Federal Housing Administration,

18 (FHA).   FHA loans required a minimum loan to value ratio (LTV)

19 of 97 percent, and a borrower down payment of at least

20 3 percent."

21 Q.   And Special Agent McNeely, are you familiar with the

22 allegations against Beazer and Beazer Mortgage with regard to

23 down payment assistance fraud?

24 A.   Yes.

25 Q.   Please describe those for the jury.

1    A.    Okay.  The down payment assistance fraud consisted of

2    Beazer providing funds to a third-party charity.  One was

3    named Nehemiah.  And these were organizations that would

4    receive the money from Beazer but then they would gift the

5    money to the home buyer.  So it was a gift.  So the home buyer

6    really wasn't bringing a down payment to the transaction, but

7    they had received a gift.  However, the way the fraud worked

8    is Beazer on the backside would raise the price of the house

9    being sold to that exact buyer by the exact amount that they

10   had provided as a gift for that buyer.  Therefore, they

11   recouped the funds and it could not be considered a gift.

12   Q.    Special Agent McNeely, I want to show you now

13   Government's Exhibit 36A which is a hard copy document.

14          MR. MEYERS:  May I approach the witness, Your Honor?

15          THE COURT:  You may.

16   Q.    Special Agent McNeely, are you familiar with Government's

17   Exhibit 36A?

18   A.    I am.

19   Q.    How are you familiar with it, sir?

20   A.    I have reviewed these documents before today.

21   Q.    And Special Agent McNeely, have you reviewed those

22   documents to see if they have any connection to Mike Rand?

23   A.    I did and they do.

24   Q.    Well, we heard during opening statement from the

25   defendant that Mike Rand had no involvement with the mortgage

1   company.  Do those documents relate to mortgage origination

2   issues?

3   A.   They do.

4   Q.   Special Agent McNeely, please turn to tab number 2 of

5   Government's Exhibit 36A.

6        What is it, please?

7   A.   This is an e-mail.

8   Q.   An e-mail between who?

9   A.   This is an e-mail from Mike Rand to Jimmy Yandle with the

10  subject line "High closing costs."

11  Q.   Special Agent McNeely, was that document relevant to the

12  FBI's mortgage fraud investigation?

13  A.   Absolutely.

14  Q.   Explain.

15  A.   We had just talked about the Nehemiah down payment

16  assistance program and the allegations of fraud regarding

17  raising the prices of a house to recoupe those funds, and that

18  seems to be the substance of this e-mail.  So this is an

19  e-mail -- this e-mail would constitute evidence of that fraud.

20  Q.   Well, did the defendant write anything about that?

21  A.   The defendant wrote this e-mail.

22  Q.   What did he say?

23  A.   I can read it if you like.

24  Q.   Yes, sir.

25  A.   Says, Okay, recognizing Nehemiah, that's the program that

1    I described, the down payment organization -- Heart, which is

2    another name, and other programs.  "I still find it hard to

3    understand how the combined closing and selling costs for a

4    house can exceed 15 percent without subsidizing Beazer

5    Mortgage.  Or even worse, artificially writing up sales prices

6    above the legally allowed amount."

7    Q.    Special Agent McNeely, was that part of the issue of the

8    FBI's investigation with regard to down payment fraud?

9    A.    Yes.

10   Q.    Please turn to the next page of that e-mail -- or of that

11   document which is tab number 2.

12   A.    Okay.

13   Q.    What's indicated there, please?

14   A.    It looks like file records associated with the e-mail,

15   computer file records.

16   Q.    Is there a date deleted indicated there, sir?

17   A.    Yes.

18   Q.    What is indicated?

19   A.    The date deleted says March 30th of 2007.

20   Q.    When was the e-mail originally sent according to that

21   document?

22   A.    It was originally sent in August -- it was August 14th of

23   2001.

24   Q.    So how much time passed between when that e-mail was sent

25   and when it was deleted according to that document?

1  A.   Almost six years.

2  Q.   Please turn to tab 6.

3       Are you familiar with that document?  Have you had a

4  chance to review it before your testimony today?

5  A.   Yes, I am.

6  Q.   Was that document relevant to the FBI's mortgage fraud

7  investigation?

8  A.   Yes, this document was.

9  Q.   Explain, please.

10 A.   It's in this same category.  It's the down payment

11 fraud -- this is evidence of down payment fraud.  They're

12 discussing the Nehemiah program.  Talking about bumping up the

13 prices to cover the closing costs.  And this is -- the top is

14 an e-mail from Mr. Rand, again, to Jimmy Yandle saying that

15 the -- this large -- "closing costs in addition to commissions

16 is a large pill unless you can raise prices."

17          THE COURT REPORTER:  Would you spell Nehemiah.

18 Q.   And is raising prices fraudulently --

19          THE COURT:  Just a second.

20          THE COURT REPORTER:  Would you spell Nehemiah.

21          THE WITNESS:  Sure.  It's spelled here

22 N-e-h-e-m-i-a-h.

23 BY MR. MEYERS:

24 Q.   The defendant is talking about raising prices to cover

25 the down payment assistance.  Is that the very issue the FBI

1  looked at?

2  A.   Absolutely.

3  Q.   Is that the very issue charged in the bill of

4  information --

5  A.   Yes, it is.

6  Q.   -- the defendant said didn't exist?

7  A.   It is.

8  Q.   Special Agent McNeely, I want to show you now

9  Government's Exhibit 11 which has already been admitted into

10  evidence.  I want to ask you to take a look at the string

11  listed at the top.

12       Can you tell first what kind of document Government's

13  Exhibit Number 11 is, please.

14  A.   This is another e-mail.

15  Q.   Please read who this e-mail is from.

16  A.   The e-mail is from Mike Rand.

17  Q.   What is the date this e-mail is sent, please?

18  A.   Friday, March 9th, 2007.

19  Q.   So approximately how long before the FBI started its

20  investigation does this e-mail say it was indicated was sent?

21  A.   This was a week or so before our investigation started.

22  We opened our investigation on March 20th.  This is dated

23  March 9th.

24  Q.   What is the content of this e-mail that Mike Rand sent,

25  please?  Read it.

1    A.    It's a single line.  It says, "I will remind the group

2    the FBI is getting involved with mortgage fraud."

3    Q.    Special Agent McNeely, I want you to turn back to

4    Government's Exhibit 36A, please.  And please look at tab

5    number 12.

6    A.    Okay, I'm looking at tab 12.

7    Q.    Is tab number 12 relevant to the FBI's investigation of

8    mortgage fraud?

9    A.    Yes, it is.

10   Q.    Explain, please.

11   A.    This e-mail seems -- is evidence of what I would call a

12   kickback fraud.  And it has to do with how money is being

13   passed around to influence realtors as well as possibly the

14   buyer themselves.

15   Q.    Well, who is -- who are the parties to that e-mail at tab

16   12?

17   A.    This is an e-mail from Mike Rand to Jimmy Yandle on

18   May 17th of 2002.

19   Q.    Discussing what the FBI would view as evidence of

20   kickback fraud.

21   A.    Absolutely.

22   Q.    Please turn the page and let the jury know if there's

23   text indicated after that e-mail.

24   A.    The last page?

25   Q.    Yes, sir.

MICHAEL McNEELY - DIRECT

1  A.   Yes.  Again, it looks like data associated with file

2  creation and deletion.

3         MR. COUNCILL:  Objection, Your Honor.  Lack of

4  foundation that this witness has personal knowledge of that.

5         THE COURT:  I'll sustain that objection as to form.

6  Require some more foundational questions.

7  Q.   Special Agent McNeely, I would ask you to look at that

8  last page of that document and just read what's indicated, if

9  anything, past the date deleted column, please.

10 A.   Sure.

11        MR. COUNCILL:  Same objection, Your Honor.  He's

12 trying to get in hearsay through a witness that has no

13 personal knowledge.

14        THE COURT:  Mr. Meyers.

15        MR. MEYERS:  Your Honor, we -- what we're trying to

16 do is get in testimony that's sequential.  Otherwise, we'd

17 have to recall this witness after the appropriate witness

18 comes to testify about the source of that meta data that's

19 there.  And so we would ask that the court give us some leeway

20 pursuant to Rule 104(b).

21        THE COURT:  I'll overrule the objection.  I'll admit

22 this conditionally subject to linking it up at a later time.

23 Q.   Special Agent McNeely, please read what's indicated, if

24 anything, after the date deleted information there.

25 A.   It says March 30th, 2007.

1  Q.   And when was that e-mail originally sent, please?

2  A.   May 17th of 2002.

3  Q.   So how long, again, asking you to do math on the stand.

4  I apologize.

5  A.   That's okay.

6  Q.   Between when that e-mail was originally sent and when it

7  indicates it was deleted.

8  A.   Looks like it was sent about five years before he deleted

9  it.

10  Q.   Please turn to tab 18.

11      Special Agent McNeely, do you -- have you had a chance to

12  look at the document in tab 18 prior to your testimony today?

13  A.   I have.

14  Q.   Would that document have been relevant to the FBI's

15  mortgage fraud investigation?

16  A.   Absolutely.

17  Q.   Explain, please.

18  A.   This again appears to be evidence associated with the

19  kickback scheme where they're talking about sending money to

20  buyers.

21  Q.   Special Agent McNeely, please turn the page.

22      First tell me who are the parties to that e-mail.

23  A.   This is an e-mail from Mike Rand to Jimmy Yandle.

24  Q.   And please turn the page and read for the jury any

25  information indicated with regard to date deleted.

MICHAEL McNEELY - DIRECT

1          MR. COUNCILL:  Objection, Your Honor.  Same issue as
2     before.  Calls for information this witness does not appear to
3     have personal knowledge of.
4          THE COURT:  I'll overrule the objection.  Are you
5     moving -- I guess this is already in evidence as part of 36A.
6          MR. MEYERS:  It's not already in evidence, Your
7     Honor.  We're going to be moving 36A into evidence in relation
8     to the witness who will testify about it.
9          THE COURT:  Very well.  I will overrule the
10    objection and conditionally admit this subject to the
11    government linking it up.
12         MR. MEYERS:  Thank you.
13         MR. COUNCILL:  Your Honor, just for sake of
14    convenience, can I preserve for the record and make an
15    objection to --
16         THE COURT:  Yes, you can.  To this same -- you have
17    the same objection to this line of questioning.
18         MR. COUNCILL:  Yes, sir.  Thank you, Your Honor.
19    BY MR. MEYERS:
20    Q.   Special Agent McNeely, please indicate what's reflected,
21    if anything, next to date deleted.
22    A.   March 30th, 2007.
23    Q.   And when was the e-mail originally sent, please?
24    A.   April 5th, 2002.
25    Q.   I'm going to ask you to do the math again.

MICHAEL McNEELY - DIRECT

1  A.   Again.  The e-mail appears to have been sent five years

2  prior, roughly, to when it was deleted.

3  Q.   Special Agent McNeely, now please turn to tab 19,

4  Government's Exhibit 36A.

5       Would this document have been relevant to the FBI's

6  investigation of mortgage fraud?

7  A.   Yes.

8  Q.   Explain, please.

9  A.   This appears to be evidence of what I will call closing

10  fraud.  That is when are they going to actually account for

11  when a closing occurred versus when maybe the customer is

12  going to actually move into the property and when a

13  certificate of occupancy is issued.  So rather than -- it

14  appears as though they are attempting to maneuver these dates

15  around so that they can account for profits in certain

16  quarters that they want.

17  Q.   Special Agent McNeely, who are the parties on the e-mail

18  at tab 19?

19  A.   This is an e-mail from Mike Rand to Jimmy Yandle.

20  Q.   And when was that e-mail sent?

21  A.   Monday, September 24th, 2001.

22  Q.   Please flip the page and indicate any information with

23  regard to the date deleted.

24  A.   March 30th, 2007.

25            THE COURT:  Mr. Meyers, Government's Exhibit's 11 is

MICHAEL McNEELY - DIRECT

1    on the screen and unless you're examining on it, would you

2    take it off.

3    Q.   Special Agent McNeely, now please turn to tab 16 of

4    Government's Exhibit 36A.

5         Are you familiar with that document?

6    A.   Yes, I am.

7    Q.   And Special Agent McNeely, to be clear, did you see that

8    document or many of the other documents I've shown you at the

9    time during your investigation?

10   A.   I did not.

11   Q.   What is reflected, if anything, in tab 16 of Government's

12   Exhibit 36A?

13   A.   This -- I remember the first time I saw this.  This is

14   evidence of kickback fraud.  I think the thought that went

15   through my mind when I first read this --

16        MR. COUNCILL:  Objection, Your Honor.  He's

17   characterizing the evidence.  The document speaks for itself.

18        THE COURT:  I'll sustain the objection as

19   nonresponsive.  Ask you to ask another question.

20   Q.   Special Agent McNeely, would that document have been

21   relevant to the FBI's investigation?

22   A.   Absolutely.

23   Q.   Why would it have been relevant to the FBI's

24   investigation?

25   A.   Because this is evidence of a kickback scheme.

1  Q.   And how relevant would that document have been to the

2  FBI's investigation?

3  A.   Incredibly relevant.

4  Q.   Explain, please.

5  A.   In this document is a paragraph that details point by

6  point how to account for monies that are being provided to a

7  buyer so that it can be hidden from the lender exactly the

8  nature of what is taking place.

9      They have in this paragraph, they've got 47 houses that

10 they're discussing in which they want to list monies on a

11 HUD-1 and they're going into great detail about how it is

12 they're going to detail in the HUD-1 what this payment is

13 called, but it's nothing more than an incentive payment to a

14 buyer.

15      MR. COUNCILL:  Objection, Your Honor.  Same as

16 before.  He's characterizing the document.  It speaks for

17 itself.

18      THE COURT:  Overruled.

19 Q.   Special Agent McNeely, I have asked you to look at a

20 handful of examples from that binder.  Have you looked at

21 other examples in that binder to determine whether they would

22 have been relevant to the FBI's mortgage fraud investigation?

23 A.   Yes.

24 Q.   Have I shown you the only examples?

25 A.   No.

1  Q.   Are there several others, numerous others that would be

2  relevant?

3  A.   There's several others that would have been relevant to

4  our investigation.

5  Q.   Special Agent McNeely, we heard that in the opening

6  statement from the defendant, that there was no mortgage fraud

7  investigation.  Have any individuals been charged for mortgage

8  fraud at Beazer?

9  A.   Yes.

10  Q.   Who?

11  A.   Last month there was a bill of information filed against

12  Janette Parker who is the branch manager for Beazer Mortgage

13  here in Charlotte.

14          MR. MEYERS:  Your Honor, may I collect Government's

15  Exhibit 36A?

16          THE COURT:  You may.

17          MR. COUNCILL:  Your Honor, may we have a brief

18  recess to look at this exhibit, 36A, which is 1,343 pages.

19          THE COURT:  Not at this time.  I will give you time

20  to look at it before you cross examine.

21          MR. COUNCILL:  Thank you.

22          MR. MEYERS:  Just to be clear, Your Honor, we

23  provided that weeks ago.

24          THE COURT:  You may continue.

25  BY MR. MEYERS:

MICHAEL McNEELY - DIRECT

1    Q.    Special Agent McNeely, did the FBI investigation of

2    Beazer become known at some point?

3    A.    Publicly?

4    Q.    Yes, sir.

5    A.    Yes.

6    Q.    Explain, please.

7    A.    On March 27th someone from the media had contacted our

8    media coordinator who was Ken Lucas at the time and he did

9    confirm that there was an FBI investigation into Beazer Homes.

10   Q.    Who was he contacted by?

11   A.    I don't recall.  Somebody in the media.  It was some news

12   article.

13   Q.    Special Agent McNeely, I'll show you Government's Exhibit

14   13A which is already in evidence and ask you if you're

15   familiar with it?

16   A.    Yes.

17   Q.    What is it, please?

18   A.    This is a *BusinessWeek* article dated March 27th, 2007.

19   Q.    Please read the headline for this *BusinessWeek* article,

20   sir.

21   A.    "Feds Are Investigating Homebuilder Beazer."

22   Q.    And I want to ask you, Special Agent McNeely, to please

23   look at the paragraph that I am zooming up for you -- zooming

24   for you and ask you to read that to the jury.

25   A.    Sure.  Caption states, "Actively Pursuing Fraud.

1  Investigators, however, are not limiting their probe to

2  possible mortgage fraud.  'There's all sorts of potential

3  fraud issues here,' FBI spokesman Ken Lucas told *BusinessWeek*.

4  'We're looking at all types of potential fraud associated with

5  Beazer - corporate, mortgage, investments.'"

6  Q.    Now, Special Agent McNeely, does the FBI normally comment

7  on investigations that it has?

8  A.    We don't.

9  Q.    Explain.

10  A.    Normally our policy is if someone asks us or inquires

11  whether there's an investigation, we don't confirm or deny it.

12  Q.    Nevertheless, was what was told here accurate?

13  A.    It was.

14  Q.    Special Agent McNeely, I want to ask you to look at the

15  next paragraph here, please, and ask you to read that to the

16  jury.

17  A.    "After *BusinessWeek* posted its initial story of the

18  investigation online, Beazer released a statement saying it

19  could not 'comment on or verify any investigation.  However,

20  we will fully cooperate with any investigation by any

21  government agency.'"

22  Q.    I'm going to ask you to look at and read for the jury a

23  few other documents, please, Special Agent McNeely.

24       I want to first show you Government's Exhibit Number 14.

25  And I'll ask you to please read for the jury who this e-mail

1    appears to be from.

2    A.    This is from Mike Rand.

3    Q.    And what is the date that it was sent, please?

4    A.    Tuesday, March 27, 2007.  Same day as the article.

5    Q.    Please read for the jury the first sentence of this

6    e-mail.

7    A.    "*Bloomberg News* called me at home.  Fortunately I was at

8    kids baseball practice."

9    Q.    And please read the next sentence.

10   A.    "You may want to send a message to others."

11   Q.    I'm going to ask you now to please look at Government's

12   Exhibit 18A.

13        I'm going to ask you to look at the top e-mail only and

14   ask you to please read for the jury who it appears to be from.

15   A.    This is an e-mail from Mike Rand.

16   Q.    And what is the date of this e-mail, please?

17   A.    Wednesday, March 28, 2007.

18   Q.    How long was this e-mail sent after the *BusinessWeek*

19   article?

20   A.    The next day.

21   Q.    Please read for the jury the content that I have shown on

22   your screen.

23   A.    It says:  The FBI called my house.  What do u think?"

24   Q.    Now, Special Agent McNeely, do you know if the FBI really

25   called the defendant's house?

MICHAEL McNEELY - DIRECT

1  A.   I don't believe we did.  I have no recollection of

2  anybody calling his house.

3  Q.   I'm going to show you now Government's Exhibit Number 19.

4       And I'm going to ask you to please look first at the

5  bottom part of the e-mail which I'm going to blow up on your

6  screen and to read that to the jury.

7  A.   Sure.  This is an e-mail from someone named Scott Bingham

8  to Mike Rand on Wednesday, March 28.  The subject line is,

9  it's forwarded, "FTI consulting-qualifications for Beazer

10 Homes with appendix."

11 Q.   Please read to the jury the first paragraph of that

12 e-mail.

13 A.   "Mike, I hope you are doing well in light of the

14 additional information that hit the press last night.  See the

15 note below, which I have bifurcated in case you want to

16 forward, et cetera."

17 Q.   Special Agent McNeely, when was this e-mail sent in

18 relation to the *BusinessWeek* article?

19 A.   The next day.

20 Q.   Does the defendant appear to forward the e-mail?

21 A.   He does.

22 Q.   I want you to look in the bottom of your screen to

23 Government's Exhibit Number 21, and ask you to look at the

24 bottom e-mail first, please.

25      And what is the date?

1 A. The date is Wednesday, March 28, 2007.

2 Q. And who does the e-mail appear to be to?

3 A. It's to Mike Rand.

4 Q. I'm going to scroll up, Special Agent McNeely.  I'm going

5 to ask you to tell the jury who the from line is, please.

6 A. The from line is from Mike Rand.

7 Q. And what is the date of this e-mail?

8 A. Wednesday, March 28, 2011.

9 Q. Special Agent McNeely, when is this in relation to the

10 *BusinessWeek* article, please?

11 A. It's the following day.

12 Q. Please read for the jury the text of this e-mail from

13 Mike Rand.

14 A. "Scott mentioned that the head of FTI is a former FBI

15 agent who would be available to alert us to the practice FBI

16 goes through during investigations like this if we are

17 interested."

18 Q. Special Agent McNeely, was there a robust mortgage fraud

19 investigation?

20 A. Yes, there was.

21 Q. After your review of those documents, did the defendant

22 participate in conversations that were very relevant to the

23 mortgage fraud investigation?

24 A. Yes, he did.

25   MR. MEYERS:  No further questions, Your Honor.

1    THE COURT:  Any cross?

2    MR. COUNCILL:  Your Honor, may we have a brief

3  recess?  The exhibit that they were talking the witness over

4  with was 1300-plus pages and a lot of the statements were

5  taken out of context.

6    THE COURT:  I'll allow you to begin your cross in

7  the morning and we'll go on with another witness and you'll

8  have overnight to look at it.

9    MR. COUNCILL:  Thank you, Your Honor.

10    THE COURT:  36A.

11    Call your next witness.

12    And Mr. McNeely, if you would remain subject to

13  subpoena and available in the morning.

14    THE WITNESS:  Yes, Your Honor.

15    (Witness stepped down.)

16    MS. VENTO:  Government calls Deborah Danzig.

17                    DEBORAH DANZIG,

18  being first duly sworn, was examined and testified as follows:

19    THE COURT:  Mr. Meyers, you have until approximately

20  6:00 time wise.

21    MR. MEYERS:  Thank you, Your Honor.

22                  DIRECT EXAMINATION

23  BY MS. VENTO:

24  Q.   Would you please introduce yourself to the jury.

25  A.   My name is Deborah Danzig.

DEBORAH DANZIG - DIRECT

1   Q.   And where do you live, Ms. Danzig?

2   A.   I live in Atlanta, Georgia.

3   Q.   By whom are you currently employed?

4   A.   Ashton Woods Homes.

5   Q.   And what do you do for Ashton Woods Homes?

6   A.   I'm the chief legal officer.

7   Q.   Were you previously employed by Beazer?

8   A.   I was.

9   Q.   Through your employment with Beazer Homes, did you become

10  familiar with the defendant, Michael Rand?

11  A.   I did.

12  Q.   Would you please point to Mr. Rand and describe something

13  that he is wearing.

14  A.   I can't actually see him.

15       He's right there (indicating).  He's wearing a blue tie.

16  Q.   Thank you.

17       Would you briefly describe your education for the jury.

18  A.   I went to Emory University for my undergraduate and I

19  went to Cornell Law School.

20  Q.   And would you please briefly describe your employment

21  experience prior to the time you joined Beazer.

22  A.   I clerked on the Eleventh Circuit Court of Appeals in

23  Atlanta, Georgia.  Then I was employed at Davis Polk &

24  Wardwell, a law firm in New York City; and then Sutherland

25  Asbill & Brennan, a law firm in Atlanta, Georgia; and then I

1  went to Beazer.

2  Q.   Would you describe for the jury the positions that you

3  held and what generally the responsibilities you had while at

4  Beazer.

5  A.   When I was first employed at Beazer, I was corporate

6  counsel and I managed litigation for approximately half of the

7  company's business divisions.

8  Q.   And when was it you were first employed at Beazer Homes?

9  A.   July of 2005.

10 Q.   And when did you leave Beazer?

11 A.   July of 2011.

12 Q.   I want to focus you in on a March 2007 time frame.  What

13 was your position at Beazer at that point in time?

14 A.   Corporate counsel.

15 Q.   And could you just tell us a little bit more about what

16 it means to be corporate counsel at a company like Beazer.

17 A.   I managed the litigation and claims for the company's

18 operations -- half the company's operations and did other

19 general legal work for those divisions.

20 Q.   I'd like to focus you back on some events that occurred

21 at Beazer beginning Friday, March 23rd, 2007.

22      At that time would you describe for us what the lay of

23 the land was in the corporate offices where you worked.  Where

24 was your office?  Where was the defendant's office?  How were

25 the offices situated?

1  A.   So my office was on the twelfth floor in the corporate

2  office and it was in -- the legal offices of the lawyers and

3  the paralegals were on that side of the hall, so -- and

4  Mr. Rand's office was several offices down, maybe five or six

5  offices down.

6  Q.   So in that same section of the hallway?

7  A.   On the same hall.

8  Q.   During that time frame at the end of March, did you come

9  to learn that a grand jury subpoena had been served upon

10  Beazer?

11  A.   I did.

12  Q.   When did you learn of the grand jury subpoena?

13  A.   Friday, March 23rd.

14  Q.   What did you learn about this grand jury subpoena?

15  A.   I learned that there had been a subpoena served on our

16  division in Charlotte.

17  Q.   Did you learn anything else about the subpoena at that

18  point in time?

19  A.   I saw a copy of the subpoena.

20  Q.   What did you think about the fact Beazer had been served

21  with a grand jury subpoena?

22          MR. SAMUEL:  Objection, relevance.

23          THE COURT:   Sustained.

24  Q.   When you -- did you receive a copy of the grand jury

25  subpoena?

DEBORAH DANZIG - DIRECT

1  A.    I did.

2  Q.    Why did you get a copy of the grand jury subpoena?

3  A.    Because I was a lawyer for the company.

4  Q.    And why would it be necessary for you to have a copy of

5  it, then?

6  A.    Because it needed attention on that day that we received

7  it.

8  Q.    Why did it need attention?

9  A.    Because it was a grand jury subpoena that was issued by a

10  grand jury that was looking into something that the company

11  had something to do with.

12  Q.    And why did the company need to pay attention to that?

13  A.    Because there were certain things that we had to do to

14  respond to the subpoena and make sure we complied with our

15  obligations.

16  Q.    So what, if anything, did you do after you learned of the

17  grand jury subpoena and received a copy of it on that Friday?

18  A.    I called an outside lawyer to determine what our next

19  step should be for the company.

20  Q.    And why did you do that?

21  A.    Because I -- there were certain things that the company

22  should do in response to the subpoena and I wanted guidance.

23  Q.    Who did you call?

24  A.    I called Mike Brown at Alston & Bird.

25  Q.    Now, did you know Mr. Brown before that day?

1   A.    I did.

2   Q.    Did you have any sort of friendship or personal or

3   professional relationship with Mr. Brown?

4   A.    I know -- I was friends with Mike Brown and I also know

5   that he was a former prosecutor and was then on the defense

6   side and had handled grand jury subpoenas before.

7   Q.    Are you friends with other defense lawyers in Atlanta?

8   A.    Yes.

9   Q.    Including any of the lawyers sitting at defendant's

10  table?

11  A.    I know the lawyers at the defendant's table, yes.

12  Q.    Do you socialize with any of those lawyers as well?

13  A.    If I see them out socially, yes.

14  Q.    What was the level of awareness in Beazer's corporate

15  offices on the day the grand jury subpoena was served

16  March 23rd, 2011?

17  A.    Another at least several people that were aware that

18  there was a subpoena served.

19  Q.    Were there discussions about it?

20  A.    Yes.

21  Q.    Were people paying attention to it?

22  A.    The people with whom I spoke, yes.

23  Q.    And why?

24  A.    Because it -- we had never received a grand jury subpoena

25  before.

DEBORAH DANZIG - DIRECT

1    Q.    Did you think you needed to do anything in response?

2    A.    Yes.

3    Q.    Focusing you in on the next week, what was going on at

4    Beazer's corporate office that following week with regard to

5    the grand jury investigation, if anything?

6    A.    There were several things going on that next week.

7    Q.    Was there any press coverage?

8    A.    Yes.

9    Q.    I'll show you what's been marked as Exhibit 13A and it's

10   been entered into evidence.

11        Can you identify Exhibit 13A for us, please.

12   A.    It is an article that ran in *BusinessWeek* that next week

13   about the investigation.

14   Q.    And when did this article run in *BusinessWeek*?

15   A.    On March 27th, 2007.

16   Q.    When did you become aware of this article?

17   A.    On March 27th, 2007.

18   Q.    To your knowledge, when did others at Beazer become aware

19   of this article?

20   A.    There were a lot of people that became aware on March 27,

21   2007.

22   Q.    Why do you say that?

23   A.    Because we were trying to determine in the corporate

24   office how to respond to the article and the statements in the

25   article.

DEBORAH DANZIG - DIRECT

1  Q.   Did the people in the corporate office take this

2  seriously?

3  A.   There were a lot of people who took it seriously, yes.

4  Q.   Why did you take it seriously?

5           MR. SAMUEL:  Your Honor, objection.  First of all,

6  it's repetitive to the last question.  Second of all, it's not

7  particularly relevant.

8           THE COURT:  Overruled.

9  Q.   You can answer.

10  A.   Because it related to the investigation and there were a

11  lot of -- there were additional statements in this article

12  that we needed to respond to.

13  Q.   I want to point you to this paragraph.  What is set forth

14  in the highlighted portion of this paragraph?  Here, please.

15  A.   It says, "Actively Pursuing Fraud."

16  Q.   And the sentence that I just highlighted?

17  A.   It says, "We're looking at all types of potential fraud

18  associated with Beazer - corporate, mortgage and investments."

19  Q.   I think you just referenced some additional allegations;

20  is that correct?

21  A.   Yes.

22  Q.   Is that what you were referring to?

23  A.   Yes.

24  Q.   What, if anything, did Beazer do as a result of this

25  article coming out?

1  A.    We -- the company issued a response.

2  Q.    Why did you issue a response?

3  A.    We -- well, the company -- the company had filed a

4  response to what was written in the *BusinessWeek* article.

5  Q.    Now, there was some mention in opening statement that you

6  were sending messages that week that indicated that the grand

7  jury subpoena was no big deal.  Is that true?

8  A.    I'm sorry?

9  Q.    There were some statements --

10          MR. SAMUEL:  Your Honor, I'm going to object to the

11  preface of the question.  The witness wasn't in the courtroom.

12  I think the question just ought to be asked without the

13  prefatory language.

14          THE COURT:  Sustained as to form.

15  Q.    Ma'am, did you send any messages out that week to

16  employees at Beazer and tell them the grand jury subpoena was

17  no big deal?

18  A.    I did not.

19  Q.    Did you consider it to be a big deal?

20  A.    I did.

21  Q.    Why?

22  A.    Because there was a federal investigation into the

23  company.

24  Q.    I want to show you what's been marked as Government's

25  Exhibit 13B.

1       Are you familiar with Exhibit 13B?

2   A.  I am.

3   Q.  When was Exhibit 13 -- what is Exhibit 13B, please?

4   A.  It's a news release issued by Beazer.

5   Q.  And when was this news release issued?

6   A.  On March 27, 2011.

7   Q.  And would you read for us, please, the highlighted

8   portion of this news release.

9   A.  "However, we will fully cooperate with any investigation

10  by any government agency."

11  Q.  Why did Beazer say it was cooperating with any

12  investigation by any government agency?

13  A.  Because the company was cooperating with any government

14  investigation -- any government agency that was investigating

15  it.

16  Q.  So that was a true statement.

17  A.  That was true, that the company was going to cooperate

18  with any government agency.

19  Q.  And what government agencies were you aware were

20  potentially investigating Beazer at that point in time?

21  A.  We knew that there was a grand jury subpoena issued by

22  the U.S. Attorney's Office, that HUD-OIG was on it.  And the

23  *BusinessWeek* article also had other references that we had

24  read about.

25  Q.  And were those references to the FBI?

DEBORAH DANZIG - DIRECT

1   A.   Yes.

2   Q.   So at this point you were aware of a grand jury

3   investigation, an investigation by HUD, and reports of an FBI

4   investigation?

5   A.   Yes.

6   Q.   And this was March 27th, 2007?

7   A.   Yes.

8   Q.   What did it mean when you said -- when -- withdrawn.

9        What does it mean to cooperate with a government

10  investigation?

11  A.   It means to work with the government, to look -- to

12  cooperate with them and to work with them on the concerns they

13  had about the company.

14  Q.   What does it mean to cooperate or what did you understand

15  it to mean to cooperate with regard to responding to the grand

16  jury subpoena?

17  A.   Well, initially we knew that we would -- we believed it

18  would be to provide documents and talk with the government

19  about the concerns.

20  Q.   Did you have an understanding at this point whether or

21  not Beazer intended to provide documents in response to the

22  grand jury subpoena?

23  A.   I understood that the company was preserving its

24  documents with respect to the government investigation.

25  Q.   Thank you.

DEBORAH DANZIG - DIRECT

1    I want to show you what's previously been introduced into
2  evidence as Exhibit 17.
3    And focusing you first on the bottom e-mail.  Who was
4  that e-mail from, please?
5  A.   That e-mail was from Ian McCarthy.
6  Q.   Who was Mr. McCarthy?
7  A.   Mr. McCarthy was the company CEO.
8  Q.   And who is the e-mail to, please?
9  A.   It's to the senior divisional and corporate managers.
10 Q.   The BZH senior management group, do you know if that
11 included the defendant?
12 A.   Yes, it should have.
13 Q.   And when was this e-mail sent, please?
14 A.   On March 28, 2007.
15 Q.   At approximately what time?
16 A.   7:52.
17 Q.   Is that in the morning?
18 A.   It would be in the morning.
19 Q.   And I want to point you to the second paragraph and ask
20 you if you would please read for us the highlighted portion.
21 A.   "In this story and in others reporting on the situation,
22 a representative of the FBI was quoted as saying that they are
23 looking at all types of potential fraud associated with
24 Beazer."
25 Q.   And I want to also ask you if you would please read for

1  us the first sentence of this paragraph.

2  A.    "As I am sure you are aware by now, yesterday afternoon

3  *BusinessWeek* reported in a story on their website that federal

4  investigators have opened a broad criminal probe into lending

5  practices, some financial transactions, and other dealings at

6  Beazer Homes."

7  Q.    And referring you to the top e-mail, who was that e-mail

8  from, please?

9  A.    That e-mail is from Mike Rand.

10  Q.    And who is the e-mail to?

11  A.    It is to Lisa Hupfer.

12  Q.    Does this e-mail forward the bottom e-mail?

13  A.    It does.

14  Q.    What time did Mr. Rand forward this e-mail from

15  Mr. McCarthy referencing the *BusinessWeek* article and the FBI

16  probe?

17  A.    It was forwarded at 7:55 a.m.

18  Q.    That same day?

19  A.    Yes.

20  Q.    So approximately three minutes later.

21  A.    Yes.

22  Q.    I want to show you Exhibit 5 of this -- page 5 of this

23  exhibit and ask you if you would please read for us --

24           (Government counsel conferred.)

25  Q.    I want to show you page 5 of this exhibit.  This page is

1    not yet in evidence.  Could you read for us what's written

2    after date deleted.

3            MR. SAMUEL:  Objection, Your Honor.  This is the

4    subject of the objection we made earlier that counsel raised

5    and we raised also (inaudible).

6            THE COURT:  Overruled.  Note your continuing

7    objection.

8    Q.    Would you please read for us what it says after date

9    deleted.

10   A.    Says March 31st, 2007.

11   Q.    And is the substance of the e-mail below that similar to

12   the e-mail we just looked at?

13   A.    Yes, it appears to be.

14   Q.    Was there additional press coverage after the

15   *BusinessWeek* article we previously looked at that came out on

16   March 27?

17   A.    My recollection is yes.

18   Q.    Was there coverage throughout that week?

19   A.    Yes.

20   Q.    What was the level of awareness at Beazer's corporate

21   offices with regard to the grand jury investigation at that

22   point?

23   A.    It was broadly known that there was a grand jury

24   investigation.

25   Q.    Why do you say that?

DEBORAH DANZIG - DIRECT

1    A.    It was all over the media and there were a lot of people

2    in the corporate office that were working on the response to

3    the investigation.

4    Q.    I want to show you what's been marked as Exhibit 16 and

5    has previously been admitted into evidence.

6         What is Exhibit 16, please?

7    A.    It is an article that ran in *BusinessWeek*.

8    Q.    And when did this article run, please?

9    A.    March 28th, 2007.

10   Q.    So this was the day after the article we previously

11   looked at.

12   A.    Yes.

13   Q.    I'd ask if you can please read for us the first paragraph

14   there.

15   A.    "Homebuilders came under fire in the market again on

16   March 28 after news that the North Carolina field offices of

17   the Federal Bureau of Investigation, the Internal Revenue

18   Service, the Inspector General of Housing and Urban

19   Development, and the Justice Department have opened a criminal

20   probe into lending practices, some financial transactions and

21   other dealings at Beazer Homes USA."

22   Q.    I want to show you a third page of this exhibit, please.

23        What is this page, please?

24   A.    It is another article from *BusinessWeek*.

25   Q.    And when did this article come out?

1   A.   March 28, 2007.

2   Q.   What time did this article come out?

3   A.   4:35 p.m.

4   Q.   And what is the title of this article?

5   A.   "Beazer, Builders Under a Microscope."

6   Q.   And looking at the second sentence of the first

7   paragraph, would you please read that for us.

8   A.   "Federal investigators, as first reported by

9   Businessweek.com, have opened a criminal probe into the

10  lending practices of Beazer Homes USA."

11  Q.   And I'd ask if you'd please read for us the last sentence

12  of the second paragraph which I'm highlighting.

13  A.   "Last week the FBI, the Internal Revenue Service, the

14  Justice Department, and the Inspector General of the Housing

15  and Urban Development Department started looking into the

16  company's mortgage business and other dealings."

17  Q.   And scrolling down to the third paragraph, read the first

18  sentence there.

19  A.   "'We're looking at all types of potential fraud

20  associated with Beazer - corporate, mortgage, investments,'

21  says FBI spokesman Ken Lucas, noting the joint investigation

22  itself doesn't prove any wrongdoing."

23  Q.   I'll show you what's been marked as Exhibit 20A

24  previously admitted into evidence.  Refer you to the bottom

25  e-mail first.

1    Who is this e-mail from, please?

2  A.   It's from Mike Rand.

3  Q.   And when was the e-mail sent?

4  A.   It was sent Wednesday, March 28, 2007, at 3:30 p.m.

5  Q.   Who is the e-mail to?

6  A.   Leslie Kratcoski.

7  Q.   And what is the subject line in Mr. Rand's e-mail?

8  A.   "Just trying to stay in touch."

9  Q.   And what did Mr. Rand write in the first sentence of this

10 e-mail which I'm highlighting?

11 A.   "What is the 8-K trigger event per our attorneys?"

12 Q.   What is an 8-K?

13 A.   An 8-K is a filing made by a public -- by a public

14 company to give certain information to investigators.

15 Q.   And what is an 8-K trigger?

16 A.   There are certain requirements under the SEC rules that

17 require companies to file an 8-K.

18 Q.   What, if anything, did you understand to be a potential

19 8-K trigger here?

20 A.   As I read this, the 8-K trigger would be the

21 investigation.

22 Q.   And what did Mr. Rand write in the second sentence of his

23 e-mail on March 28th?

24 A.   "In addition, unrelated but related, do companies

25 routinely announce that a subcommittee of the audit committee

1  or governance committee has been established to conduct an

2  investigation?"

3  Q.   What is the audit committee?

4  A.   Audit committee is a -- one of the committees of the

5  board of directors.

6  Q.   And what is the purpose of the audit committee?  What do

7  they do?

8  A.   The audit committee has a lot of purposes for the

9  company, including reviewing its financial statements before

10 it's filed.

11     But here it's talking about an audit committee doing an

12 independent investigation.

13 Q.   At some point did the audit committee of Beazer do an

14 investigation?

15 A.   Yes.

16 Q.   Who did the -- who, if anyone, did the audit committee

17 hire to conduct the investigation?

18 A.   The audit committee hired Alston & Bird as their counsel

19 to represent the audit committee to conduct the internal

20 independent investigation.

21 Q.   What role, if any, did you have in making the

22 determination as to whether or not Alston & Bird would be

23 hired to conduct the independent investigation?

24 A.   I had no role.

25 Q.   Did you make any recommendations to the audit committee

DEBORAH DANZIG - DIRECT

1  as to who they should hire?

2  A.   I did not.

3  Q.   Did you have any role in whether or not Mr. Brown was

4  hired to conduct the internal investigation?

5  A.   I did not.

6  Q.   You said it was an independent investigation.  What do

7  you mean by that?

8  A.   Audit committees, when they -- an audit committee can run

9  an independent investigation, meaning it's an investigation

10  that's not done by the company, and it defines the audit

11  committee's investigation separately that's separate from the

12  company itself doing an investigation into allegations of

13  fraud.

14  Q.   Did you receive any benefit, financially, socially,

15  otherwise, as a result of Mr. Brown and his firm being hired

16  by the audit committee?

17  A.   No benefit at all.

18  Q.   I want to show you what's previously been admitted into

19  evidence as Exhibit 23, and point you first to the bottom

20  e-mail.

21       Who is this e-mail from, please?

22  A.   This e-mail is from Leslie Kratcoski.

23  Q.   And who is it to?

24  A.   It's to Deborah Haertel, Larry Colditz, and Mike Rand.

25  Q.   Were you CCed on this e-mail?

1    A.    I was.

2    Q.    And what is the subject of this e-mail?

3    A.    8-K filing.

4    Q.    And what is Ms. Kratcoski relaying in this e-mail to you,

5    Mr. Rand, and others?

6    A.    She is forwarding the 8-K that would be filed that

7    afternoon.

8    Q.    And scrolling up to the e-mail above that, who is that

9    e-mail from, please?

10   A.    It's from Mike Rand.

11   Q.    And what did Mr. Rand write back to Ms. Kratcoski, you,

12   and others with regard to the 8-K filing?

13   A.    "Looks good to me."

14   Q.    And what was this 8-K filing about?

15   A.    I don't recall that specific...

16   Q.    Do you recall generally what it was in reference to, the

17   8-K that was filed on March 29th?

18   A.    About the independent investigation to be conducted by

19   the audit committee.

20   Q.    So this was generally about the independent investigation

21   the audit committee was conducting.

22   A.    Yes.

23   Q.    Ms. Danzig, we've talked about various press articles

24   that came out that week.  What impact, if any, did those press

25   articles have on the corporate offices at Beazer?

1    A.    There was a lot of work to be done in the corporate

2    office.

3    Q.    And why do you say that?

4    A.    There were a lot -- a lot of work to be done because of

5    the investigation responding to media, filing the required

6    filings with the SEC, making sure that we put everything in

7    place appropriately in the company to respond to the

8    investigation.

9    Q.    Were there discussions about this?

10   A.    Yes.

11   Q.    One or two?  Numerous discussions?

12   A.    Numerous.

13   Q.    Were many people involved in these discussions?

14   A.    Yes.  It was extensive.

15   Q.    Were these all closed door meetings or were they

16   happening around the office?

17   A.    It was closed doors.  It was around the office.  I would

18   say it was widely discussed continually throughout the week.

19   Q.    I want to show you what's previously been marked and

20   introduced and admitted into evidence as Exhibit 24A, and

21   point you first to the bottom e-mail.

22       Who is this e-mail from, please?

23   A.    It's from Peggy Caldwell.

24   Q.    Who is Ms. Caldwell?

25   A.    She was at the time the acting general counsel at Beazer.

1  Q.   Did you report to her?

2  A.   I did.

3  Q.   Who was this e-mail sent to?

4  A.   It was sent to various lawyers, Ian McCarthy, the CEO, to

5  myself, Leslie Kratcoski, and lawyers for the company and the

6  audit committee.

7  Q.   And what did Ms. Caldwell write in this e-mail, please?

8  A.   "Here is a courtesy copy of the securities class action

9  filed against us today in the U.S. district court here in

10  Atlanta.  We have not been served yet."

11  Q.   And scrolling up further in the chain, who is the top

12  e-mail from, please?

13  A.   It's from Peggy Caldwell.

14  Q.   And when was the top e-mail sent?

15  A.   It was sent March 29th, 2007, at 6:10 p.m.

16  Q.   And to whom was this e-mail sent and CCed?

17  A.   It was sent to Henry Nidden and with a CC to Mike Rand

18  and Leslie Kratcoski.

19  Q.   And what did Ms. Caldwell write in the first sentence

20  that I've highlighted?

21  A.   "Attached please find a copy of the suit filed against

22  Beazer today."

23  Q.   When was this e-mail sent in relation to the press

24  articles that we've been looking at?

25  A.   It was the same week.

DEBORAH DANZIG - DIRECT

1  Q.   I want to take you to page 3 of this exhibit.

2       Who is named as defendants in this lawsuit?

3  A.   The defendants were Beazer Homes, Ian McCarthy, James

4  O'Leary, Mike Rand, and Ken Gary.

5  Q.   And what is set forth as the complaint in the highlighted

6  portion?

7  A.   "Complaint for violation of the federal securities laws."

8  Q.   And I want to take you to page 8 and ask you to please

9  read for us what's set forth in paragraph 16.

10 A.   "Defendant Michael T. Rand (Rand) is, and at all relevant

11 times was, senior vice president and chief accounting officer

12 of the company.  During the class period Rand was responsible

13 for the company's false financial statements."

14 Q.   Taking you to the next page, please read for us the

15 highlighted portion of paragraph 19.

16 A.   "Defendants are liable for making false statements, or

17 failing to disclose adverse facts known to them about Beazer."

18 Q.   I'd like to show you what's previously been marked as

19 Exhibit 24 and admitted into evidence.

20      Who is the bottom e-mail from, please?

21 A.   Bottom e-mail is from Cory Boydston.

22 Q.   And who is the e-mail to?

23 A.   Mike Rand.

24 Q.   Would you please read to us what Ms. Boydston wrote in

25 that e-mail.

1   A.   "You're a named defendant.  Wasn't sure if you saw this."

2   Q.   When did Ms. Boydston send this e-mail to Mr. Rand,

3   please?

4   A.   March 29th.

5   Q.   And referring you to the e-mail above.  Who is that

6   e-mail from?

7   A.   It's from Mike Rand.

8   Q.   Who is it to?

9   A.   Lisa Hupfer.

10  Q.   And when was that e-mail sent in relation to the e-mail

11  below it?

12  A.   It was sent soon thereafter.

13  Q.   And what did Mr. Rand write in the first sentence which

14  I've highlighted?

15  A.   "I'm named in a civil complaint."

16  Q.   I want to take you up a couple of e-mails.

17       The e-mail that is now at the top of the pull out, who is

18  that from, please?

19  A.   The top e-mail is from Mike Rand.

20  Q.   And who is it to?

21  A.   It's to Lisa Hupfer.

22  Q.   And what is the date of that e-mail?

23  A.   Thursday, March 29th.

24  Q.   So is this later that same day?

25  A.   It is.

1  Q.    And what did Mr. Rand write in this e-mail to Ms. Hupfer?

2  A.    He wrote, "Not sure how.  It's a purported class action

3  suit suggesting false financial statements amongst other

4  things."

5  Q.    When was this e-mail sent in relation to the time that

6  the grand jury subpoena had been served upon Beazer's offices?

7  A.    It was sent six days later.

8  Q.    And when was this sent in relation to the news articles

9  that we've been looking at?

10  A.    The same week.

11        MS. VENTO:  Your Honor, I'm not sure how much longer

12  you would like to go, but this would be a good time to break

13  if --

14        THE COURT:  It would indeed.

15        Members of the jury, we're going to break for the

16  day.  I want to send you home with a couple of instructions.

17        One is not to talk about the case when you get home.

18  Friends and family will be very curious as to what you did all

19  day in federal court, but you simply are not to talk about the

20  case.  It's important to the integrity of this process that

21  you don't discuss the case amongst yourselves or with anybody

22  else until you begin your deliberations at the end of the

23  case.

24        The other thing that I would urge you is to keep an

25  open mind until you've heard all the evidence and instructions

DEBORAH DANZIG - DIRECT

1    of the court at the end of the case.

2            And so with those instructions, we'll break for the

3    evening.  I'll ask you to be back in the...

4            THE CSO:  Jury pool.

5            THE COURT:  Jury administration.

6            THE CLERK:  Jury assembly room.

7            THE COURT:  Come back to the jury assembly room at

8    8:50 in the morning ready to come back into court at 9:00.

9    We'll start right at 9:00.

10           So with those instructions, we'll call it an

11   evening.  I thank you for your attention and we'll see you

12   tomorrow morning.

13           (Jury exited the courtroom.)

14           THE COURT:  You can be excused, and if you will

15   return at 9:00 in the morning.  And do not discuss your

16   testimony with anybody between now and then.

17           THE WITNESS:  Okay.

18           THE COURT:  You're free to go at this time.

19           (Witness stepped down.)

20           THE COURT:  All right.  So we'll start at 9:00 in

21   the morning and we'll start with the cross of Mr. McNeely.

22   Then we'll start with the redirect -- well, actually, why

23   don't we finish this witness and then have the cross of

24   Mr. McNeely after the direct and cross of this witness

25   tomorrow morning.  So we'll start with her in the morning and

1    when we complete that, we'll begin the cross of Mr. McNeely.

2              MR. SAMUEL:  Your Honor...

3              THE COURT:  Yes, sir.

4              MR. SAMUEL:  Do you want us to take our things up

5    now or in the morning?

6              THE COURT:  What's that?

7              MR. SAMUEL:  If we have an issue, would you prefer

8    us to do it now or in the morning?

9              THE COURT:  Well, we're going to start court at 9:00

10   and if there are any legal issues -- why don't we get here at

11   8:30, and if there are legal issues, we'll discuss those at

12   that time.

13             MR. SAMUEL:  It's possible we can work them out

14   between now and then.

15             THE COURT:  Good idea.  At least to have that

16   conversation.

17             MR. SAMUEL:  Just showing you I'm trying.

18             THE COURT:  All right.  Anything further from either

19   side?

20             MR. MEYERS:  No, Your Honor.  Thank you.

21             THE COURT:  Okay.  We'll see you all at 8:30 in the

22   morning.

23             (Evening recess at 6:03 p.m.)

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5          I certify that the foregoing transcript is a true

6  and correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9          Dated this 12th day of October 2011.

10

11

12                          s/Cheryl A. Nuccio
                            Cheryl A. Nuccio, RMR-CRR
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25