**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:17-cv-687-RJC**
**(3:10-cr-182-RJC-DSC-1)**

| | | |
|---|---|---|
| **MICHAEL T. RAND,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's First Amended Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 filed by counsel.[1] (Doc. No. 10); <u>see</u> (Doc. No. 14) (Memorandum in Support); (Doc. No. 30) (Amended Statement of Disputed Fact). The Government has filed a Response opposing relief, (Doc. No. 21), and Petitioner has filed a Reply, (Doc. No. 27). The parties have filed evidence in support of their respective positions.

### I.      BACKGROUND[2]

Petitioner, a certified public accountant, was indicted in the underlying criminal case for accounting fraud based on earnings mismanagement and improper accounting practices while acting as the Chief Accounting Officer ("CAO") at Beazer Homes USA, Inc. ("Beazer"), a home-building company, from 2000 to 2007. He was also charged with obstructing an investigation into Beazer's mortgage origination practices. The charges were: Count (1), conspiracy to commit offenses against the United States; Count (2), mail/wire fraud conspiracy; Count (3), securities

---

[1] Counsel withdrew from representation after filing a Reply on Petitioner's behalf and Petitioner is again proceeding *pro se*. <u>See</u> (Doc. Nos. 31, 33).

[2] This Section is not exhaustive. Additional facts will be included, as relevant, in the Discussion section.

fraud; Counts (4)-(5) false statements to a bank; Count (6), obstruction of justice; Count (7), destruction of records; Counts (8)-(9), misleading conduct to hinder an investigation; Count (10), witness tampering; and Count (11), obstruction of an official proceeding. (3:10-cr-182, Doc. No. 3).

The factual background of the case, as summarized by the Fourth Circuit Court of Appeals, is as follows:

> In 2010, the government charged Michael Rand with accounting fraud based on his work at Beazer Homes USA, Inc. ("Beazer"), a home-building company, from 2000 to 2007 and with obstructing an investigation into Beazer's mortgage origination practices. Rand, a certified public accountant, was Beazer's controller and later its chief accounting officer from 1999 to 2007. He reported to Beazer's CEO and CFO.

> The government's accounting charges concerned earnings management: it believed that Rand attempted to adjust Beazer's reported earnings over time so that Beazer would hit consensus—that is, the quarterly earnings amount that Wall Street predicted. This practice involved "cookie jar" accounting with respect to Beazer's reserve accounts, where funds are set aside for future expenditures or revenue. It is generally accepted that the amount put into a reserve account is what the company reasonably anticipates needing to meet the expected expense. It is not appropriate to increase or decrease funds in reserve accounts to understate or inflate its actual earnings. Instead, if a company determines that it does not need the reserve funds, those funds "are to be taken back as income as soon as [the company] know[s] that they are no longer required." J.A. 1260.

> The government attempted to prove that Rand manipulated the accounting to reduce earnings when Beazer was beating consensus. E.g., J.A. 3720 ("If you have more than 100k extra, hide it."); id. at 3722 ("To achieve the 'goal' $ for this year, let's squirrel $ away in places which will turn around in the next year; not be so 'open.' "); id. at 1982–83 ("We may have $5 million to squirrel away, so if you have ant [sic] ideas, let me know. Joavan's cookie jar has no more room."). This practice resulted in a misrepresentation of Beazer's earnings in many quarters, including each quarter in fiscal year 2006.

> The government also alleged that Rand improperly accounted for transactions involving model homes Beazer sold to and leased back from GMAC, an investment company. In 2005, Beazer sought to enter into model-home sale-leaseback agreements. Under these agreements, Beazer would sell model homes to investors and rent the homes back from the investors until the subdivision was complete and the model home could be sold to a third party.

Generally, a seller cannot count the transaction as a sale and recognize revenue until "all risks and rewards of ownership" are transferred to the buyer. J.A. 2056. A seller may not have any "continuing involvement" with the property for it to be counted as a sale. Id. A transaction is not counted as a sale if the seller retains the ability to share in the appreciation of the home after it is sold.

Deloitte & Touche ("Deloitte") served as Beazer's auditors. Rand consulted with Deloitte senior manager, Corbin Adams, about a potential sale-leaseback arrangement with GMAC. In December 2005, Rand sent Adams a draft Master Sale and Rental Agreement ("MSRA") that did not include any provision for Beazer to benefit from later appreciation in the value of the homes. He later confirmed that Beazer would not be able to "participate in appreciation of [the] leased assets." Id. at 2074. Meanwhile, Rand was assuring Beazer's employees that Beazer would share in the upside—the future profits from appreciation in value before GMAC eventually sold them. The same day Beazer entered into the MSRA, a Property Management Agreement ("PMA") between GMAC entities was executed, providing that Beazer would share in the upside of any consumer transactions. In the next nine months, Beazer entered into two more MSRAs, followed by PMAs, agreeing that Beazer would share in appreciation when the model homes sold. Beazer received $117 million for the model homes it sold and reported $24.8 million in total profit.

Finally, Rand was charged with obstruction of justice stemming from his allegedly deleting emails following a grand jury subpoena. In March 2007, the FBI began investigating Beazer for mortgage fraud. On March 23, 2007, a federal grand jury issued a subpoena requiring Beazer to retain all documents, including emails, related to mortgages or home sales.

On March 28, Beazer initiated an "email dumpster," which would save all deleted emails from permanent deletion. Beginning March 29, all deleted emails were caught in this dumpster without the employee's knowledge. At 2:58 p.m. on March 30, Beazer's CEO Ian McCarthy sent a memorandum to Rand and other senior management notifying them that Beazer was providing documents in response to the subpoena and would be providing an updated document-retention memorandum. Around 4:20 p.m., Deborah Danzig, an in-house attorney, sent an email to all employees in the corporate office, including Rand, with this memorandum, instructing them not to destroy any records. Danzig also testified that she told Rand directly that "he was required to keep everything and destroy nothing." Id. at 975.

Between 5:55 p.m. on March 29 and 5:45 p.m. on March 30, 2007, Rand deleted nearly 6,000 emails dating back to 1999. Some of the emails were responsive to the grand jury's subpoena and contained evidence of mortgage fraud. Other emails that Rand deleted were related to the cookie-jar accounting scheme. Others still appeared irrelevant to either set of charges.

Shortly after the subpoena was issued, Beazer's audit committee hired the law firm Alston & Bird to conduct an internal investigation. Mike Brown, a partner at Alston & Bird, interviewed Rand as part of that investigation. On June 15, 2007, during their first interview, Rand told Brown that he had not destroyed or deleted any documents or emails since the investigation had begun. On June 26, 2007, Brown met with Rand again. Brown had learned that the email dumpster had recovered thousands of emails that Rand had attempted to delete. At that meeting, Rand initially provided that he did not delete any emails, but he eventually admitted that he might have deleted "a couple of emails" to reduce the size of his mailbox. Id. at 1072. On further questioning, Rand said that he deleted "a series of emails" from one particular coworker on March 30. Id. at 1073.

Beginning July 2008, the FBI conducted between six and eight interviews with Rand as part of a proffer. During these interviews, conducted by FBI Agent Douglas Curran and others, Rand admitted to manipulating Beazer's earnings, admitted that that was illegal, and expressed remorse. Curran testified that he also asked Rand about the GMAC transaction, and Rand admitted that there was a "verbal side agreement to share in the appreciation of the model homes when they were ultimately sold." Id. at 2780.

Curran also asked Rand about the email deletions. Curran testified that Rand admitted that "he was certain that by March 27th he was for sure at the latest aware that there was a federal investigation in Charlotte." Id. at 2784. Rand also admitted that he had spoken with Danzig and understood that the document-retention memorandum applied to him, when he "went back to his office and started performing mass deletions of emails." Id. at 2784–85. Explaining that he was "essentially in a state of panic," he deleted the emails because "[t]here were a lot of stressful events going on in his life at that time, and on top of that he was aware of the federal grand jury investigation that was focused in Charlotte and he did not want to be associated with that investigation in any way." Id. at 2785. Rand admitted that he "understood that he was deleting evidence pertinent to the investigation" and "[h]e knew it was wrong." Id. at 2786.

Rand went to trial twice. Before the first trial, Rand sought leave to subpoena computer forensic evidence of Rand's email deletions and records from Beazer's accounting system to show Rand's accounting was reasonable and justified and to contextualize and refute the prosecution's accounting records. The district court denied both requests.

In the first trial, the government presented evidence of emails relevant to the grand jury's investigation into Beazer's mortgage division and that Rand deleted from his Beazer email account. Aaron Philipp, a computer forensics expert, testified that based on Beazer's backup tapes, 3,272 emails were deleted between March 23 and 28, while another 5,936 were deleted on March 30, after the email dumpster was put into place.

The jury deliberated for twenty hours and returned a split verdict, convicting Rand on seven counts and acquitting on four. A new trial was later granted due to juror misconduct.

In advance of the second trial, Rand again sought to subpoena Beazer to obtain records from its accounting system. Again, the district court denied the request. Rand also tried again to get the backup tapes from Beazer of the March 23–28 email deletions, and this time, the court granted the request. Rand's expert examined the data on the backup tapes and concluded that approximately 2,500 of the approximately 3,200 emails that Philipp testified during the first trial were deleted between March 23 and March 28, 2007 (prior to the dumpster being in place), were not, in fact, deleted, explaining that "there [were] various technical explanations why Mr. Philipp could not find them on the tape the first time." Id. at 719.

The government dropped Philipp from its witness list, halted all efforts to prove the March 23–28 deletions, and moved to strike parts of the indictment relating to those deletions. The government also moved to preclude Rand from introducing evidence or mentioning the false accusations at the retrial. The court granted the prosecution's request ruling that the evidence was irrelevant and excludable under Federal Rule of Evidence 403 as distracting or confusing because the prosecution was no longer seeking to prove the March 23–28 deletions.

United States v. Rand, 835 F.3d 451, 456–59 (4th Cir. 2016) (footnotes omitted).

In the second trial, the jury found Petitioner guilty of Counts (1), (2), (6), (9), (11).[3] (Id., Doc. No. 357). Although the advisory guidelines called for 900 months of imprisonment, the Court sentenced Petitioner to a total of 120 months' imprisonment (60 months for Count (1) and 120 months for Counts (2), (6), (9), and (11), concurrent) followed by three years of supervised release. (Id., Doc. Nos. 380, 381); see (Id., Doc. No. 387) (Amended Judgment reflecting that the Court will decline to order restitution).

Petitioner argued on direct appeal that the exclusion of evidence that the Government falsely accused him at a reverse proffer session of deleting a large number of emails hampered his constitutional right to present a defense; that several of the Court's other evidentiary rulings were

---

[3] Counts (3) and (7) were dismissed on the motion of the United States. (Id., Doc. Nos. 326, 338).

improper including its decision to quash Petitioner's Rule 17(c) subpoena to Beazer; that the Government made improper statements in its rebuttal closing argument about Petitioner's wealth and silence; that the Government improperly vouched for rebuttal witness FBI Special Agent Curran's credibility;[4] and that the sentence is procedurally unreasonable. The Fourth Circuit Court of Appeals affirmed, finding that the exclusion of evidence did not violate due process, that the Court's denial of Petitioner's third-party document subpoena was not an abuse of discretion; that the prosecutor's comments on Petitioner's wealth was harmless; that the prosecutor did not improperly comment on Petitioner's silence; and that the sentence was not procedurally unreasonable. United States v. Rand, 835 F.3d 451 (4th Cir. 2016). The United States Supreme Court denied certiorari on November 28, 2016. Rand v. United States, 137 S.Ct. 525 (2016).

Petitioner argues in his First Amended Motion to Vacate, (Doc. No. 10), that (renumbered and restated): (1) counsel was ineffective for (A) operating under an actual conflict of interest due to the defense law firm's hiring of former prosecutor Matthew Martens; (B) failing to prepare Petitioner to testify at trial and refusing to allow him to testify; (C) failing to correct the Government's false, misleading, and erroneous accounting testimony; (D) failing to obtain and present exculpatory evidence; (E) failing to object to the prosecution's "Indict the Industry" theory that shifted the burden of proof and failing to request an appropriate jury instruction; and (F) providing deficient performance in additional ways; and (2) prosecutorial misconduct deprived Petitioner of a fundamentally fair trial. Petitioner requests an evidentiary hearing.

The Government has filed a Response, (Doc. No. 21), arguing that Petitioner's claims of ineffective assistance of counsel are meritless, that his claims of prosecutorial misconduct fail as

---

[4] Curran was permitted to testify in the Government's rebuttal pursuant to the third exception in the immunity agreement, to impeach, rebut or counter a defense. (3:10-cr-182, Doc. No. 411 at 14-15). Curran testified that Petitioner admitted having knowingly engaged in illegal acts, including his manipulations of earnings were material and that there was a right to ask to share GMCA upside in a verbal side agreement, and expressed remorse.

a matter of law, and that his remaining claims (that the Court denied him his right to testify and that permitted the United States to assert a defense that effectively shifted the burden of proof), are procedurally defaulted, and that the § 2255 Motion to Vacate should be denied without an evidentiary hearing.

In the Reply, Petitioner reiterates his arguments about defense counsel's alleged conflict of interest, ineffective cross examination about accounting rules, failing to present exculpatory and impeachment evidence, failing to prepare Petitioner to testify and refusing to allow him to testify at trial, that Petitioner was deprived of constitutionally adequate representation at his proffer, that counsel was ineffective for switching expert witnesses, failing to call Deloitte & Touche witnesses at trial, counsel failed to prepare Petitioner for sentencing, that counsel's deficient performance prejudiced him, and that any procedural default is excused by cause and prejudice and/or actual innocence.

## II. STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. The parties have submitted evidence in support of their respective positions. However, after examining the record in this matter, the Court has determined that it can dispose of

this case based on the record and governing case law and thus no evidentiary hearing is required. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION[5]

### (1)    Ineffective Assistance of Counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. Const. Amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003).  The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

---

[5] When counsel appeared for Petitioner, the Court permitted counsel to file a superseding amended § 2255 petition on Petitioner's behalf but specifically disallowed hybrid representation. (Doc. No. 7). Counsel then filed a First Amended Motion to Vacate, (Doc. No. 10), and Memorandum in Support, (Doc. No. 14).  Attached to the First Amended Motion to Vacate is a 50-page "Declaration" by Petitioner, (Doc. No. 10-1), that is nearly identical to Petitioner's *pro se* § 2255 Motion to Vacate and was stricken because it violated the spirit of the Court's Order disallowing hybrid representation and was otherwise defective. (Doc. No. 29). Counsel subsequently filed "Petitioner's Amended Statement of Disputed Facts," (Doc. No. 30), which is signed by counsel, not Petitioner, and refers to the stricken Declaration. Counsel will not be permitted to make an end-run around the Court's rulings and the stricken Declaration will not be considered. Further, to the extent that the Court does not specifically address each of the claims and examples asserted in Petitioner's voluminous filings, they have been considered and rejected.

probability sufficient to undermine confidence in the outcome." Id. at 694. In considering the prejudice prong of the analysis, a court cannot grant relief solely because the outcome would have been different absent counsel's deficient performance, but rather, it "can only grant relief under … Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 697.

### (A)    Conflict of Interest

Petitioner argues that his defense team from WilmerHale had an actual conflict of interest because a former prosecutor in Petitioner's case, Matthew Martens, was hired at WilmerHale before Petitioner's second trial. Petitioner claims that Martens' employment at the firm caused counsel to refuse to call Martens at trial to testify about the Government's allegation at a reverse proffer session that Petitioner had deleted a large number of emails, which turned out to be false, and that this false accusation coerced Petitioner to concede his actions were illegal and that he was remorseful. Petitioner further argues that the Government made a "false claim" at trial[6] that Petitioner "confessed" to intentionally engaging in criminal activity and failed to call Petitioner to testify about this evidence to reveal Martens' misconduct and explain his state of mind upon entering the proffers due to Martens' prosecutorial misconduct. (Doc. No. 14 at 15). Petitioner

---

[6] This is an apparent reference to Agent Curran's rebuttal testimony.

contends that counsel declined to bring this conflict to the Court's attention because it did not want to lose Petitioner's lucrative representation.[7]

"[I]t is clearly established that the [Sixth Amendment] right to effective assistance includes the right to representation free from conflicts of interest." Rubin v. Gee, 292 F.3d 396, 401 (4th Cir. 2002) (citing Cuyler v. Sullivan, 446 U.S. 335, 348-50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). To establish ineffective assistance of counsel based on a conflict of interest, a defendant who raised no objection at trial must demonstrate that (1) counsel operated under an "actual conflict of interest;" and (2) this conflict "adversely affected his lawyer's performance." United States v. Dehlinger, 740 F.3d 315, 322 (4th Cir. 2014) (quoting Cuyler, 446 U.S. at 348). If the petitioner satisfies this showing, "prejudice is presumed and [he] need not demonstrate a reasonable probability that, but for counsel's conflicted representation, the outcome of the proceeding would have been different." Woodfolk v. Maynard, 857 F.3d 531, 553 (4th Cir. 2017) (citing United States v. Nicholson, 611 F.3d 191, 195 (4th Cir. 2010)).

An actual conflict exists when an attorney's and a defendant's interests are divergent with respect to a material factual or legal issue or a course of action. Cuyler, 446 U.S. at 335, 356 ("An actual conflict of interest negates the unimpaired loyalty a defendant is constitutionally entitled to expect and receive from his attorney."). "A defendant has established an adverse effect if he proves that his attorney took action on behalf of one client that was necessarily adverse to the defense of another or failed to take action on behalf of one because it would adversely affect another." Mickens v. Taylor, 240 F.3d 348, 360 (4th Cir. 2001) (en banc). A showing of adverse effect requires the petitioner to: (1) "identify a plausible alternative defense strategy or tactic that his

---

[7] Petitioner blames nearly every perceived deficiency by counsel on defense counsel's alleged conflict with Martens. Petitioner's other claims of ineffective assistance of counsel that do not relate directly to Martens, including the allegation that counsel interfered with Petitioner's right to testify, will be considered in separate sections.

defense counsel might have pursued;" (2) show that this strategy "was objectively reasonable under the facts of the case known to the attorney at the time," and (3) show "that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Dehlinger, 740 F.3d at 322 (quoting Mickens, 240 F.3d at 361). Because an actual conflict of interest requires not only a theoretically divided loyalty, but also a conflict that actually affected counsel's performance, the actual conflict and adverse effect inquiries are often intertwined. Jones v. Polk, 401 F.3d 257, 267 (4th Cir. 2005).

The Government has filed a letter dated October 15, 2013 from defense counsel Brent Gurney to Plaintiff memorializing their conversation about Martens having recently joined WilmerHale as a partner "and confirming that [Petitioner] wish[es] to continue with WilmerHale as [his] counsel," after having discussed the matter with independent counsel. (Doc. No. 21-1 at 1). The letters states that the firm will establish a Chinese Wall between the defense team and Martens and notes that Petitioner previously indicated that he may like to call Martens as a witness or file motions directed at his conduct. Gurney states in the letter that the defense team "do[es] not think that attacking Martens' conduct personally (either by calling him as a witness, questioning other witnesses about his conduct, or filing motions based on his conduct) would be a wise strategy and therefore in your best interest." (Id.). Depending on the evidence, the defense does, however, expect to attack the conduct of the FBI and U.S. Attorney's Office generally, argue that the Government threatened and intimidated him, caused him to believe he was guilty when he was not, and demonstrate that inaccurate accusations about email deletions misled him into thinking that he deleted certain emails that he did not delete, and that this case never should have been brought. However, "we don't see any basis for singling out Martens and/or any benefit from doing so." (Id.). Further, the applicable ethical rules would not permit WilmerHale to represent Petitioner

if he sought to call Martens as a witness, and the firm is not comfortable representing Petitioner if his strategy includes attacking Martens directly or indirectly. Gurney concludes in the letter that Petitioner "shouldn't continue with us if you are not comfortable that we can defend you as you wish to be defended [and] … if you are or think you may be uncomfortable with us, you should find other counsel now, while the case is still in its early stages, and that you may wish to get independent legal advice – from Steve Councill, your former lawyers (Samuel and Gardner), or other lawyers you may know or we can recommend – about whether having WilmerHale represent you is in your best interest." (Doc. No. 21-1 at 2).

Consistent with Gurney's letter, defense counsel attempted repeatedly to gain admission of evidence about the false email deletion accusation at trial.[8] When the Court granted the Government's request to introduce evidence of Petitioner's proffer session statements, the defense sought again to introduce evidence that the Government made false deletion accusations at the reverse proffer session, but the Court found that the door had not been opened. (3:10-cr-182, Doc. No. 411 at 16). The defense argued that the false deletion accusations constituted material inducement of Petitioner's proffer statements and that the issues are prosecutorial misconduct and Petitioner's state of mind. (Id., Doc. No. 411 at 20). Gurney told the Court that he "hesitate[s] to call [his] colleagues – say they have engaged in prosecutorial misconduct," and in any event, "the issue is not the prosecutor's good faith," but rather, "Mr. Rand's state of mind … [a]nd he should be allowed to testify as to why he was induced into proffering before the United States

---

[8] See (3:10-cr-182, Doc. No. 395 at 12-20) (opposing the Government's Motion in Limine regarding the false deletion allegation), (Id., Doc. No. 405 at 13) (continuing objection regarding the prohibition of raising false email deletion accusations); (Id., Doc. No. 396 at 91) (proffering cross examination that the defense would have pursued absent the ruling on false email deletion); (Id., Doc. No. 406 at 6) (continuing objection regarding false email deletion); (Id., Doc. No. 398 at 5) (arguing that the Government opened the door to evidence about the false email deletion allegation); (Id., Doc. No. 409 at 15) (defense arguing that it should be permitted to raise the false email deletion allegations); (Id., Doc. No. 411 at 16-24) (the Court reasserting its ruling about the admission of false email deletion allegations despite finding that Curran can testify about the proffer sessions, denying defense motion to suppress).

government." (Id., Doc. No. 411 at 20-21). The Court held that Petitioner "can do that without reference to the fact that years later some of the information that he was confronted with turned out to be false." (Id., Doc. No. 411 at 21).

Petitioner has failed to demonstrate that defense counsel labored under an actual conflict of interest. The record demonstrates that the interests of Petitioner and counsel were not divergent with respect to a material factual, legal issue, or course of action. The defense strategy was to show that Petitioner's proffer statements were induced by false email accusations. Counsel pursued this strategy vigorously but was ultimately unsuccessful. Counsel informed Petitioner that a claim of prosecutorial misconduct with regards to the false deletion accusation was not in his best interest, but that if it was a strategy he wished to pursue, he would need to seek alternate counsel. Petitioner chose not to do so. Petitioner's after-the-fact disagreement with counsel's strategic decision that was fully disclosed prior to trial and which Petitioner considered with the benefit of independent legal advice, provides no basis for determining that an actual conflict existed. See, e.g., United States v. Reyes-Bosque, 596 F.3d 1017, 1034 (9th Cir. 2010) (finding no conflict of interest where the attorney-client conflict "centered on the fact that [the client] was unhappy with counsel's performance"); United States v. Fields, 483 F.3d 313, 353 (5th Cir. 2007) ("mere disagreement about strategic litigation decisions is not a conflict of interest.").

Nor has Petitioner demonstrated any adverse effect. Counsel informed Petitioner that a prosecutorial misconduct claim against Martens as an unsound strategy. This assessment was borne out at trial, with the Court finding that no prosecutorial misconduct occurred. See (3:10-cr-182, Doc. No. 395 at 42) (the Court finding that no knowing or deliberate misconduct occurred and precluding the defense from making any argument regarding the false accusations about email deletions). No adverse effect can be found from counsel's reasonable strategic decision under these

circumstances. See Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (finding that counsel's decisions not to present a "lesser culpability" argument on appeal was not due to a conflict, but had a reasonable strategic basis where it was rejected by the lower court); Mickens, 240 F.3d at 348 (rejecting a conflict of interest claim where many of the petitioner's attempts to show adverse effect were not viable defense strategies and strategies that were viable were not linked to the alleged conflict); see also Powell v. Kelly, 562 F.3d 656, 670 (4th Cir. 2009) (once counsel conducts a reasonable investigation of law and facts, his strategic decisions are "virtually unchallengeable.")(quoting Strickland, 466 U.S. at 688).

Petitioner has not demonstrated the existence of an actual conflict or any adverse effect, and therefore, his conflict of interest claim will be denied.[9]

**(B)    Petitioner's Right to Testify**

Petitioner contends that counsel failed to prepare Petitioner to testify by adequately reviewing discovery with him and refused to allow him to testify despite his repeated expressions of desire to do so. Petitioner further argues that counsel's "horrible decision[s]" effectively forced him to refrain from testifying. (Doc. No. 14 at 27). Petitioner has filed his SEC deposition from May 8, 2018 in support of this claim, (Doc. No. 28), in which he provided "straightforward, simple,

---

[9] Petitioner suggests that counsel, due to a conflict of interest, failed to call Martens and/or Petitioner to testify that Curran lied about Petitioner's admission of guilt and expression of remorse at a proffer session. However, this argument is inconsistent with Petitioner's admission that Mr. Glaser never told Petitioner to lie in the proffer statements, and to the contrary, told him only to tell truth and that Petitioner did, in fact, state in the proffer sessions that his actions were illegal and that he was remorseful. (Doc. No. 27 at 12-13). Counsel cannot be deemed ineffective for failing to call Petitioner, Martens, or any other witness to challenge the veracity of Curran's testimony in this regard because Petitioner has admitted that it is true. See, e.g., Turk v. White, 116 F.3d 1264, 1265 (9th Cir. 1997) (counsel could not be deemed ineffective for failing to investigate an incompetence defense would have directly conflicted with the self-defense theory that counsel reasonably selected after investigating the case; "[p]ursuit of these conflicting theories would have confused the jury and undermined whatever chance [defendant] had of an acquittal."); Scott v. Dugger, 891 F.2d 800, 805 (11th Cir. 1989) (counsel in a capital case was not ineffective for failing to present mitigating evidence under a theory that would have been "completely false.").

and irrefutable explanation for many of the allegations at issue in this case" that he would have provided at trial had he been permitted to take the stand. (Doc. No. 14 at 1, n.1).

A criminal defendant has a fundamental constitutional right to testify on his or her own behalf at trial. United States v. Midgett, 342 F.3d 321, 325 (4th Cir. 2003). A defendant's waiver of this right, like that of any other constitutional right, is "personal" and must be made voluntarily and knowingly. Sexton, 163 F.3d at 881. In order to prove ineffective assistance of counsel based on his claim that his attorney prevented him from exercising his right to testify, a petitioner must show both that his attorney violated his right to testify and that his testimony had a reasonable probability of changing the outcome. See United States v. Rashaad, 249 Fed. Appx. 972, 973 (4th Cir. 2007).

Petitioner's contention that he wanted to testify at trial but that counsel prevented him from doing so is conclusively refuted by the record. At Petitioner's first trial, the Court conducted an exhaustive colloquy informing Petitioner that his right to testify or not testify at trial is a constitutional one and that it is his alone to make:

> THE COURT: …Mr. Rand, the sole purpose of my talking to you right now is to make sure that you understand your options in this case. You have a constitutional right to testify in your own defense, and that is something that obviously you should consult with your attorneys about. But at the end of the day it's a choice that's peculiarly yours to make.
>
> You also have a right – a constitutional right not to testify. And you've heard me instruct the jury, both in the selection process and in the preliminary instructions, that they can't hold that against you if you exercised that right.
>
> And I'm not trying to persuade you one way or the other. I recommend that you talk to your attorneys about the options that you have available to you. But I wanted to make sure that you understood those options.
>
> DEFENDANT RAND: Yes I do, Your Honor.

THE COURT: And then at some later point I will ask you whether you've made your – whether you've chosen your option or not. But at this point I just wanted to make sure that you understood that.

DEFENDANT RAND: (Nodding head.)

(3:10-cr-182, Doc. No. 421 at 25-26).

After the defense rested, Petitioner exercised his personal constitutional right not to testify:

THE COURT: … Having considered your options, have you made a decision as to whether you wish to testify in your own defense or not?

DEFENDANT RAND: Yes, I have made a decision and I do not choose to testify.

(3:10-cr-182, Doc. No. 421 at 26).

At Petitioner's second trial, the Court again informed Petitioner of his right to testify or not

testify which is a personal constitutional right:

THE COURT: … You have a right not to testify if you don't wish to testify, and I think you've heard me explain that to the jury, that you have a presumption of innocence and with that presumption there's a requirement that the burden is on the government to prove its case. You don't have a burden. Having said that, you also have a right to testify if you wish to testify. That's a personal right which I'm sure you've discussed with your attorneys. But I wanted to make sure on the record that you understood the choice you have, whether to testify or not.

Do you understand that choice?

THE DEFENDANT: I do, Your Honor.

THE COURT: All right. And I'm not going to ask you this evening what you're going to do but I will ask your attorneys – well, we'll meet back here at 9:00 and at that point the defense will put on any evidence it wishes to put on, including if you choose to testify, your testimony. But if you choose not to testify, you should know that I will again instruct the jury that that's your constitutional right.

Do you understand that?

THE DEFENDANT: Yes. Thank you, Your Honor.

(3:10-cr-182, Doc. No. 400 at 139-40).

Counsel announced the intent to rest the defense case after having presented several witnesses but without having called Petitioner. Petitioner, who was present in the courtroom, did not say anything about wishing to testify. (3:10-cr-182, Doc. No. 411 at 116). After conferring with Petitioner following the Government's rebuttal case, defense counsel rested for a second time and Petitioner again remained mute. (3:10-cr-182, Doc. No. 402 at 22).

The foregoing reveals that Petitioner was well aware of his constitutional right to testify or not to testify, that he understood his right was personal, and that he chose not to testify in his own defense. Any suggestion that Petitioner did not understand his rights or did not knowingly waive his right to testify is conclusively refuted by the record and his present self-serving contentions to the contrary will be rejected. See generally Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); see, e.g., United States v. Lemaster, 403 F.3d 216, 221–22 (4th Cir. 2005) (§ 2255 petitioner's sworn statements during the plea colloquy conclusively established that his plea agreement and waiver were knowing and voluntary). To the extent that Petitioner suggests that counsel's representation was so deficient that counsel de facto deprived him of the option of testifying is likewise rejected. The record reflects that counsel provided a vigorous, well-prepared, and thorough defense.

Moreover, Petitioner has failed to demonstrate prejudice. None of the proposed testimony that Petitioner ostensibly would have provided had a reasonable probability of resulting in a different outcome in light of the voluminous evidence of his conspiratorial, fraudulent, and obstructive content, the most damning of which were Petitioner's own emails and email deletions that plainly set forth his fraudulent earnings management activities, arrangement of a GMAC deal

that he knew was in violation of accounting principles, and his attempts to avoid the attention of auditors and investigators.[10] There is no reasonable probability that, had Petitioner testified at trial, there would have been a different trial outcome.

Petitioner's claims of deficient performance and prejudice with regards to his right to testify are meritless and will be denied.

### (C)    False, Misleading, and Erroneous Accounting Evidence

Petitioner contends that counsel was ineffective for allowing false material testimony with regards to accounting principles to be adduced at trial without subjecting it to any meaningful confrontation. Petitioner has presented Declarations from two expert witnesses, John L. Campbell, (Doc. No. 14-1), and Steven Sapp, (Doc. No. 27-1), analyzing five passages of exchanges between the prosecutor and Government witnesses addressing contingency accounting, a CAO's responsibilities with respect to individual transactions, individual reserves, and individual divisions, adjusting reserves with the effect of hitting a target and/or moving a company closer to consensus, defining reserves, expenses, and matching principles, and defining "material." Petitioner claims that the Declarations explain why each of the exchanges between witnesses and the prosecutor adduced testimony that was false, misleading, and erroneous, that counsel should have known that this testimony was wrong, and should have confronted the Government about putting this evidence before the jury. Petitioner argues that an evidentiary hearing is required to determine whether the witnesses intentionally testified falsely, but that the testimony was unquestionably erroneous and material, which requires the conviction to be vacated.

A conviction obtained through the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could

---

[10] The Court recognizes the myriad differences between trial testimony and an SEC deposition. See generally (3:10-cr-182, Doc. No. 411 at 11-12) (addressing several considerations with regards to SEC depositions at trial).

have affected the judgment. <u>Napue v. Illinois</u>, 360 U.S. 264 (1959); <u>United States v. Chavez</u>, 894 F.3d 593, 601 (4th Cir. 2018). To prevail on a claim that the prosecution knowingly introduced perjured testimony at trial, a petitioner must demonstrate: (1) the testimony was false; (2) the government knew the testimony was false, and (3) there is a reasonable probability that the false testimony could have affected the verdict. <u>See</u> <u>United States v. Roane</u>, 378 F.3d 382, 400 (4th Cir. 2004). A meritorious <u>Napue</u> claim requires "a showing of the falsity and materiality of the testimony." <u>Daniels v. Lee</u>, 316 F.3d 477, 493 (4th Cir. 2003).

As a preliminary matter, this claim is barred to the extent that the Fourth Circuit found on direct appeal that the Court did not err by allowing the Government to have Beazer employees testify as lay witnesses about the propriety of complex accounting practices. <u>See</u> <u>Rand</u>, 835 F.3d at 464. It is well settled that a criminal defendant cannot "circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion." <u>United States v. Dyess</u>, 730 F.3d 354, 360 (4th Cir. 2013) (quoting <u>United States v. Linder</u>, 552 F.3d 391, 396 (4th Cir. 2009)); <u>see</u> <u>also</u> <u>United States v. Roane</u>, 378 F.3d 382, 396 n. 7 (4th Cir. 2004) (noting that, absent "any change in the law," defendants "cannot relitigate" previously decided issues in a § 2255 motion); <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir.1976) (holding criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]"). To the extent that Petitioner attempts to re-cast this rejected claim as one of ineffective assistance of counsel, the claim is denied.

This claim also fails on the merits. Counsel cannot be deemed ineffective for failing to raise a <u>Napue</u> claim because Petitioner has not demonstrated that any false testimony was knowingly presented by the Government or that there is a reasonable probability that the false testimony could have affected the verdict. A number of Petitioner's former colleagues at Beazer

testified about job duties, conduct that Petitioner carried out and/or instructed them to carry out, and their understanding of the propriety of various actions and instructions under accounting principles and Beazer's policies. Petitioner has failed to demonstrate that any of the Government's testimony was demonstrably false or knowingly presented as such.[11]

The Declarations submitted by Petitioner do not alter this conclusion. Campbell's Declaration is based on just five exchanges between prosecutors and witnesses. From that limited review, Campbell opines that "the lawyers asked questions in ways that did not reflect that GAAP inherently requires management judgment and estimates" and second that "the witnesses did not appear to understand GAAP and its application in the corporate setting." (Doc. No. 14-1 at 2). Sapp, in turn, reviewed Campbell's Declaration and filed his own Declaration concurring with Campbell's conclusions. (Doc. No. 27-1). Nothing in these Declarations reveals that the Government presented demonstrably false testimony or that it knowingly did so.[12]

The record further refutes Petitioner's suggestion that counsel meaningfully challenged the Government's evidence. The defense cross examined the Government's witnesses on their recollections of the timing of various events, their preparation with prosecutors and review of transcripts from the first trial, the breadth and complexity of Petitioner's job, and the complexity of the applicable accounting rules. The defense also called former Beazer employees Robert Gentry and Christine Malta to testify about the Beazer Way accounting policies and accounting activities; accounting expert Todd Bailey to testify about the propriety of various journal entries including adjustments to reserves and accounting for the GMAC transactions; and economic expert

---

[11] Petitioner has also failed to demonstrate that the prosecution withheld exculpatory or impeachment evidence. See Section (D), *infra*.

[12] Nor do the Declarations set forth any evidence that had a reasonable probability of resulting in a different trial outcome had it been presented to the jury.

Sanjay Unni to testify that the challenged accounting adjustments did not significantly affect Beazer's stock prices. The jury had competing evidence before it and resolved the issues in the Government's favor; Petitioner has failed to demonstrate that, had counsel challenged the Government's evidence in certain ways would have had a reasonable probability of a different trial outcome. The lack of prejudice is especially clear in light of the other evidence of Petitioner's guilt, including his emails and statements explicitly outlining fraudulent practices in which he was engaged and directed others to carry out, as well as his efforts to avoid scrutiny by auditors and investigators.

Absent any showing of a <u>Napue</u> error, counsel cannot be deemed ineffective for failing to raise this meritless claim. <u>See</u> <u>generally</u> <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) ("this Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success.").

**(D)** **Defense Evidence**

Petitioner contends that counsel failed to obtain "critically important exculpatory evidence" including accounting records from Beazer, Alston & Bird internal investigation witness interviews, and testimony from a Deloitte & Touche representative about its audit findings. (Doc. No. 14 at 32). Petitioner claims that defense counsel failed and refused to adhere to the well-settled legal standard for subpoena that would have obtained relevant records and evidence, that counsel failed to obtain and use exculpatory and impeaching statements from Alston & Bird witness interviews, and that counsel failed to call a representative from Deloitte & Touche to testify to key material exculpatory facts concerning their audit findings from "2000 to 2007 and beyond…," even though Petitioner requested that they do so. (Doc. No. 14 at 35).

Petitioner's claims are barred to the extent that Petitioner the Fourth Circuit rejected claims on direct appeal that the Court abused its discretion by quashing Petitioner's Rule 17(c) subpoena to Beazer and by prohibiting Petitioner's expert from testifying about work papers prepared by Deloitte & Touche because they were not reliable. Petitioner may not recast these rejected claims as ones of ineffective assistance of counsel. See Dyess, 730 F.3d at 360.

These claims also fail on the merits. The record demonstrates that counsel zealously attempted to obtain Beazer, Alston & Bird, and Deloitte & Touche records for trial. These matters were the subject of extensive pretrial proceedings. See, e.g., (3:10-cr-182, Doc. Nos. 69, 215, 223, 224) (Rule 17(c) subpoenas for Beazer records); (Id., Doc. No. 222) (motion to compel records from Beazer); (Id., Doc. Nos. 253, 317) (motions to quash by Beazer); (Id., Doc. No. 212) (Rule 17(c) subpoena for Alston & Bird interview memorandum); (Id., Doc. No. 234, 236, 248) (notices of appeal regarding magistrate judge's order on motion for discovery). Nor has Petitioner demonstrated what more counsel could have done to obtain documents from Beazer despite its vigorous opposition to Petitioner's attempts, from Alston & Bird with regards to an internal investigation,[13] or from Deloitte & Touche that would have been relevant notwithstanding Petitioner's omissions and misrepresentations to auditors. See (3:10-cr-182, Doc. No. 401 at 7) (limiting defense expert testimony with regards to Deloitte & Touche work papers because Corbin Adams testified that he was not provided sufficient information, and thus, it is not reliable); see generally Pruett v. Thompson, 996 F.2d 1560, 1571 n.9 (4th Cir. 1993) (decisions about what types of evidence to introduce "are ones of trial strategy, and attorneys have great latitude on where they can focus the jury's attention and what sort of mitigating evidence they can choose not to

---

[13] Petitioner's claim that Alston & Bird interviews were disclosed to the SEC during a later investigation is irrelevant to the defense attempts to obtain those statements for trial. See generally Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (communications made by company's employees to counsel for the company at the direction of corporate superiors to secure legal advice from counsel were privileged).

introduce."). Petitioner has also failed to demonstrate that the lack of any desired evidence was due to any impropriety by the Government.[14] Moreover, Petitioner has failed to demonstrate a reasonable probability of a different outcome but for counsel's alleged deficient performance with regards to any of the foregoing in light of the strong evidence of his guilt. Therefore, this claim will be denied.

(E)     **Shifting the Burden**

Petitioner contends that counsel was ineffective for failing to object to the Government's "indict the industry" approach. He claims that this theory shifted the burden of proof to the defense to establish the legitimacy of his accounting practices, and that counsel was ineffective for failing to object to this theory of prosecution or request jury instructions to address the issue.

It is well settled that "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." United States v. Saint Louis, 889 F.3d 145, 156 (4th Cir. 2018) (quoting United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992)). As a general matter, a district court has an obligation to give instructions to the jury that "fairly state[] the controlling law." United States v. Cobb, 905 F.2d 784, 789 (4th Cir.1990).

Petitioner's contention that counsel should have objected to the Government's burden-shifting theory of the case is refuted by the record. The Government presented evidence that Petitioner conspired to manipulate Beazer's accounting records with regards to the company's earnings and GMAC proceeds. Nothing about the Government's theory of the case or presentation of evidence shifted the burden to Petitioner, and Petitioner has failed to identify any improper

---

[14] The prosecution's "suppression … of evidence favorable to the accused" violates due process. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1198, 10 L.Ed.2d 215 (1963); see Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (applying Brady to impeachment evidence).

comments or arguments that could have shifted the burden of proof. Further, the Court repeatedly instructed the jury that the burden of proof was on the Government and that Petitioner had no burden to prove his innocence or to present any evidence or testify. (3:10-cr-182, Doc. No. 405 at 14); (Id., Doc. No. 403 at 32, 33). The jury is presumed to have followed these instructions. See Jones v. United States, 427 U.S. 373, 394, 119 S. Ct. 2090, 2105, 144 L. Ed. 2d 370 (1999). The instructions that the Court provided on the burden of proof were legally correct and adequately addressed the issues at hand and Petitioner fails to explain what instruction counsel should have requested. Petitioner has failed to show that counsel was deficient in any way or that prejudice resulted from the alleged deficiency.

### (F)    Additional Allegations of Ineffective Assistance

Petitioner argues that he was denied effective representation in several other areas that prejudiced him.[15] This claim is too vague and conclusory to support relief and alternatively fails on the merits.

**(i)**    Petitioner suggests that Richard Glaser, the attorney who was representing him at the time of the proffer session, was ineffective.

The Sixth Amendment right to counsel is intended to protect a criminal defendant during "critical confrontations" with the government. United States v. Payne, 954 F.2d 199, 203 (4th Cir. 1992). This right attaches "at or after the time that judicial proceedings have been initiated ... 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Fellers v. United States, 540 U.S. 519, 523, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004) (quoting Brewer v. Williams, 430 U.S. 387, 398, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)).

---

[15] Although post-conviction counsel cites solely to Petitioner's stricken Declaration in support of this claim, the Court will address several examples in an abundance of caution.

Petitioner entered into the proffer agreement with the Government on July 17, 2008, but he was not indicted until August 18, 2010. (3:10-cr-182, Doc. No. 73-1). Because judicial proceedings had not yet commenced, Petitioner's right to counsel had not yet attached and Mr. Glaser cannot be deemed ineffective for any advice he provided to Petitioner during the proffer sessions. <u>See</u>, <u>e.g.</u>, <u>United States v. Hornsby</u>, 666 F.3d 296, 309 (4th Cir. 2012) (use of undercover government agent before charges were filed does not implicate the Fifth Amendment, and there was no Sixth Amendment violation because there were no judicial proceedings initiated against defendant at the time).

**(ii)     Sentencing**

Petitioner contends that counsel failed to adequately prepare him for sentencing or allow him to provide any input on the matter.[16]

This claim is too vague and conclusory to support relief because Petitioner fails to explain what specific actions counsel should have taken that had a reasonable probability of affecting the outcome of the proceedings. <u>See</u> <u>Dyess</u>, 730 F.3d at 354 (vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the district court). Indeed, counsel obtained a downward variance sentence from the advisory guideline range of 900 months to just 120 months' imprisonment. Petitioner has failed to explain what more counsel could have done that had a reasonable probability of further reducing his sentence.

**(iii)    Expert Witness**

Petitioner also contends that counsel was ineffective for failing to call Duross O'Brien as a defense expert. He contends that the expert who testified at trial for the defense, Todd Bailey, did not present the issues as well and failed to address key issues.

---

[16] Mr. Gurney vehemently denies these allegations in his Affidavit, (Doc. No. 21-3), however the Court's resolution of this claim is not dependent on Mr. Gurney's Affidavit.

Defense counsel called several witnesses at trial including Mr. Bailey, a CPA and former auditor with construction experience who explained that the contingency entries and adjustments were reasonable and proper, that the disputed journal entries are inconsistent with cookie-jar accounting, and that the GMAC transaction had no continuing involvement and was handled appropriately under accounting principles. Mr. Bailey and other defense witnesses addressed these issues at trial. Petitioner has failed to demonstrate that counsel's decision to use Mr. Bailey instead of Mr. O'Brien was an unreasonable decision or that there is a reasonable probability that the jury would have embraced the defense theory had counsel called Mr. O'Brien at trial instead of Mr. Bailey.

**(2)      Substantive Error**

Petitioner contends that the Government engaged in misconduct that rendered his trial and conviction fundamentally unfair. This includes the alleged withholding of exculpatory and impeachment material, putting on erroneous evidence regarding accounting principles and other material factual issues that the prosecution knew or should have known was wrong or outright false. The Government has argued that these claims are procedurally defaulted from § 2255 review because Petitioner failed to raise these claims on direct appeal and that he has failed to demonstrate cause and prejudice or actual innocence. In his Reply, Petitioner claims that he can show cause and prejudice through his claims of ineffective assistance of counsel and, further, Petitioner maintains his factual innocence of the charges of conviction.

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." Bousley v. United States, 523 U.S. 614, 621 (1998) (internal citations omitted); United States v. Sanders, 247 F.3d 139, 144 (4th Cir. 2001). In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, a petitioner

must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack. See United States v. Frady, 456 U.S. 152, 167-68 (1982); United States v. Mikalajunas, 186 F.3d 490, 492–93 (4th Cir. 1999); United States v. Maybeck, 23 F.3d 888, 891-92 (4th Cir. 1994). Actual prejudice is then shown by demonstrating that the error worked to petitioner's "actual and substantial disadvantage," rather than just creating a possibility of prejudice. See Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). To establish cause based upon ineffective assistance of counsel, a petitioner must show that the attorney's performance fell below an objective standard of reasonableness and that he suffered prejudice as a result. See Murray, 477 U.S. at 488; Strickland, 466 U.S. at 687. In order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a petitioner must show actual innocence by clear and convincing evidence. See Murray, 477 U.S. at 496.

Petitioner failed to raise his claims of substantive error on direct appeal and therefore they are procedurally defaulted from § 2255 unless he can demonstrate cause and prejudice or actual innocence, which he has failed to do.

First, Petitioner contends that counsel's ineffective assistance demonstrates cause and prejudice. While a meritorious claim of ineffective assistance of counsel can be "cause" to excuse procedural default of a claim, no such showing has been made here. All of Petitioner's ineffective assistance claims are meritless, having demonstrated neither deficient performance nor prejudice. Therefore, ineffective assistance of counsel cannot excuse Petitioner's procedural default of these substantive claims.

Second, Petitioner's reliance on the actual innocence exception is misplaced. That exception requires a petitioner to come forward with clear and convincing evidence of his factual innocence. Petitioner has failed to come forward with clear and convincing evidence of his innocence and offers only his own self-serving contentions in support of his actual innocence claim. Petitioner has not satisfied his burden of demonstrating cause and prejudice or actual innocence, and therefore, his claims of substantive errors are procedurally defaulted from § 2255 review.

## IV.     CONCLUSION

For the foregoing reasons, the Court will dismiss and deny Petitioner's First Amended Motion to Vacate.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's First Amended Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 10), is **DISMISSED** with prejudice and **DENIED**.

2.      **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: March 6, 2020

Robert J. Conrad, Jr.
United States District Judge